Docket No. 23-1719

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

NHC LLC,

       Plaintiff – Appellee

v.

CENTAUR CONSTRUCTION COMPANY INC., et al.,

       Defendants - Appellants

Appeal from the United States District Court
For the Northern District of Illinois
Case No. 19-cv-06332
The Honorable Matthew F. Kennelly Judge Presiding

# BRIEF AND REQUIRED APPENDIX
# OF THE APPELLANTS

Matthew W. Horn
Kimberly A. Herring
Michael F. Cocciemiglio
Amundsen Davis LLC
150 North Michigan Ave, Suite 3300
Chicago, IL 60601
(312) 894-3329

Attorneys for Appellants
Centaur Construction Company, Inc.,
Spiro Tsaparas, and Peter Alexopoulos

# ORAL ARGUMENT REQUESTED

# DISCLOSURE STATEMENT

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1719

Short Caption: NHC LLC v. Centaur Construction Company Inc., et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    Centaur Construction Company, Inc., Spiro Tsaparas, Peter Alexopouos

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    Amundsen Davis LLC (formerly SmithAmundsen LLC)

(3)    If the party, amicus or intervenor is a corporation:

      i)    Identify all its parent corporations, if any; and

          None

      ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

---

Attorney's Signature: /s Kimberly Anne Herring         Date: April 19, 2023

Attorney's Printed Name: Kimberly Anne Herring

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ✔  No ☐

Address: 150 N. Michigan Ave, Suite 3300

    Chicago, Illinois 60601

Phone Number: 312-894-3329         Fax Number: 312-997-3403

E-Mail Address: kherring@amundsendavislaw.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1719

Short Caption: NHC LLC v. Centaur Construction Company Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Centaur Construction Company, Inc., Spiro Tsaparas, Peter Alexopouos

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Amundsen Davis LLC (formerly SmithAmundsen LLC)

(3)   If the party, amicus or intervenor is a corporation:

    i)   Identify all its parent corporations, if any; and

       None

    ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       None

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s Kimberly Anne Herring     Date: April 19, 2023

Attorney's Printed Name: Kimberly Anne Herring

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ✔   No ☐

Address: 150 N. Michigan Ave, Suite 3300

    Chicago, Illinois 60601

Phone Number: 312-894-3329     Fax Number: 312-997-3403

E-Mail Address: kherring@amundsendavislaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................................…..….…..…vi

JURISDICTIONAL STATEMENT...............................................................xi

STATEMENT OF THE ISSUES..................................…...................…xiv

STATEMENT OF THE CASE....................................................……xv

SUMMARY OF ARGUMENT...................................................…xvii

STANDARD OF REVIEW.........................................................…xviii

ARGUMENT..........................................................…..………….…..…1

    I.    **NHC's fraud claims are a restatement of its breach of contract claims, and therefore no recovery on the fraud claims can be had**...........................................................1

        a.  **Relatedly, because the breach of contract damages are one in the same and because of the format of the verdict form, the damages award returned by the Jury is impossible to apportion**...........................................................3

    II.   **The fraud claims underlying the verdict against Centaur, Mr. Tsaparas, and Mr. Alexopoulos are not actionable under Illinois law**.......................................…..........................7

    III.  **Contract damages are not recoverable pursuant to the clear and unambiguous terms of the contract between the parties.** ........................................................12

        a.  **The Design Build Amendment**....................…...........…..…13

        b.  **Termination *before* the execution of the Design Build Amendment**.....................…..…..…13

        c.  **Termination *after* the execution of the Design Build Amendment**.............................…..…14

    IV.  **NHC failed to prove its fraud claim at trial by clear and convincing evidence**......................…...............…..…16

a. NHC failed to present sufficient evidence of "reasonable reliance" to support a jury verdict for fraud.............................17

b. NHC failed to prove evidence of "fraudulent intent.".............20

V. Refusal to issue a missing witness instruction was an abuse of discretion which resulted in an unfair trial....................21

a. NHC and RCD are one in the same, and the witness at issue was within the control of Plaintiff NHC LLC...............23

b. In an act of gamesmanship, NHC abandoned any and all connections to Mr. Nunez in an effort to preclude him from testifying at trial and ensuring he was outside the reach of Defendants. ....................25

c. The trial court abused its discretion in failing to give the missing witness instruction. ........................27

i. Mr. Nunez was physically available only to NHC.............29

ii. NHC has a relationship with Mr. Nunez which made him practically unavailable to Defendants..............30

iii. The testimony of Mr. Nunez would elucidate the issues in the case......................................................31

VI. Admission of settlement correspondence violated Federal Rule of Evidence 408 and resulted in an unfair trial................................................................................32

VII. The pre-judgment interest award was improper given that the damages were not easily discernable. ............................................35

VIII. The award of attorney's fees violates the law..............................37

IX. The punitive damages award was improperly based on bias and passion and must therefore be vacated...........39

X. The District Court erred in granting summary judgment in favor of NHC on its breach of contract claims...........................40

CONCLUSION.....................................................................................43

CERTIFICATE OF COMPLIANCE WITH CR 32(c) ......................................45

**CIRCUIT RULE 30(d) STATEMENT**............................................................47

**ATTACHED REQUIRED APPENDIX**.................................................…..…...48

**TABLE OF CONTENTS FOR REQUIRED APPENDIX**................................49

<u>**TABLE OF AUTHORITIES**</u>

**CASES**

*Ameritech Information Systems, Inc. v. Bar Code Resources, Inc.,* 331 F. 3d 571 (7th Cir. 2003)

*Arlington Devco v. T10 Meltel, LLC,* No. 15 C 3558, 2017 WL 743889, at *3 (N.D. Ill. Feb. 27, 2017)

*Association Benefit Services, Inc. v. Caremark RX, Inc.*, 493 F. 3d 841, 853 (7th Cir. 2007)

*Athey Prod. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 434 (7th Cir. 1996)

*Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill. 2d 100 (2005), *cert. denied,* 547 U.S. 1003 (2006)

*Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 483 (7th Cir. 2000)

*Brown v. United States,* 134 U.S.App.D.C. 269, 414 F.2d 1165 (1969)

*Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989)

*Central Soya Co. v. Epstein Fisheries, Inc.*, 676 F.2d 939, 944 (7th Cir.1982)

*Central States Joint Bd. V. Continental Assurance Co.,* 117 Ill. App. 3d 600, 607 (1st Dist. 1983)

*Chicago Coll. of Osteopathic Med. v. George A. Fuller Co.,* 719 F.2d 1335, 1353 (7th Cir. 1983)

*Chow v. Aegis Mortg. Corp.*, 185 F. Supp. 2d 914, 917 (N.D. Ill. 2002)

*Clarke & Co. v. Fidelity & Cas. Co. of New York*, 220 Ill. App. 576, 582 (2d Dist. 1921)

*Couch v. State Farm Insurance Co.,* 279 Ill. App. 3d 1050, 1054 (1996)

*Delta Min. Corp. v. big Rivers Elec. Corp.*, 18 F.3d 1398, 1405 (7th Cir. 1994)

*Dougherty v. Ziimbler,* 922 F. Supp. 110 (N.D. Ill. 1996)

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 822 (7th Cir. 2016).

*Epic Sys. Corp. v. Tata Consultancy Services Ltd.,* 980 F.3d 1117, 1128–29 (7th Cir. 2020)

*Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893)

*Greenberger v. GEICO,* 631 F.3d 392, 393 (7th Cir., 2011)

*Hefferman v. Bd. of Trustees of Illinois Cmty. Coll. Dist. 508,* 310 F.3d 522, 525 (7th Cir. 2002)

*Hoffman v. Caterpillar, Inc.,* 368 F.3d 709, 713 (7th Cir. 2004)

*Houben v. Telular Corp.,* 231 F. 3d 1066, 1074 (7th Cir. 2000)

*In re Collazo*, 613 B.R. 650, 671 (N.D. Ill. 2020)

*Kane v. Nomad Mobile Homes Inc.,* 105 Ill.App.2d 465 (1969)

*Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd*, 376 Ill.App.3d 1006, 1014 (1st Dist. 2007)

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)

*Librizzi v. Children's Mem'l Med. Ctr.*, 134 F.3d 1302, 1305–06 (7th Cir. 1998)

*McRoberts Software, Inc. v. Media 100, Inc.,* 329 F.3d 557, 572 (7th Cir.2003)

*Midwest Builder Distributing, Inc. v. Lord and Essex, Inc.*, 383 Ill.App.3d 645 (1st Dist. 2007)

*Nat'l Acceptance Co. of Am. v. Pintura Corp.*, 94 Ill. App. 3d 703, 707 (1981)

*Niehus v. Liberio,* 973 F.2d 526, 530 (7th Cir. 1992)

*Northbound Group, Inc. v. Norvax, Inc.*, 5 F. Supp. 3d 956 (N.D. Ill. 2013)

*Obriecht v. Raemisch*, 517 F.3d 489, 492 (7th Cir. 2008)

*People ex rel. Madigan v. Tang,* 346 Ill. App. 3d 277, 284 (2004)

*Peterson Indus. Inc. v. Lake View Trust & Sav. Bank,* 584 F. 2d 166, 168 (7th Cir. 1978)

*Rainey v. Taylor*, 941 F.3d 243, 251 (7th Cir. 2019)

*Safeway Insurance Co. v. Daddono,* 334 Ill.App.3d 215, 219 (2002)

*Santa's Best Craft, LLC v. Zurich Am. Ins. Co.,* 408 Ill. App. 3d 173, 191 (2010)

*Shair v. Qatar Islamic Bank,* 2009 WL 691249, at *3 (N.D. Ill.)

*Shelby County State Bank v. Van Diest Supply Co.,* 303 F.3d 832, 835 (7th Cir.2002)

*Shott v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 338 F.3d 736, 745 (7th Cir. 2003)

*Sigsworth v. City of Aurora*, 487 F.3d 506, 511 (7th Cir. 2007)

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)

*Sullivan v. Cox,* 78 F.3d 322 (7th Cir.1996)

*Teamsters Local 282 Pension Trust Fund v. Angelos,* 839 F. 2d 366, 370 (7th Cir. 1988)

*Turubchuk v. S. Illinois Asphalt Co., Inc.,* 958 F.3d 541, 548 (7th Cir. 2020)

*United States v. Blakemore,* 489 F.2d 193, 195 (6th Cir. 1973)

*United States v. Mahone,* 537 F.2d 922, 926 (7th Cir. 1976)

*United States v. Tavarez*, 626 F.3d 902, 904 (7th Cir. 2010)

*Waldock v. M.J. Select Glob., Ltd.*, 2005 WL 3542527, at *13 (N.D. Ill. Dec. 27, 2005)

*White Pearl Inversiones S.A. (Uruguay) v. Cemusa, Inc.*, 647 F.3d 684, 689 (7th Cir. 2011)

*Williams v. Chicago Osteopathic Health Sys.,* 274 Ill. App. 3d 1039, 1048 (1st Dist. 1995)

*Winchester Packaging, Inc. v. Mobil Chem. Co.*, 14 F.3d 316, 320 (7th Cir.1994)

*Wottowa Ins. Agency, Inc. v. Bock,* 104 Ill.2d 311 (1984)

*Yumich v. Cotter,* 452 F.2d 59, 64 (7th Cir. 1971)

*Zankle v. Queen Anne Landscaping*, 311 Ill.App.3d 308, 312 (2d Dist. 2000)

*Zic v. Italian Gov't Travel Office,* 130 F.Supp.2d at 996

*Zuber v. Northern Pacific Railway Co.,* 246 Minn. 157, 74 N.W.2d 641, 649 (1956)

## STATUTES

28 U.S.C. § 1291
28 U.S.C. §§ 1332(a)(1)
28 U.S.C. §§ 1332(a)(2)
28 U.S.C. §§ 1332(a)(3)

## JURISDICTIONAL STATEMENT

### I.    District Court Jurisdiction.

The United States District Court for the Northern District of Illinois has subject matter jurisdiction over this case based on 28 U.S.C. §§ 1332(a)(1), 1332(a)(2) and 1332(a)(3) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States, citizens of a State and citizens or subjects of a foreign state, and/or citizens of different States and in which citizens or subjects of a foreign state are additional parties.

### a.    Citizenship of Appellant

At all relevant times, Centaur Construction Company was an Illinois corporation with its principal place of business in Chicago, Illinois. Mr. Tsaparas is a citizen of the state of Colorado where he resides with the intent to remain in the state as his home. Mr. Alexopoulos is a citizen of the State of Illinois where he resides with the intent to remain in the state as his home.

### b.    Citizenship of Appellee

The following facts are based on signed and sworn statements made by Appellee in the District Court litigation.

NHC LLC is a Florida limited liability company with its principal place of business in Miami Beach, Florida. NHC LLC has two members: Encasa LLC and R3 Map LLC. Both are Florida limited liability companies. The members of Encasa LLC and R3 Map LLC are six trusts: The Andrea Chapur Duarte 2012 Family Trust, The Mariel Chapur Duarte 2012 Family Trust, The Paola Chapur Duarte 2012 Family Trust, The Rafael Chapur Duarte 2012 Family Trust, The Roberto Chafic Chapur

Duarte 2012 Family Trust and The Rodrigo Chapur Duarte 2012 Family Trust. The trustees of the six trusts are Andrea Chapur Duarte, Mariel Chapur Duarte, Paola Chapur Duarte, Rafael Chapur Duarte, Roberto Chafic Chapur Duarte and Rodrigo Chapur Duarte. The beneficiary of each of the Trusts is as follows:

- Andrea Chapur Duarte is the sole beneficiary of The Andrea Chapur Duarte 2012 Family Trust;

- Mariel Chapur Duarte is the sole beneficiary of The Mariel Chapur Duarte 2012 Family Trust;

- Paola Chapur Duarte is the sole beneficiary of The Paola Chapur Duarte 2012 Family Trust;

- Rafael Chapur Duarte is the sole beneficiary of The Rafael Chapur Duarte 2012 Family Trust;

- Roberto Chafic Chapur Duarte is the sole beneficiary of The Roberto Chafic Chapur Duarte 2012 Family Trust; and

- Rodrigo Chapur Duarte is the sole beneficiary of The Rodrigo Chapur Duarte 2012 Family Trust.

Andrea Chapur Duarte, Mariel Chapur Duarte, and Paola Chapur Duarte are each citizens of the State of Florida, where they reside with the intent to remain in the state as their home. Rafael Chapur Duarte, Roberto Chafic Chapur Duarte, and Rodrigo Chapur Duarte are each citizens of the Dominican Republic, where they reside with the intent to remain in the country as their home.

## II.    Appellate Jurisdiction.

The United States Court of Appeals for the Seventh Circuit has subject matter jurisdiction over this final decision from the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1291.

On August 18, 2022, a judgment was entered against Appellants Centaur, Tsaparas, and Alexopoulos following a jury verdict. On September 15, 2022, Appellants Centaur, Tsaparas, and Alexopoulos timely filed three Motions pursuant to Federal Rules of Civil Procedure 50 and 59. (ECF 212, 213, 214). That same day, NHC LLC filed a Motion pursuant to Federal Rule of Civil Procedure 59. (ECF 215). These four Motions tolled the time within which to appeal.

On March 15, 2022, District Court Judge Matthew F. Kennelly issued an order adjudicating the four above-cited Motions brought pursuant to Rules 50 and 59. (ECF 227). Simultaneous with the court's order, an amended final judgment was entered against the Appellants Centaur, Tsaparas, and Alexopoulos. (ECF 228).

Appellants Centaur Construction Company, Inc., Spiro Tsaparas, and Peter Alexopoulos appeal from the final judgment entered on August 18, 2022 and amended on March 15, 2023. *See Librizzi v. Children's Mem'l Med. Ctr.*, 134 F.3d 1302, 1305–06 (7th Cir. 1998)("An appeal from the Rule 58 final judgment always covers the waterfront. The whole case is properly before us for decision.")

# STATEMENT OF THE ISSUES

I.     Whether, pursuant to Illinois law, recovery can be had on NHC's fraud claims which are duplicative of its breach of contract claims.

II.     Whether NHC's allegations of fraud, which were based on future promises, financial projections, and statements of future intent are actionable under Illinois law.

III.     Whether contract damages are recoverable pursuant to the clear and unambiguous terms of the contract between the parties.

IV.     Whether NHC met its burden of proof on the elements of fraud at trial.

V.     Whether the trial court's refusal to issue a missing witness instruction constituted an abuse of discretion.

VI.     Whether the trial court erred in refusing to exclude inadmissible Rule 408 settlement communications.

VII.     Whether the trial court abused its discretion in awarding prejudgment interest to NHC LLC.

VIII.     Whether the trial court abused its discretion in upholding an award of attorney's fees that violates Illinois law.

IX.     Whether the punitive damages award should have been set aside as a matter of law because it arose out of the jury's bias and passion.

X.     Whether the district court erred in granting summary judgment in favor of NHC on its breach of contract claims because the Defendants' affirmative defenses of waiver and estoppel are a question of fact for the jury.

## STATEMENT OF THE CASE

In 2017, the 12-story Nobu Hotel Chicago was being constructed in Chicago's West Loop neighborhood under the ownership of a real estate development company called M Development. While construction was underway, the Plaintiff NHC LLC purchased the project. Centaur Construction was the general contractor on the Project under M Development, and when NHC LLC purchased the Project, it hired Centaur Construction to be the design builder – an even bigger role than general contractor. This was the largest construction project ever undertaken by Centaur and Centaur's officers, Mr. Tsaparas and Mr. Alexopoulos. While NHC LLC and Centaur eventually entered into a contract, construction on NHC's newly purchased Project began before any contract was signed. The construction of the Project moved much faster than Centaur was able to keep up with the Project financials.

At the summary judgment stage, the trial court made an improper finding of liability on the breach of contract claims against Centaur and Mr. Tsaparas. The matter proceeded to trial on damages for breach of contract, as well as liability and damages for fraud against Centaur, Mr. Tsaparas, and Mr. Alexopoulos.

The damages sought for fraud and breach of contract at trial were duplicative – i.e. NHC sought damages for "payments to subcontractors that Centaur owed but did not pay" and "payments made to Shawmut Design & Construction to complete construction of the Nobu Hotel Chicago Project" under both legal theories. Duplicative damages were awarded despite the Defendants' vehement objections to the jury instructions and verdict forms, and the trial resulted in a verdict that is

impossible to apportion pursuant to Illinois law.

# SUMMARY OF ARGUMENTS

I.   The damages that NHC sought in its breach of contract and fraud claims were duplicative, making them improper under established Illinois law requiring alleged fraudulent acts to be separate and distinct from alleged breach of contractual promises. Further, the duplicative claims resulted in a jury verdict which is impossible to apportion without violating Illinois law.

II.  The fraud claims against Centaur, Mr. Alexopoulos, and Mr. Tsaparas are based upon future promises, financial projections, and statements of future intent, which make them improper under Illinois law.

III. Contract damages are not recoverable pursuant to the clear and unambiguous terms of the contract between NHC and Centaur because the parties failed to execute the "Design Build Amendment."

IV.  NHC failed to meet its burden to prove the "reasonable reliance" and "fraudulent intent" elements of a claim for fraud by clear and convincing evidence.

V.   The district court abused its discretion when it failed to issue a missing witness instruction where NHC informed the Defendants on the eve of trial that the location of its former employee – a critical witness to the defense and a resident of Mexico outside the Defendants' subpoena power – was "unknown."

VI.  In denying the Defendants' Motion *in Limine #10,* the trial court allowed settlement correspondence between NHC's owner and Centaur's Chief Executive Officer to be admitted into evidence in violation of Federal Rule of Evidence 408.

VII. The district court erred in awarding prejudgment interest in this case because the damages were not easily discernable.

VIII. The award of attorneys fees in this case violates Illinois law.

IX.  The punitive damages award was based on bias and passion, had no basis in fact, and is therefore must be set aside.

X.   The district court erred in granting summary judgment in favor of NHC on its breach of contract claims because the Defendants' affirmative defenses of waiver and estoppel are a question of fact for the jury improperly decided at the summary judgment stage.

# STANDARDS OF REVIEW

I.   The Seventh Circuit's review of a district court's denial of a motion for judgment as a matter of law is *de novo. Epic Sys. Corp. v. Tata Consultancy Services Ltd.,* 980 F.3d 1117, 1128–29 (7th Cir. 2020); *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.,* 831 F.3d 815, 822 (7th Cir. 2016).

II.  The Seventh Circuit's review of a district court's denial of a motion for judgment as a matter of law is *de novo. Epic Sys. Corp. v. Tata Consultancy Services Ltd.,* 980 F.3d 1117, 1128–29 (7th Cir. 2020); *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.,* 831 F.3d 815, 822 (7th Cir. 2016).

III. A district court's interpretation of a contract is reviewed *de novo. Shelby County State Bank v. Van Diest Supply Co.,* 303 F.3d 832, 835 (7th Cir.2002).

IV.  The Seventh Circuit's review of a district court's denial of a motion for judgment as a matter of law is *de novo. Epic Sys. Corp. v. Tata Consultancy Services Ltd.,* 980 F.3d 1117, 1128–29 (7th Cir. 2020); *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.,* 831 F.3d 815, 822 (7th Cir. 2016).

V.   Where a district court declined to give the missing witness instruction because it concluded that such an instruction was inappropriate as a matter of law, the Seventh Circuit's review is *de novo. United States v. Tavarez*, 626 F.3d 902, 904 (7th Cir. 2010).

VI.  When rulings on motions *in limine* involve an issue of law, review is *de novo. Turubchuk v. S. Illinois Asphalt Co., Inc.,* 958 F.3d 541, 548 (7th Cir. 2020); *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).

VII. A district court's decision to award prejudgment interest is reviewed for abuse of discretion. *McRoberts Software, Inc. v. Media 100, Inc.,* 329 F.3d 557, 572 (7th Cir.2003); *Shott v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 338 F.3d 736, 745 (7th Cir. 2003).

VIII. A district court's denial of a Rule 59(e) motion is reviewed for an abuse of discretion. *Obriecht v. Raemisch*, 517 F.3d 489, 492 (7th Cir. 2008); *Sigsworth v. City of Aurora*, 487 F.3d 506, 511 (7th Cir. 2007).

IX.  Appellate courts must to conduct *de novo* review of a trial court's review of a punitive damages award. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

X.   The Seventh Circuit reviews summary judgment rulings *de novo*, construing the evidence in the light most favorable to the non-moving party. *Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F. 3d 397 (7th Cir. 2018).

# ARGUMENT

## I. NHC's fraud claims are a restatement of its breach of contract claims, and therefore no recovery on the fraud claims can be had.

Under established Illinois law, an alleged fraudulent act must be separate and distinct from the alleged breach of a contractual promise. *Greenberger v. GEICO,* 631 F.3d 392, 393 (7th Cir., 2011). Moreover, the Illinois Appellate Court has previously held that, were it to accept assertions that "unfilled promises" are actionable under some theory of fraud, plaintiffs could "convert any suit for breach of contract into a fraud action." *Zankle v. Queen Anne Landscaping*, 311 Ill.App.3d 308, 312 (2d Dist. 2000). Put differently, in order to prevail its fraud claim, NHC must point to some standalone fraudulent act or practice that is separate and independent from Defendants' "contractual promises." *Greenberger*, F.3d 392 at 400. To hold otherwise would result in every breach of contract rising to a "fraud." However, in this case, the fraud claims against the Defendants-Appellants are simply restatements of NHC's breach of contract claims, and therefore the fraud verdict must be vacated in its entirety.

The jury instructions given in this case clearly confirm that NHC's fraud claim is simply a restatement of its breach of contract claim. Jury Instruction p. 11 regarding the breach of contract claim states:

> NHC's first claim is a claim for breach of the construction agreement. As I have stated, there has been a finding that Centaur breached various provisions of the contract and that Centaur and Mr. Tsaparas are liable to NHC for the breach. You, the jury, must determine the amount of damages to award to NHC for the breaches. I will address the question of damages later in these instructions.
>
> The contract provisions that were breached are as follows:

1

- Section 1.1 (industry standards)
- Section 1.4.15 (guaranteed maximum price)
- Section 1.1.7 (schedule)
- Section 9.3.1 (payment applications)
- Section 9.6.2 (subcontractor payments)

It is these same sections of the Contract implicated in NHC's fraud claim, *i.e.* Defendants' knowledge that the Project was overbudget (Section 1.4.15), Defendants' knowledge that the Project was not on schedule (Section 1.1.7), Defendants' failure to pay subcontractors (Section 9.6.2), Defendants' knowledge that the payment applications were not accurate (Section 9.3.1).

In short, NHC's fraud claim is merely a restatement of Centaur's contractual breaches, and the alleged "broken promises" NHC identifies as the basis of its fraud claim are simply broken "contractual promises" contained in the Contract. Further to this point, the damages alleged for the fraud and breach of contract claims are ***exactly the same***, namely:

· payments to subcontractors that Centaur owed but did not pay; and

· payments made to Shawmut Design & Construction to complete construction of the Nobu Hotel Chicago project.

(R. 210; 204).

Simply put, the facts supporting NHC's breach of contract claim are *identical* to the alleged conduct forming the basis of NHC's fraud claim, as are NHC's claimed injuries and damages. This is further evidenced by the fact that NHC could not separate or distinguish its fraud damages from its contractual damages—except for attorney's fees — as noted by the Court:

- "Items 1 and 2 are the exact same things [as] the plaintiff is asking for on

the contract claim, so there's one difference on compensatory damages. It's [the attorneys' fees incurred in defending or fighting off subcontractors who were asserting claims] and then the other difference is punitive damages." (R. 252, p. 512:19-22).

- "It is accurate that the injuries that are claimed as the result of the breach of contract are the same or at least a subset of the injuries that are claimed for fraud. Specifically, two things: the payments to subcontractors and the payments to Shawmut design and construction. Those are claimed as breach of contract damages. Those are also claimed as fraud damages." (R. 253, p. 827:8-14).

As noted above, the law of the Seventh Circuit is clear: an alleged fraudulent act must be separate and distinct from the alleged breach of a contractual promise. Because the fraudulent acts adduced at trial and presented to the members of the jury in this case were not separate and distinct from the alleged breaches of contractual promises, the district court judge erred in denying the Defendant-Appellant's Rule 50(a) and Rule 50(b) Motions.

**a. Relatedly, because the breach of contract damages are one in the same and because of the format of the verdict form, the damages award returned by the Jury is impossible to apportion.**

On August 18, 2022, the Jury returned a verdict which sets forth compensatory damages that are impossible to apportion. The Jury awarded compensatory damages in the amounts as follows:

<u>Compensatory damages</u>

We, the jury, award Centaur compensatory damages as follows:

$ _9,487,290.20_ for payments to subcontractors that were not paid by Centaur

$ _10,800,000.00_ for payments made to Shawmut Design & Construction to complete construction of the Nobu Hotel Chicago project

$ _150,000.00_ for attorney's fees paid by NHC in lawsuits brought or threatened against NHC by subcontractors on the Nobu Hotel Chicago project **(this element of damages is available only if you have found in favor of NHC against one or more defendants on NHC's second claim (fraud))**

(R. 210).

Over the Defendants' objections, the verdict form did not include any separation of compensatory damages for fraud and compensatory damages for breach of contract.[1] Stated another way, the verdict awards compensatory damages without distinguishing whether or not they are for breach of contract or fraud, and whether or not the damages are attributable to Centaur Construction, Spiro Tsaparas, or Peter Alexopoulos.[2] If the compensatory damages are for breaches of contract, Peter Alexopoulos is not, and cannot, be liable for them – since there are no breach of contract claims against him personally. If the compensatory damages are for fraud, then there is no way to distinguish which Defendant the jury intended to be liable.

The trial court acknowledged this exact circumstance in open court just one day before the verdict was returned, but decided not to otherwise address the issue. The court stated "I get that there might be some theoretically, hypothetical, plausible possibility that a defendant could be found liable for fraud but not responsible for each and every element of damages, maybe just one or maybe just one of the other ones . . . So I mean, I get that maybe there is some plausible scenario under which a defendant could be found liable for, you know, one of these elements or two of these

---

[1] Defendants' proposed verdict forms, which were rejected by the court, would have cured these defects.

[2] Further complicating the issue, the verdict form returned by the Jury states "We, the jury, award **Centaur** compensatory damages as follows." (R. 210) (emphasis added). The apparent award of compensatory damages to Centaur – despite Centaur making no claims for damages in this litigation – only highlights the confusion that this verdict form presented to the Jury.

elements but not all three . . ." (R. 253, p. 831:20-23). The verdict form, as written, does not identify which Defendant is liable for which category of damages. (R. 210).

For example, Peter Alexopoulos cannot be liable for compensatory damages for breach of contract – damages which are **one and the same and indistinguishable** from the damages for fraud as written on the verdict form. Similarly, the verdict form does not indicate which fraud damage the jury found Mr. Alexopoulos liable for – it only finds by implication and deduction that he is liable for fraud. Without an identification – on the verdict form – of which damages are for breach of contract and which are for fraud, Mr. Alexopoulos cannot be liable for a single penny of the compensatory damage award. Similarly, if the compensatory damages were intended by the jury to be attributed to the fraud claim, Centaur and Mr. Tsaparas cannot be liable to pay them as damages for breach of contract.

Stated another way, the method of apportionment of the jury verdict returned – of more accurately, the lack thereof – violates clear Illinois law. Illinois law on breach of contract holds that a corporate officer – such as Mr. Alexopoulos – is not personally liable for breach of contract. *Waldock v. M.J. Select Glob., Ltd.*, 2005 WL 3542527, at *13 (N.D. Ill. Dec. 27, 2005); *Nat'l Acceptance Co. of Am. v. Pintura Corp.*, 94 Ill. App. 3d 703, 707 (1981); *Kane v. Nomad Mobile Homes Inc.*, 105 Ill.App.2d 465 (1969). The purpose behind this rule is that "[o]ne of the purposes of a corporate entity is to immunize the corporate officer from individual liability on contracts entered into in the corporation's behalf." *People ex rel. Madigan v. Tang*, 346 Ill. App. 3d 277, 284 (2004). Accordingly, in most instances, the law immunizes corporate officers from

corporate liabilities and debts. *Safeway Insurance Co. v. Daddono,* 334 Ill.App.3d 215, 219 (2002). ("[C]orporate status generally shields corporate officers and shareholders from liability from corporate debts and obligations").

Even further, the particular officer that signs the contract on behalf of a corporation himself cannot be held personally liable for breach of that contract. *See Shair v. Qatar Islamic Bank,* 2009 WL 691249, at *3 (N.D. Ill.); *see also Zic v. Italian Gov't Travel Office,* 130 F.Supp.2d at 996 (dismissing individual defendants who acted on behalf of a corporation from a breach of contract claim); *Sullivan v. Cox,* 78 F.3d 322 (7th Cir.1996) ("When an officer signs a document and indicates next to his signature his corporate affiliation, then absent evidence of contrary intent in the document, the officer is not personally bound.") (quoting *Wottowa Ins. Agency, Inc. v. Bock,* 104 Ill.2d 311 (1984)). In light of these rules of law, at no time during the progression of the case were there ever any breach of contract allegations asserted against Mr. Alexopoulos personally.

The verdict form submitted to the jury in this case – over the strenuous objection of the Defendants – either 1) holds Mr. Alexopoulos personally liable for breaches of contract, in violation of Illinois law; or 2) cannot be apportioned because there is no way to discern which damages are the result of breach of contract and which are the result of fraud. Accordingly, an apportionment of the verdict form which seeks to hold Mr. Alexopoulos liable for any cent of the $20,437,290.20 in compensatory damages would violate the above-cited Illinois law and – without an

apportionment *from the jury* – would improperly hold Mr. Alexopoulos liable for damages for breach of contract.

As the court noted in its March 15, 2023 memorandum opinion and order, "Counsel for defendants contended that the verdict form should include separate lines for damages for breach of contract and for fraud." (R. 227, p. 8). The court refused to account for this contention, and as a result, the damages awarded by the jury on August 18, 2022 are ***impossible*** to apportion.

Accordingly, the district court erred in failing to either 1) apportion all damages only to the breach of contract claim, or 2) order a new trial so that a jury can apportion the damages as to each claim and each Defendant.

## II. The fraud claims underlying the verdict against Centaur, Mr. Tsaparas, and Mr. Alexopoulos are not actionable under Illinois law.

The evidence elicited by NHC at trial confirms that its fraud claim is not only duplicative of and identical to its breach of contract claims, but is also based on future promises, financial projections, and statements of future intent arising out of Centaur's contractual duties—namely, that Centaur would finish the Project on time and on budget, and make progress payments to certain entities. However, "promissory fraud, involving a false statement of intent regarding future conduct, is generally not actionable under Illinois law unless the plaintiff also proves that the act was a part of a scheme to defraud." *Association Benefit Services, Inc. v. Caremark RX, Inc.*, 493 F. 3d 841, 853 (7th Cir. 2007). Moreover, "Illinois law does not allow the plaintiffs to proceed on a fraud claim when the evidence of intent to defraud consists

of nothing more than unfulfilled promises and allegations made in hindsight." *Id.; see also Northbound Group, Inc. v. Norvax, Inc.*, 5 F. Supp. 3d 956 (N.D. Ill. 2013) (finding that a statement that the defendants could do something is either a prediction or opinion, and neither provides the basis for a fraud claim sufficient to defeat summary judgment).

As the evidence presented at trial illustrates, and the above-cited verdict form and jury instruction confirms, NHC fraud claims are premised upon future promises, financial projections, and statement of future intent arising out of Centaur's contractual duties as follows: 1) that Centaur would finish the project on time; 2) that Centaur would finish the project on budget; and 3) that Centaur would make certain payments to certain subcontractors.

First and foremost, the unequivocal and uncontradicted testimony from Mr. Alexopoulos – the individual who signed the payment applications sent from Centaur to NHC – was that:

> there was no direct correlation between the payment applications that were being sent and work that had been done in the field. Ordinarily when we submit a payment application, it's almost never round numbers. If it's for work that has been performed, it's, you know, $10,350 for this person plus X number of dollars for that person, the sum of all of that plus multipliers of fees and insurance and things like that, and it gets to a pretty specific number. I was simply passing along documentation based on my understanding that we were supposed to submit invoices on the dollar amounts on that schedule.

(R. 252, pp. 612-613).

The schedule Mr. Alexopoulos was referring to was outlined on February 22, 2018:

Rodrigo,

Here, in its simplest form, is a summary for your review. Before the next payment application which will be in May 2018 (due in June), Centaur shall provide a comprehensive accounting analysis with all the supporting documentation.
The amounts depicted below are to obtain an order of magnitude and pretty close to what you should prepare for.
The Payment Applications (Draws) can drag on for 2-3 months after completion as it sometimes takes ~60 days to flush out all the specifics at the end and we hold payments accordingly for the last push/punch list/retention etc.

Please let me know if I can expect any funds tomorrow. I need to plan accordingly.

| DATE | AMOUNT |
|---|---|
| February 23rd, 2018 | $ 4,555,000 |
| June 1st, 2018 | $ 2,900,000 |
| July 1st, 2018 | $ 3,300,000 |
| August 1st, 2018 | $ 3,500,000 |
| September 1st, 2018 | $ 3,300,000 |
| October 1st, 2018 | $ 4,000,000 |
| November 1st, 2018 | $ 2,900,000 |
| December 1st, 2018 | $ 2,800,000 |
| January 1st, 2019 | $ 2,700,000 |
| February 1st, 2019 | $ 2,100,000 |
| March 1st, 2019 | $ 1,900,000 |
| April 1st, 2019 | $ 2,700,000 |
| May1st, 2019 | $ 2,900,000 |
| June, 1st, 2019 | $ 2,500,000 |
| July, 1st, 2019 | $ 2,000,000 |
| August 1st , 2019 | $ 2,000,000 |
|  |  |
| Total payments remaining | $ 46,000,000 |
| Paid to Centaur | $  2,630,000 |
| Paid at purchase | $ 15,000,000 |
|  |  |
| Total without legal/admin etc. | $ 63,685,000 |

From: Rodrigo Chapur [mailto:rodchapur@rcdhotels.com]
Sent: Thursday, February 22, 2018 11:27 AM
To: Spiro Tsaparas
Subject:

contract will be send in the next 30mins I will call you on soon when I finish my go to meeting I have for another project. my father was asking if you cans end cash flow on the 48,687,000 budget so we can review thank you

AVISO DE CONFIDENCIALIDAD.

Este mensaje y sus documentos adjuntos van dirigidos de manera exclusiva a su destinatario y pueden contener información confidencial cuya divulgación está prohibida. Si usted ha recibido este mensaje por error, le pedimos nos lo comunique de forma inmediata y proceda a su eliminación. Corporación Inmobiliaria KTRC S.A. de C.V., con domicilio en Boulevard Kukulkan Km. 14.5, Zona Hotelera, Cancún, Quintana Roo, México, c.p. 77500 es responsable del Tratamiento de sus Datos. Los Datos se utilizan únicamente para los fines previstos en el **Aviso de Privacidad**. Para conocer el Aviso de Privacidad Integral, visite nuestra página web arriba indicada.

CONFIDENTIALITY WARNING.

This message and its attachments are intended exclusively for its addressee and may contain sensitive information whose disclosure is prohibited. If you have received this message by error, please notify us immediately and delete it.Corporación Inmobiliaria KTRC S.A. de C.V., located at Boulevard Kukulkan Km. 14.5, Zona Hotelera, Cancun, Quintana Roo, Mexico, p.c. 77500, is responsible for the management of your Data. Data usage is solely for the purposes indicated in the **Privacy Notice**. To consult our Complete Privacy Notice, visit the indicated website.

(R. 259-40).

Further, Mr. Alexopoulos *had no knowledge* of the work being done in the field and the payments being made at the time of the submission of the payment application. (R. 252, p. 613). Accordingly, the payment applications can be nothing more than future promises to make payments and perform work pursuant to the Contract.

Second, this was confirmed by Manuel Nunez, who was in charge of proof of payments for the Nobu Hotel Chicago Project on behalf of NHC. While, as set forth in detail below, Mr. Nunez was improperly not present to testify at trial, during his deposition he testified that he flew to Chicago in December of 2018 to meet with Spiro Tsaparas to discuss and retrieve the information and documentation that NHC/RCD needed. (R. 250, p. 282:9-15). During that meeting, Mr. Tsaparas informed Mr. Nunez that the billing summaries that Centaur had been sending to NHC were not an accurate representation of work completed, and that Centaur had spent more money than what was shown in those summaries. (R. 251, pp. 312:22-315:20). As such, NHC

was clearly aware that these Payment Applications were not a representation of work performed.

Third, the jury awarded $10,800,000.00 in compensatory damages for "payments made to Shawmut Design & Construction to complete construction of the Nobu Hotel Chicago project." (R. 210). These damages, to the extent they are attributed to the fraud claim, can only be based on future promises regarding the cost to complete the project and future promises regarding the time to complete the Project.

In this case, the evidence of fraud elicited at trial was based on future promises, financial projections, and statements of future intent made by one or more of the Defendants. Accordingly, the district court erred in: 1) denying the Defendants' Motion for Summary Judgment on the fraud claims (R. 125); 2) denying the Defendants' Rule 50(a) Motion (R. 207); and 3) denying the Defendants' Rule 50(b) motion (R. 227).

## III.  Contract damages are not recoverable pursuant to the clear and unambiguous terms of the contract between the parties.

Under Illinois law, a breach of contract claim requires the plaintiff to prove (1) the existence of a contract, (2) the performance of the contract conditions by the plaintiff, (3) a breach by the defendant, and (4) damages that resulted from the breach. *Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd*, 376 Ill.App.3d 1006, 1014 (1st Dist. 2007). When contracts contain express conditions precedent, "strict compliance with such conditions is required." *Midwest Builder Distributing, Inc. v. Lord and Essex, Inc.*, 383 Ill.App.3d 645 (1st Dist. 2007). A condition precedent

is defined as a condition in which performance by one party is required before the other party is obligated to perform. *Id.* "***Courts will enforce express conditions precedent despite the potential for harsh results for the noncomplying party. This is particularly true where, as in this case, the parties are sophisticated business entities***." *Arlington Devco v. T10 Meltel, LLC,* No. 15 C 3558, 2017 WL 743889, at *3 (N.D. Ill. Feb. 27, 2017) (citations omitted); *see also Midwest Builder Distributing,* 383 Ill. App. 3d at 668.

In this case, pursuant to the Contract entered into between two sophisticated business entities and drafted by a major Chicago law firm representing NHC LLC, the execution of a "Design Build Amendment" is an express condition precedent to NHC's right to damages "surviving termination" of the Contract. Here, there was no Design Build Amendment and the Contract was terminated, and therefore there is no right to contractual damages.

### a. The Design Build Amendment

The contract contemplates the execution of a written modification known as the "Design Build Amendment." (R. 26-1, pp. 3, 7, 26). That "Design Build Amendment" was to contain, among other things, the final contract price for the work which could only be identified after the completion of final drawings. (R. 26-1, p. 26) ("The Contract Sum is stated in the Design-Build Amendment").

### b. Termination *before* the execution of the Design Build Amendment.

Section 13.1. of the Contract – which governs termination *before* execution of the Design Build Amendment – states that "[t]he Owner may terminate this

Agreement upon not less than seven days' written notice to the Design Builder for the Owner's convenience and without cause." (R. 26-1, p. 36).

### c. Termination *after* the execution of the Design Build Amendment.

Conversely, Section 13.2.2.1 of the Contract controls termination of the Contract *after* execution of the Design-Build Amendment, whether for cause by the Owner (NHC) or otherwise. Section 13.2.2.4 provides that Owner's damages in such situations survive termination of the Contract:

> If the unpaid balance of the Contract Sum exceeds the costs of finishing the work and other damages incurred by owner and not expressly waived, such excess shall be retained by the Owner. If such costs and damages exceed the unpaid balance, the Design-Builder shall pay the difference to the Owner. **The obligation for such payments shall survive the termination of the Contract.**

(R. 26-1, p. 37) (emphasis added).

Notably, unlike Section 13.2 of the Contract, Section 13.1 of the Contract is completely silent as to the amount and survivability of damages in the event of termination before a Design Build Amendment is executed.

Adhering to the canon of construction for statutes and contracts referred to as "*expressio unius*" or "*expressio unius, exclusion alertius*", which is a Latin maxim meaning: "the expression of one thing excludes others," NHC's Contract damages *do not* survive termination of the contract because the termination occurred *before* the parties executed the Design Build Amendment. *Delta Min. Corp. v. big Rivers Elec. Corp.*, 18 F.3d 1398, 1405 (7th Cir. 1994) (holding that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded); *Clarke & Co. v. Fidelity & Cas. Co. of New York*, 220 Ill. App. 576, 582 (2d

Dist. 1921) (holding that the express mention of one thing, person or place implies the exclusion of another).

Based on the undisputed evidence at trial: 1) NHC terminated Centaur from the Project; and 2) the Design Build Amendment was never executed (R. 250, p. 262:4-24, 241:5-7). Accordingly, NHC's termination of Centaur is controlled by Section 13.1, which does not provide for the survival of contract damages after termination. While this may seem like a harsh result, as expressly stated in the Contract, no construction work was supposed to take place before: 1) the final drawings and scope of work were prepared; 2) the final contract price agreed upon; and 3) the Design Build Amendment was executed. (R. 26-1, Section 5.2.1). Since the evidence has clearly shown that none of these three requirements were satisfied before construction work started, the work was essentially performed without a final price, on a "cost plus" basis, for which Contract termination damages do not apply.

While the Court stated that this argument was forfeited because there was a finding of liability for breach of contract on summary judgment, this is an issue of NHC's lack of *damages*, not liability. As such, there was no finding made regarding the same on summary judgment.[3]

Simply put, the execution of a Design Build Amendment is a condition

---

[3] The court's order rests almost entirely on a purported "gotcha" moment where counsel for the Defense ostensibly waived this argument before the court during oral argument by stating that this issue relates to contractual liability. Any statements made to that effect – which were nothing more than six words uttered in agreement with the trial judge – were immediately clarified when counsel for the Defense stated "Your Honor, just to be clear, it does related to the recoverability, the survivability of damages."

precedent to either of the parties' damages surviving termination of the Contract. Because the parties did not execute a Design Build Amendment before NHC terminated the Contract, NHC's damages did not survive termination of the Contract and, therefore, NHC has no damages for which it can recover as a result of the breach of contract. Accordingly, any and all damages awarded to NHC as a result of the breach of contract claim must be vacated in their entirety.

## IV. NHC failed to prove its fraud claim at trial by clear and convincing evidence.

To state a claim for fraud under Illinois law, "a plaintiff must prove that the defendant made a false statement of material fact, which the defendant knew or believed to be false, with the intent to induce plaintiff to act, and that the plaintiff justifiably relied on the statement and was damaged as a result." *Association Ben. Services, Inc. v. AdvancePCS Holding Corp.,* 2005 WL 2335484, No. 04 C 3271 (N.D. Ill 2005)(Kennelly, J.)(citing *Houben v. Telular Corp.,* 231 F. 3d 1066, 1074 (7th Cir. 2000); *Williams v. Chicago Osteopathic Health Sys.,* 274 Ill. App. 3d 1039, 1048 (1st Dist. 1995)); *see also Hefferman v. Bd. of Trustees of Illinois Cmty. Coll. Dist. 508,* 310 F.3d 522, 525 (7th Cir. 2002). Each element of a common law fraud claim brought pursuant to Illinois law must be proven by clear and convincing evidence. *Association Benefit Services, Inc. v. Caremark RX, Inc.,* 493 F. 3d 841 (7th Cir. 2007); *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill. 2d 100 (2005), *cert. denied,* 547 U.S. 1003 (2006)(noting the legal presumption that transactions are fair and the resultant rule that common law fraud claims under Illinois law must be proved by clear and convincing evidence).

In this case, NHC: (1) failed to elicit evidence sufficient to show that a jury could find reasonable reliance by clear and convincing evidence; and (2) failed to elicit evidence sufficient to show that a jury could find fraudulent intent by clear and convincing evidence.

### a. NHC failed to present sufficient evidence of "reasonable reliance" to support a jury verdict for fraud.

In order to prove the element of reasonable reliance, a plaintiff "must set forth enough facts from which a jury could find by clear and convincing evidence that [it] justifiably relied upon [a defendant's] 'alleged misrepresentations." *Dougherty v. Ziimbler,* 922 F. Supp. 110 (N.D. Ill. 1996)(citing *Teamsters Local 282 Pension Trust Fund v. Angelos,* 839 F. 2d 366, 370 (7th Cir. 1988)). When determining whether a plaintiff's reliance was reasonable pursuant to Illinois law, "all of the facts which a plaintiff had actual knowledge of, as well as all of those it might have learned if it had used ordinary prudence, must be taken into account; if ample opportunity existed to discover the truth, then reliance is not justified." *Id.* (citing *Central States Joint Bd. V. Continental Assurance Co.,* 117 Ill. App. 3d 600, 607 (1st Dist. 1983)). Put differently, "[a] person charging fraud may not close his eyes to obvious facts." *Peterson Indus. Inc. v. Lake View Trust & Sav. Bank,* 584 F. 2d 166, 168 (7th Cir. 1978).[4]

NHC's allegations of fraud, the jury's finding of fraud, and the trial court's Memorandum Opinion and Order upholding the fraud verdict arise out of allegedly

---

[4] Notably, since NHC has failed to identify any fraudulent act by Centaur distinct from its breaches of contract, NHC could not have relied on any alleged fraudulent representations at law. *Greenberger*, F.3d 392 at 401.

fraudulent Payment Applications. However, the evidence has clearly shown that NHC knew – from February 22, 2018 through the present – that the Payment Applications were a reflection of the February 22, 2018 Cash Flow Projection, and the perfectly round numbers being submitted as part of Centaur's Payment Applications were not a representation of work performed on the Project. (R. 252, pp. 612-613).

Further, Manuel Nunez, who was in charge of proof of payments for the Nobu Hotel Chicago Project on behalf of NHC, testified that he flew to Chicago in December of 2018 to meet with Spiro Tsaparas to discuss and retrieve the information and documentation that NHC/RCD needed. (R. 250, p. 282:9-15). During that meeting, Mr. Tsaparas informed Mr. Nunez that the billing summaries that Centaur had been sending to NHC were not an accurate representation of work completed, and that Centaur had spent more money than what was shown in those summaries. (R. 251, pp. 312:22-315:20). As such, NHC was clearly aware that these Payment Applications were not a representation of work performed.

Moreover, RCD/NHC's Treasurer, Israel Navarro testified that he specifically requested invoices from Centaur based on, and in line with, the February 22, 2018 Cash Flow Projection, so Mr. Navarro could pay Centaur. (R. 251, p. 379:3-380:12). In fact, when Mr. Navarro requested invoices from NHC, he went so far as to *send the Cash Flow Projection in this emails to Centaur.* (*Id.*) An example of this is seen in Defendants' Trial Exhibit 15:

**From:** Israel Navarro [mailto:inavarro@rcdhotels.com]
**Sent:** Monday, July 02, 2018 9:20 AM
**To:** Spiro Tsaparas <Spiro@CentaurCo.com>
**Cc:** Rodrigo Chapur <rodchapur@rcdhotels.com>; DeAnna Van Senus <dvsenus@centaurco.com>
**Subject:** invoice

Hi Spiro good morning, can you send me, the invoice for the wire transfer for today.

regards

| DATE | AMOUNT |
|------|--------|
| February 23rd, 2018 | $ 4,555,000 |
| June 1st, 2018 | $ 2,900,000 |
| July 1st, 2018 | $ 3,300,000 |



**Israel Navarro**
Gerente De Tesoreria
SM 13. Mza.1. Lt 22. Loc. 14-16.
Edif. Zona Zentro. C.P. 77504
Benito Juaréz, Cancún, Quintana Roo.
+1 52 (998) 254.6500 Ext. 3012
**inavarro@rcdhotels.com**



(R. 259-43).

In fact, from February 23, 2018 through June 1, 2019, except for once, NHC paid Centaur the exact, perfectly round numbers outlined in that February 22, 2018 Cash Flow Projection. (R. 250, p 254:1-4).

Even further, NHC admitted its experience, sophistication, and prowess in the construction industry at trial – all of which allowed it to know the status of construction – and costs – on the Project at all times. (R. 250, p. 250:1-18; R. 251, pp. 410:20-411:12).

Simply put, there is insufficient evidence to support reasonable reliance on behalf of NHC, because the unequivocal testimony and evidence in this case supports the fact that NHC knew: 1) that the Payment Applications were a reflection of nothing more than the Cash Flow Projection; and 2) that the Payment Applications were not a reflection of work completed on the Project.

In order to prove the element of reasonable reliance, a plaintiff "'must set forth enough facts from which a jury could find by clear and convincing evidence' that [it] justifiably relied upon [a defendant's] 'alleged misrepresentations.'" *Dougherty,* 922 F. Supp. 110. NHC has not done so here, and therefore the trial court erred in denying the Defendants' Rule 50(b) Motion.

### b. NHC failed to prove evidence of "fraudulent intent."

A litigant alleging fraud under Illinois law bears a heavy burden – proof of intent to defraud by clear and convincing evidence. *Athey Prod. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 434 (7th Cir. 1996). The unequivocal evidence elicited from Defendants Tsaparas and Alexopoulos at trial was that they never made any intentional false statements of material fact upon which they intended NHC to rely. (R. 253, 254). Moreover, as discussed above, NHC knew that the Payment Applications were a reflection of nothing more than the Cash Flow Projections and that Centaur's Payment Applications were not a reflection of work completed. Further, Mr. Nunez knew – because the Defendants told him – that the billing summaries sent to NHC were inaccurate. (R. 251, pp. 312:22-315:20).

Mr. Navarro – the individual in charge of issuing payment to Centaur – testified that he did not need these Payment Applications to issue payment. (R. 251, pp. 380:2-382:10. Rather, Mr. Navarro stated he was expecting Centaur to submit invoices that lined up with Centaur's Cash Flow Projections and only needed the invoices with that amount to issue payment. (*Id.*). Mr. Navarro's testimony makes clear that NHC was the one requesting—and expecting—these invoices. Centaur was merely complying with these requests when submitting the same.

Accordingly, because NHC did not meet its burden to show proof of fraudulent intent by clear and convincing evidence, the trial court erred in denying the Defendants' Rule 50(b) Motion.

## V. Refusal to issue a missing witness instruction was an abuse of discretion which resulted in an unfair trial.

The heart of the Plaintiff's fraud claim against Defendants is related to the $47,757,000 sent from NHC to Centaur pursuant to the contract between the two entities. All of those monies were not sent to Centaur by NHC LLC, but instead they were sent by various entities which fit under the umbrella of brand name "RCD Hotels" – a brand which NHC repeatedly represented is one in the same with NHC.

As noted above, Manuel Nunez was the "Project Accountant" on the Nobu Hotel Project, and his role was to be in charge of "proof of payment" for NHC – which entailed reviewing everything that had been paid on the Project, and what was yet to be paid on the Project. Throughout the duration of the Project, Mr. Nunez had extensive discussions with Centaur's Tsaparas regarding Centaur's reconciliation of Project funds and missing and unallocated Project funds. By Mr. Nunez' own

admission during his deposition, Centaur even told Mr. Nunez that the billing summaries that were being sent to NHC showing monies that had been sent on the Project were not an accurate representation of work completed. This is a fact with a critical impact on NHC's ability to prove its fraud claim or that it "reasonably relied" on the accuracy of the paperwork being provided on the Project as it relates to its fraud claims.

From the outset of this litigation, NHC represented that Mr. Nunez was an employee of RCD and within the control of NHC's attorneys. Then, on the eve of trial, NHC asserted that Mr. Nunez was never an employee of NHC and had disappeared from their control – somewhere in Mexico beyond the Defendants' subpoena power. This notice was given days before trial and entirely precluded Defendants from seeking a Mexican subpoena. Defendants filed a motion to compel NHC to produce Manuel Nunez to testify at trial, or in the alternative for a missing witness jury instruction. The trial court abused its discretion in denying the same.

Ultimately, after the fraud verdict was entered and challenged by the Defendant-Appellants on a Rule 50(b) motion, the court concluded the following:

> Rodrigo testified that he believed the amounts on the payment applications reflected the work performed, and he explained that this belief was based on oral statements by Tsaparas and an email stating that the "[n]ext payment request will be on May 1st for work performed in April." Trial Tr., Vol. 1-B, at 69:3–5 (emphasis added). ***The jury was free to consider Rodrigo's, Alexopoulos's, and Nunez's testimony "and resolve any inconsistencies in their testimony however it [saw] fit"***

(R. 227, Page 13 of 23).

This pronouncement from the court illustrates exactly why the Defendants were prejudiced by NHC's actions to hide Mr. Nunez and preclude him from testifying at trial – because Mr. Nunez' testimony was favorable for the Defendants, yet the Plaintiff precluded him from testifying live at trial.

      **a. NHC and RCD are one in the same, and the witness at issue was within the control of Plaintiff NHC LLC.**

As noted above, Mr. Nunez was the "project accountant" on the Nobu Hotel Chicago Project. He held this title on behalf of NHC, but testified during his deposition that he was an employee of RCD.

Throughout this case, lead counsel for the Plaintiff has repeatedly asserted and represented to the Defendants that NHC and RCD are one in the same. This includes not only statements made on the record during depositions, but also representations that each and every member of RCD that was deposed in connection with this case – Messrs. Nunez, Alonso, Navarro, Roberto Chapur, and Rodrigo Chapur – were her "clients." Vedder Price accepted service of deposition subpoenas on behalf of every member of RCD, prepared them for their depositions, represented them for their depositions, marked their depositions as "Confidential," and requested leave of court to file Mr. Nunez' deposition under seal in order to protect RCD's business information.

On October 1, 2020, the first deposition was taken in this case – NHC's noticed deposition of Centaur Treasurer Veronica Velez. During that deposition, lead counsel for Plaintiff made the following representation regarding NHC and RCD:

```
11 Q   Did you ever discuss with Israel and Manuel the
12     issue of delays and subcontractor payments?
13 A   No.
14 Q   What discussions with -- let's start with
15     Israel -- do you recall having?
16 A   Just following up on payments that were to come
17     to us.
18 Q   Payments from NHC/RCD to Centaur that you were
19     looking for, correct?
20 A   Yes.
21 Q   When you would receive a payment from -- I'm
22     going to say "NHC," and can we agree that that
23     includes RCD so I don't have to keep saying both
24     acronyms?
```

(R. 188, p. 3; R. 188-1, Page 14 of 66).

A week later, on October 7, 2020, Centaur issued deposition notices for Rodrigo Chapur, Roberto Chapur, Antonio Alonso, Manuel Nunez, and Israel Navarro. NHC's counsel confirmed those individuals were her "clients" and she would be presenting them for their depositions.1 (R.188-2). While all witnesses were members of RCD, only Rodrigo Chapur is a trustee/beneficiary of NHC. (R. 26, p. 3). The next day, NHC took the deposition of Centaur's President and CFO, Defendant Peter Alexopoulos. During that deposition, lead counsel for Plaintiff again made the following representation:

```
14   Q   Thank you for being here today.  Obviously, we
15   are here to take your deposition in the matter of the
16   lawsuit brought by my client, NHC, which I assume you
17   probably also know to be affiliated with RCD.  So I may
18   use those initials interchangeably.
19       Will you know that I'm generally referring to
20   the plaintiff in this case if I say NHC or RCD?
21   A   Understood.
```

(R. 188-3, Page 3 of 109).

23

Three days later, on October 12, 2020, NHC's counsel further confirmed that the depositions of her noticed clients, Mr. Alonso, Mr. Nunez, and Mr. Roberto Chapur, would be proceeding as scheduled. (R. 188-4). Three days after that, during the deposition of Centaur C.E.O. Defendant Tsaparas, lead counsel for the Plaintiff again made the following representation:

> 20    Q.  What is your understanding, if any, as
> 21  to why RCD or NHC -- sometimes I'll use those
> 22  acronyms interchangeably -- as to why RCD was
> 23  purchasing the Nobu project from M Development?

(R. 188-5, Page 4 of 57).

Less than two weeks later, on October 28, 2020, Mr. Nunez's deposition proceeded as scheduled, and Vedder Price represented him. (R. 188-6). On November 24, 2020, Vedder Price designated portions of Mr. Nunez's deposition testimony as confidential. (R. 188-7).

**b. In an act of gamesmanship, NHC abandoned any and all connections to Mr. Nunez in an effort to preclude him from testifying at trial and ensuring he was outside the reach of Defendants.**

At no point during the litigation did counsel for NHC indicate they were no longer representing Mr. Nunez or otherwise suggest a change in his status. Upon receipt of Defendants' July 14, 2022 Rule 26(a)(3) Disclosures identifying Mr. Nunez as a trial witness, and listing his contact information as "c/o VedderPrice," counsel for NHC/RCD notified Defendants for the first time that Mr. Nunez was "no longer employed by RCD." (R. 188-10). Defendants responded immediately requesting the location of Mr. Nunez and when he stopped working for NHC/RCD, and, more

importantly why Defendants were not informed of the same until the eve of trial. (R. 188-10). Counsel for NHC/RCD refused to provide any information regarding the timing of Mr. Nunez's departure from NHC, instead stating that Mr. Nunez was "never employee[](or officer[]) of NHC" and that NHC had no obligation to inform Defendants of their change in employment status. (R. 188-10).[5] Counsel for NHC based this statement on the representation that Mr. Nunez was an employee of a "non-party Mexican entity, KTRC," at the time of his deposition. (R. 188-10).

While counsel for NHC claims that KTRC is an unassociated, "non-party entity," RCD's CFO testified that KTRC and RCD are one in the same:

```
 8      Q.   Antonio, who do you work for?
 9      A.   For RCD Hotels.
10      Q.   It's my understanding that RCD Hotels is a
11   brand name; is that true?
12      A.   That's correct.
13      Q.   What -- What company do you work for?
14      A.   It is called Corporacion Inmobiliaria KTRC.


10      Q.   Are you the CFO of RCD Hotels or are you the
11   CFO of KTRC?
12      A.   The company that hires me immediately is KTRC,
13   but the position is for RCD Hotels.
```

---

[5] Notably, counsel for NHC attempted to divert blame by arguing Defendants never requested the contact information for Mr. Nunez in written discovery. This argument fails as the personal contact information was not requested in discovery because from the outset of this case—and every day until July 14, 2022—Ms. Wing and Vedder Price represented that Mr. Nunez was their client. Pursuant to those representations, a request for personal contact information would be inappropriate. It was only on the eve of trial, when discovery was long past closed and the Defendants are unable to issue a subpoena to Mexico, that NHC informed counsel for the Defendants that Mr. Nunez has somehow disappeared from their control.

(R. 188-8).

Finally, various "non-party" RCD entities made many of the contractual Project payments to Centaur at issue in this lawsuit and itemized in this Plaintiff's operative Complaint. (R. 26, ¶ 19). In light of all of the above, NHC's argument that Mr. Nunez was an employee of a "non-party entity" and never employee or officer of NHC is pure gamesmanship and was an attempt to hide the members of the Plaintiff's financial team at the heart of the Defendants' fraud defense.

On July 15, 2022, Defendants formally demanded that NHC produce Mr. Nunez at trial, noting "Defendants further object, as has been set out in continuing email correspondence between the parties, to NHC's assertion that Mr. Nunez' location is 'unknown' and hereby demands that NHC produce him to testify at trial." (R. 188-12; R. 188-13). NHC refused and stood on its statements that it did not represent Mr. Nunez, while simultaneously sending email correspondence ten days later to counsel for Defendants stating that "[g]iven that NHC designated certain limited portions of Manuel Nunez's deposition transcript as Confidential under the Agreed Confidentiality Order, we plan to file a motion for leave to file Mr. Nunez's deposition transcript under seal." (R. 188-16). Then, NHC filed that Motion. (R. 169). It is nonsensical that counsel for NHC can designate certain information confidential on behalf of a "non-party entity", while simultaneously claiming NHC does not represent or control the proponent of that confidential testimony or the "non-party entities" it claims to be protecting.

### c. The trial court abused its discretion in failing to give the missing witness instruction.

Refusal to give a missing witness instruction is reviewed for abuse of discretion. *Hoffman v. Caterpillar, Inc.,* 368 F.3d 709, 713 (7th Cir. 2004). "The instruction is appropriate if the proponent establishes that the missing witness was peculiarly in the power of the other party to produce." *Rainey v. Taylor*, 941 F.3d 243, 251 (7th Cir. 2019) (citations omitted). "If the witness is physically available only to the opponent, the instruction is warranted." *Id.*

According to the "missing witness" rule, when "a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction," but chooses not to call them, an inference arises "that the testimony, if produced, would be unfavorable." *Chicago Coll. of Osteopathic Med. v. George A. Fuller Co.,* 719 F.2d 1335, 1353 (7th Cir. 1983) (quoting *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893)). The first thing that must be shown before a party can raise to the jury the possibility of drawing an inference from the absence of a witness is that the absent witness was peculiarly within the other party's power to produce. *United States v. Mahone,* 537 F.2d 922, 926 (7th Cir. 1976). This requirement is met both when a witness is physically available only to the opposing party, *Brown v. United States,* 134 U.S.App.D.C. 269, 414 F.2d 1165 (1969), and/or when the witness has a relationship with the opposing party "that would in a pragmatic sense make his testimony unavailable to the opposing party regardless of physical availability." *Yumich v. Cotter,* 452 F.2d 59, 64 (7th Cir. 1971); *United States v. Blakemore,* 489 F.2d 193, 195 (6th Cir. 1973). The second thing that must be shown

is that the testimony of the witness would elucidate issues in the case. *United States v. Mahone,* 537 F.2d 922, 927 (7th Cir. 1976).

### i. Mr. Nunez was physically available only to NHC.

As to the first aspect of NHC's power to produce, Mr. Nunez was physically available only to NHC. The importance of control in the context of a missing witness instruction is that a party should not be allowed to obtain an advantage from placing a witness beyond the reach of his adversary. *Niehus v. Liberio,* 973 F.2d 526, 530 (7th Cir. 1992). This is precisely what NHC has done here. As noted above, Mr. Nunez resides in Mexico, outside of the jurisdiction of this Court, meaning they are physically unavailable to Defendants via subpoena power – especially on the eve of trial. Mr. Nunez's deposition was conducted remotely via LegalView while he was in Cancun, Mexico. To coordinate his deposition, Defendants sent counsel for NHC notices of deposition. Counsel for NHC accepted the notice on Mr. Nunez's behalf, set up the depositions, and presented them for the same. In doing so, NHC demonstrated that Mr. Nunez was physically available to it.

The fact that NHC now claims Mr. Nunez's whereabouts are "unknown" does not change the fact that they were clearly in control of these individuals throughout this litigation. As noted by the Seventh Circuit in *Niehus,* a party should not be allowed to obtain advantage by placing a witness beyond the reach of his adversary. *See supra Niehus v. Liberio,* 973 F.2d 526, 530 (7th Cir. 1992). NHC was undoubtedly aware that their testimony was relevant to this litigation when their depositions were sought and conducted by Defendants. Critically important to the Defendants' defense

to the allegations of fraud surrounding the payment applications sent by Centaur to NHC throughout the Project, **_Mr. Nunez testified in his deposition that Centaur told him – RCD's "Project Accountant" – that the billing summaries being sent by Centaur to NHC were inaccurate._** Then, after the verdict as set forth by the trial court above, of critical importance was the jury weighing the inconsistencies between the testimony of Tsaparas, Chapur, and Nunez. (R. 227, Page 13 of 23). Notably, Messrs Tsaparas and Nunez provided consistent testimony – however Mr. Nunez' was given only by a reading of his transcript aloud by counsel, leaving the jury unable to make any meaningful credibility determination.

  ii. **NHC has a relationship with Mr. Nunez which made him practically unavailable to Defendants.**

   In addition to being physically available only to NHC, Mr. Nunez also has a relationship with NHC which made him unavailable to the Defendants. Regarding the second aspect of NHC's power to control, based on the representations of counsel for NHC, Defendants were operating under the impression that Mr. Nunez was represented by counsel for NHC. NHC's counsel unequivocally referred to Mr. Nunez as her "client" and presented him for his deposition. (*See* Ex. 2 & 4). As such, contacting Mr. Nunez through any other means than his attorneys at Vedder Price would have been a violation of the Rules of Professional Conduct—specifically Rule 4.2. IL R S CT RPC Rule 4.2 ("[A] lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter"). Bound by the rules of professional conduct, Mr. Nunez was entirely unavailable to Defendants without working through counsel for NHC.

Despite NHC's attempts to backpedal their relationship with Mr. Nunez by stating they only represented him for the "limited purpose of [his] deposition," NHC did not articulate this at any point until less than a month from trial. A team of seasoned attorneys, counsel for NHC was well aware of the impact of using the term "client" when referencing Mr. Nunez and Mr. Alonso.

Moreover, the Seventh Circuit has previously noted that "where an employee who could give important testimony relative to issues in litigation is not present and his absence is unaccounted for by his employer, who is a party to the action, the presumption arises that the testimony of such employee would be unfavorable to his employer." *Chicago Coll. of Osteopathic Med. v. George A. Fuller Co.,* 719 F.2d 1335, 1353 (7th Cir. 1983) citing *Zuber v. Northern Pacific Railway Co.,* 246 Minn. 157, 74 N.W.2d 641, 649 (1956); *see also* Annot., *In Argument of Civil Case, on Adversary's Failure to Call Employee as Witness,* 68 A.L.R.2d 1072 (1959). Here NHC not only elected not to call Mr. Nunez to testify, but it also prevented the Defendants from doing so. This decision carried with it a presumption that Mr. Nunez's testimony would be unfavorable to NHC – a fact confirmed by the trial judge in his final memorandum opinion and order (R. 227, Page 13 of 23).

### iii. The testimony of Mr. Nunez would elucidate the issues in the case.

Mr. Nunez was intimately involved in the accounting and payment procedures on the Nobu Hotel Chicago. As noted above, Mr. Nunez worked as the Project accountant. He became involved with the Nobu Hotel Chicago in approximately September of 2018. His responsibilities included determining how much had been

invoiced on the Project, how much had been allocated to equipment and materials, and how much providers had been paid. Mr. Nunez was specifically responsible for reviewing payments and ensuring everything has been paid properly—which included obtaining proof of payments from the contractors. Moreover, Mr. Nunez had personal knowledge relating to over a dozen emails between themselves, Rodrigo Chapur, Israel Navarro, Spiro Tsaparas, and several other employees of NHC and Centaur regarding payments on the Nobu Hotel Chicago—many of which the parties introduced at trial. Most importantly, Mr. Nunez testified that he **knew** that the payment documentation that Centaur was sending to him throughout the Project was inaccurate – evidence with grave implications for NHC's fraud claims against all three Defendants.

Therefore, because Mr. Nunez's testimony would elucidate many crucial issues in this case, and because the trial court itself noted the importance of Mr. Nunez' deposition testimony, the trial court abused its discretion in failing to provide a missing witness instruction, and this court should order a new trial.

## VI. Admission of settlement correspondence violated Federal Rule of Evidence 408 and resulted in an unfair trial.

Over the Defendants' objections *in limine*, NHC was permitted to introduce inadmissible settlement correspondence at trial. That correspondence comes in the form of the following email from Centaur C.E.O. Tsaparas to NHC Owner Chapur:

From: Spiro Tsaparas [spiro@centaurco.com]
on behalf of Spiro Tsaparas <spiro@centaurco.com> [spiro@centaurco.com]
Sent: 7/24/2019 8:20:54 PM
To: Rodrigo Chapur [rodchapur@rcdhotels.com]
Subject: Nobu final cost to complete

Rodrigo,
Below please find a simple yet accurate update on the final cost to complete the project.

Total amount above the contracted sum is $6,156,000.00
Centaur responsibility according to the contract of those overruns are $4,050,000.00 in addition to the $5,541,000. The subs and vendors have been supportive and able to carry my company for the time needed. Therefore, the project will not suffer any liens and the amounts in the contracts will be adjusted to ease the blow to the company.
RCD responsibility will be $2,106,000.00 (minus the amount that you paid last week to the FFE items)
The amount above $400,000.00 allocated to Nobu within the RCD overruns above is approximately $120,000. The exact amount will be determined in the coming days after we reconcile the Trimark costs as we need to go through each line item.

A detailed list will be provided in a separate email along with statements, waivers etc. ( already been given but not in order)
The cashflow will be provided next week when you are here.
I understand that there are delay costs that we need to figure out in the near future that Centaur will be responsible for.

Centaur paid $200,000 to the plumbing contractor today and tomorrow I will be paying the rest of the trades with infusion of the $1.1mm so the site will receive the manpower it needs to catch up. I will provide copies of payments tomorrow.

The delivery date remains the third week in September so Nobu can begin training and opening the first week in October.

This has been difficult and I appreciate your support and patience as I fight through this.

Please call me with questions and please allow an hour next week to walk you through the statements and the costs.
The total project is ending up at $620 per square foot including FFE/OSE ( including the purchase price of $15mm)

Spiro Tsaparas | Chief Executive Officer

CENTAUR
361 W Chestnut, Suite 200, Chicago, IL 60610
P 312 644 4470 x211 C 312 735 4960
Centaurco.com

Notice: The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Centaur. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to info@centaurco.com and destroy this communication and all copies thereof, including all attachments.

(Trial Ex. P 11).

By way of context, six days prior to the email correspondence, Mr. Tsaparas and Mr. Chapur met with an auditor from Deloitte – who was hired by NHC to perform a forensic audit of the construction project at issue. (Trial Ex. P 2; R. 175-9). As evidenced by a **sworn and uncontradicted statement** from Mr. Tsaparas, he was aware that litigation was imminent and was engaging in potential settlement talks with Mr. Chapur at that time. (R. 175-9). Further, prior to Mr. Tsaparas' email

at issue, Mr. Chapur had told him that the issues remaining on the project were out of his hands and now up to his lawyers. (*Id.*)

The email was sent only two months prior to the initiation of NHC's lawsuit which is the subject of this appeal. Mr. Tsaparas' knowledge of the impending lawsuit is further evidenced by text messages from Mr. Tsaparas to Mr. Chapur requesting NHC "Don't file a suit" (Trial Ex. P2, p. 40) and a subsequent pre-lawsuit meeting in August between Mr. Tasparas and Mr. Chapur **at Vedder Price**. (Trial Ex. P2, p. 40; R. 175-9).

Pursuant to FRE 408, conduct or statements made during settlement negotiations regarding a claim are not admissible to either prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction. The purpose of FRE 408 is to encourage settlements. *See Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 483 (7th Cir. 2000) ("settlement talks might be chilled if such discussions could later be used as admissions of liability at trial"); *see also Winchester Packaging, Inc. v. Mobil Chem. Co.*, 14 F.3d 316, 320 (7th Cir.1994); *Central Soya Co. v. Epstein Fisheries, Inc.*, 676 F.2d 939, 944 (7th Cir.1982). These discussions took place prior to the initiation of the present lawsuit as preemptory settlement discussions held in the hopes of avoiding litigation. While these negotiations fell short, unsuccessful settlement negotiations are inadmissible in federal litigation. *White Pearl Inversiones S.A. (Uruguay) v. Cemusa, Inc.*, 647 F.3d 684, 689 (7th Cir. 2011). In this case, these settlement communications were improperly presented to the jury and used as

evidence against the Defendants, resulting in an unfair trial.

**VII. The pre-judgment interest award was improper given that the damages were not easily discernable.**

This Court is clear: "[s]tatutory interest can be recover at the discretion of the court." *Ameritech Information Systems, Inc. v. Bar Code Resources, Inc.,* 331 F. 3d 571 (7th Cir. 2003). ***"The creditor must, however, prove that the money due was a liquidated amount or subject to easy computation."*** *Id.*

In this case, the money due was neither a liquidated amount nor subject to easy computation, and the district court therefore erred in amending the verdict to include prejudgment interest.

*Santa's Best Craft, LLC v. Zurich Am. Ins. Co.,* is instructive. 408 Ill. App. 3d 173, 191 (2010). There, the Illinois appellate court reiterated the proposition that "[i]n order to recover prejudgment interest, the amount due must be liquidated or subject to an easy determination" before emphasizing that "the lengthy evidentiary hearing required to calculate the amount of the fees due, similarly support the conclusion that the damages were not easily determined, nor were they liquidated." *Id.* As a result of this analysis, the *Santa's Best Craft* court determined that the trial court's refusal to award prejudgment interest was not in error.

Here, the trial court's award of prejudgment interest is based on a misplaced statement that the "damages were easy to determine, as the jury awarded the exact amount NHC requested relating to payments to subcontractors and based the other elements of the compensatory damages award on Tsaparas' admission in one of NHC's trial exhibits." (R. 227, Page 23). Being able to trace the jury award to an

amount asked for by Plaintiff or an amount contained in the record does not establish that an award was easy to calculate. Stated another way, the standard for prejudgment interest is not whether or not a jury verdict amount is traceable to some evidence or argument presented at trial.

Instead, just as in *Santa's Best Craft,* this matter proceeded to a trial to determine the amount of damages owed, which emphatically supports the proposition that the damages were not easily determined, and therefore prejudgment interest is improper.

Even further, the fact that damages in this case were nor "easily calculated or ascertained" is further emphasized by the fact that NHC itself, in its pretrial findings, did not calculate the amount of damages which the jury ultimately awarded – nor did they ask the jury for the amount ultimately awarded. Specifically, NHC sought damages for the cost to complete constriction in the amount of $11,725,545.00, and the jury awarded $10,800,000.00. (R. 172-3, Page 1 of 2). The *Santa's Best Craft* court addressed this issue, finding that the "disparity in the amount sought and the amount awarded . . . similarly support[s] the conclusion that the damages were not easily determined, nor were they liquidated. *Santa's Best Craft,* 408 Ill. App. 3d at 191; *see also Couch v. State Farm Insurance Co.,* 279 Ill. App. 3d 1050, 1054 (1996) (holding that the fact that the jury awarded an amount different from that which was sought "serves as a strong indication that the amount of damages was not readily ascertainable.)

Accordingly, because the damages sought in this case were not easily

determined or liquidated, this Court should reverse the decision of the district court amending the judgment to award prejudgment interest.

**VIII.  The award of attorney's fees violates the law.**

When NHC filed its initial complaint on September 23, 2019, it included a prayer for attorney's fees. (R. 1). From the outset of the case, through written discovery, oral discovery, expert discovery, the exchange of trial exhibit lists, the argument of motions *in limine*, and all up until ***two days*** before opening statements in the trial of this matter began, NHC had failed to disclose any documents or facts to support its claim for attorney's fees. No witness had testified to any amount of attorney's fees expended, and not a single invoice from Vedder Price or any other law firm was produced.

Then, two days before opening statements were given, NHC filed a Motion for Leave to Supplement their long-past-due Exhibit List to include a never-before-disclosed invoice from its attorneys purporting to show attorney's fees incurred in this case. (R. 196). The Defendants objected to the untimely disclosure, and the Defendants' objection was sustained on the record during the first day of trial. (R. 250, pp. 223:7-229:9).

Prior to the court's order precluding NHC from introducing untimely evidence on its attorney's fees, Defendants filed its Motion *in Limine* # 10 seeking to preclude NHC from asking the jury for an award of attorney's fees and costs. (R. 174). This was based, in part, on clear law from this district stating that as it relates to a claim for common law fraud, attorneys' fees and costs are not recoverable. *Chow v. Aegis*

*Mortg. Corp.*, 185 F. Supp. 2d 914, 917 (N.D. Ill. 2002); *In re Collazo*, 613 B.R. 650, 671 (N.D. Ill. 2020)

The court ultimately ruled that NHC was limited to offering evidence regarding attorney's fees and expenses it incurred from others as a result of the Defendants' claimed fraud. (ECF 194). The resulting jury instructions further stated that the jury could only award NHC "attorney's fees paid by NHC in lawsuits brought or threatened against NHC by subcontractors on the Nobu Hotel Chicago project." (R. 204, pg. 14).

Despite all of the above, the court allowed trial testimony from NHC's owner regarding the amount of attorney's fees he had incurred in this case. The only evidence introduced at trial regarding NHC's attorney's fees was the testimony of Rodrigo Chapur who stated he incurred "around $100,000" in legal fees as a result of a lawsuit filed by a subcontractor due to Centaur's failure to pay it. (R. 250, p. 230:2-19). Mr. Chapur also stated he incurred "around $50,000" to settle claims with other subcontractors that did not involve a lawsuit *and* to negotiate a new contract with Shawmut as the replacement general contractor. (*Id.*). As discussed above, the Jury Instructions clearly state the jury could only award fees "paid by NHC in lawsuits brought or threatened against NHC by subcontractors on the Nobu Hotel Chicago project."

First, NHC failed to establish that any of these legal fees resulted from Defendants' claimed fraud. In fact, the invoices NHC attempted to introduce at trial show that the amount of these attorney's fees included legal work relating to

"deficiencies with Four Province's work"— a matter related to some masonry-related issues on the Project, wholly unrelated to the Defendants' alleged fraud. (R. 196-2). Further, because of NHC's untimely production of these invoices, Defendants were precluded from conducting discovery relating to the same—including which of these amounts actually related to the Project and Defendants' alleged fraud.

Moreover, approximately $50,000 of the attorney's fees awarded were related to settling other unidentified claims and negotiating a new contract with Shawmut. (R. 250, p. 230:2-19). Clearly the amounts incurred by NHC in negotiating a contract with Shawmut fall well outside of the scope of what the jury was entitled to award pursuant to the Jury Instructions. Additionally, there was simply no evidence indicating any of these amounts were paid by NHC in lawsuits brought or threatened against NHC by subcontractors on the Project. As such, the jury committed manifest error when awarding this amount to NHC and, the trial court erred when it failed to grant a new trial or amend the judgment entered against Defendants on August 18, 2022 to vacate the $150,000.00 in attorneys' fees awarded.

## IX. The punitive damages award was improperly based on bias and passion and must therefore be vacated.

The jury awarded punitive damages against Centaur construction in the amount of $630,666.00. This amount ends in a repeating number – 666 – that has no basis in the record, was not asked by Plaintiff, and carries significant negative implications within our society. ". . . [I]t is not disputed that a jury award may not be upheld if it was the product of bias or passion." *Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989). Here, the amount of the award clearly

demonstrates that it was the product of the jury's bias and passion, and therefore the trial court erred in failing to set aside this award in its entirety.

### X. The District Court erred in granting summary judgment in favor of NHC on its breach of contract claims.

The district court stated in its Memorandum Opinion and Order that "'[w]here the material facts are in dispute, or where reasonable minds might differ in the inferences to be drawn from undisputed facts, the existence of waiver or estoppel is a question of fact.' *Lake Cnty. Grading Co. of Libertyville v. Advance Mech. Contractors, Inc.* 275 Ill. App. 3d 452, 463, 654 N.E.2d 1109, 1119 (1995)." (ECF 152, p. 11, Section 1(a)). Yet, the district court entered a finding – at the summary judgment stage – that the Defendants' waiver and estoppel defenses were insufficient to allow them to be presented to the jury.

Below are the facts in support of the Defendants' waiver and estoppel defenses relating to the Plaintiff's specific claims of breach of contract, which were entirely rejected and ignored by the trial court:

- **That Centaur would "complete the project for the prescribed GMP and on schedule."**

First, Section 9.1 of the Contract between NHC and Centaur states that "the Contract Sum is stated in the Design-Build Amendment." (ECF 126, ¶ 26). Though NHC's attorney told Centaur that he would follow up on the Design-Build Amendment once it became due – on or before May 21, 2018 – that Amendment was never executed. (*Id.* at ¶¶ 25-28).

Second, though the Contract Sum was never determined, both the pre-NHC

Owner, and the post-Centaur General Contractor agree that this was a Project with a budget in excess of $60,000,000.00. (ECF 126, ¶¶ 11-15).

Third, throughout the Project, Mr. Chapur made representations to Tsaparas and his conduct intentionally led Defendants to believe that these two contractual rights would not be enforced. During the April 2019 meeting in Mexico, Tsaparas told Chapur that there were significant cost overruns (ECF 126, ¶ 70) and the May 17, 2019 reconciliation showed that the GMP would be exceeded (the reconciliation showed the Project would cost more than $54.5 million) (ECF 126, ¶ 74). At any point, NHC could have insisted on strict performance of the contractual terms and it would have been within its rights to do so. Instead, NHC repeatedly instructed Centaur to proceed reassuring Defendants that they "were businessmen" and that the parties would "figure it out in the end." (ECF 126, ¶ 33, 34, 65; *see also* ECF 126, Ex. A, 133:1-22; 136:10-137:19; 233:3-24; 255:18-256:7; ECF 126, Ex. D, 28:1-29:8; 52:14-53:2; 61:3-14; 81:14-21; 85:1-9; 90:3-13; 92:17-18; 105:18-106:23; 107:14-24; 111:7-16; ECF 126, Ex. E, 29:3-31:21; 218:11-13; 221:12-222:5).

NHC, through Mr. Chapur, did not have to repeatedly mislead Defendants that these delays and cost overruns were justified and accordingly, would not constitute a breach of contract. NHC cannot, by its words and conduct, lull Defendants into a false sense of what is acceptable under their deal and then subsequently file a lawsuit on that basis.

- **That Defendants would "provide accurate monthly percentages of completion."**

Section 3.1.8.1 of the Agreement states that Centaur would provide NHC with monthly written progress reports "showing estimated percentages of completion." (ECF 137, ¶ 27). NHC admits that, in addition to providing NHC with "Weekly Photographic Highlights," "Centaur also provided NHC with Monthly Reports, which were reviewed by all six Chapur siblings, as well as their father." (ECF 136, DSOF No. 50 (where NHC admits this fact)). For example, the monthly report for September 1, 2018 through September 30, 2018 is at Doc. No. 126-21; this report (like the other monthly reports to NHC) listed specific work performed (e.g. concrete poured, layout and framing of interior walls at basement and hotel rooms L03-06, skybar canopy steel installed, etc.). Those monthly progress reports were 100% accurate and Plaintiff has not alleged otherwise.

If Plaintiff claims it is a breach of contract for providing a detailed recitation of work performed each month but failing to provide *estimated percentages* of work performed, Plaintiff has waived this argument and is estopped from advancing it by continuously receiving these reports and failing to raise this issue throughout the Project.

- **That Defendants submit accurate payment applications.**

The Payment Applications issued from Defendants to Plaintiff did not reflect work performed. Plaintiff is however, barred from arguing that imprecise Payment Applications constitute a breach of contract because Plaintiff voluntarily and intentionally relinquished that contractual right. The only reliable evidence in the record demonstrates that Plaintiff knew the Payment Applications did not reflect

work performed. (ECF 126, ¶ 39-45). By lulling Defendants into falsely believing that the Payment Applications did not have to reflect work performed, NHC waived any contractual right to seek damages on that basis.

- **That Defendant "failed to pay contractors."**

Plaintiff argues that Defendants breached the NHC-Centaur contract by failing to pay certain subcontractors following cost overruns. Doc. Nos. 26 and 135, pg. 23. Equitable estoppel bars Plaintiff's claim here. Plaintiff knew that significant design changes increased the cost of construction. (ECF 126, ¶ 63, 64, 65, 70, 74). Plaintiff also knew that although design changes would usually result in change orders reflecting different materials or additional work performed by subcontractors, NHC's Rodrigo Chapur repeatedly informed Centaur that it did not need to provide NHC with written change orders on the Project. (ECF 126, ¶ 36, 37).

Chapur repeatedly represented to Tsaparas that they "were businessmen" in the construction arena, that they generally knew how much things cost, and that the parties would "figure it out" in the end (i.e. on an on-going basis and at the end of the project, Centaur would provide how much the project cost and NHC would pay it). (ECF 126, ¶ 33). However, despite reassuring Tsaparas that these budget overruns were understandable and that NHC would devote more money to this project, Plaintiff prematurely terminated Centaur from this project. As a result of cost-overruns, Chapur going back on his word, and Plaintiff terminating Centaur, certain subcontractors were not fully paid before Centaur was removed from the Project however, Plaintiff is equitably estopped from enforcing this contractual right.

This evidence at the very least, created a question of fact for the jury as to whether Defendants were entitled to their Affirmative Defense of waiver. *See Cage v. Harper*, 2021 WL 3033631 at *4 ("the Seventh Circuit defines an affirmative defense as an argument that limits or excuses a defendant's liability even if the plaintiff establishes a prima facie case . . . in other words, it is a defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's claim, even if all the allegations in the complaint are true"). However, despite this, the district court granted NHC summary judgment on liability for its breach of contract claim against Centaur. In doing so, the district court committed a misapplication of law in not submitting the issue of waiver to the jury—the trier of fact.

## CONCLUSION

For all of the reasons set forth above, Defendants-Appellants request this Honorable Court enter an order setting aside the fraud verdict in its entirety, finding that contract damages are not recoverable pursuant to the unambiguous terms of the contract between NHC and Centaur, vacating the awards of prejudgment interest attorney's fees, and punitive damages, and awarding any further relief it deems just. Alternatively, a new trial must be awarded to rectify the prejudice suffered when improper settlement communications were introduced at trial, the missing witness instruction was not given, and liability for breach of contract was not presented to the jury.

Respectfully Submitted,

/s/ Kimberly A. Herring

———————————————

Kimberly A. Herring, # 6329811
Amundsen Davis LLC
150 N. Michigan Avenue
Suite 3300
Chicago, Illinois 60601
(312) 894-3329
kherring@amundsendavislaw.com

## <u>CERTIFICATE OF COMPLIANCE WITH C.R. 32(c)</u>

The undersigned, counsel of record for the Defendants-Appellants, Centaur Construction Company, Inc., Spiro Tsaparas, and Peter Alexopoulos, furnishes the following in compliance with Circuit Rule 32: I hereby certify that this brief conforms to the rules contained in Circuit Rule 32 for a brief produced with a proportionally spaced font. The length of this brief is less than 14,000 words; it contains exactly 12,837 words. This number was obtained from the word count of the word processing system Microsoft Word.

Dated August 23, 2023

/s/ Kimberly A. Herring

_____

Kimberly A. Herring, # 6329811
Amundsen Davis LLC
150 N. Michigan Avenue
Suite 3300
Chicago, Illinois 60601
(312) 894-3329
kherring@amundsendavislaw.com

## PROOF OF SERVICE

The undersigned, counsel for Defendants-Appellants, Centaur Construction Company, Inc., Spiro Tsaparas, and Peter Alexopoulos, hereby certifies that on August 23, 2023 she caused the foregoing brief of the Appellants to be electronically served upon all parties of record.


Dated August 23, 2023


/s/ Kimberly A. Herring
_____

Kimberly A. Herring, # 6329811
Amundsen Davis LLC
150 N. Michigan Avenue
Suite 3300
Chicago, Illinois 60601
(312) 894-3329
kherring@amundsendavislaw.com

## <u>CIRCUIT RULE 30(d) STATEMENT</u>

Pursuant to Circuit Rule 30(d), the undersigned counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix attached hereto.

Dated August 23, 2023

/s/ Kimberly A. Herring

_____

Kimberly A. Herring, # 6329811
Amundsen Davis LLC
150 N. Michigan Avenue
Suite 3300
Chicago, Illinois 60601
(312) 894-3329
kherring@amundsendavislaw.com

# REQUIRED APPENDIX
## OF THE DEFENDANTS - APPELLANTS

## TABLE OF CONTENTS FOR REQUIRED APPENDIX

March 15, 2023 Memorandum Opinion and Order
.....................................................................................................App. 1

Ruling on Defendants' Motion in Limine
10....................................................................................................App. 2

March 18, 2022 Summary Judgment
Ruling..............................................................................................App. 3

Transcript of Proceedings August 17, 2022...........................................App. 4

Transcript of Proceedings August 4, 2022............................................App. 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NHC, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19 C 6332 |
| | ) | |
| CENTAUR CONSTRUCTION CO., | ) | |
| SPIRO TSAPARAS, and | ) | |
| PETER ALEXOPOULOS, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

NHC, LLC sued Centaur Construction Co., Spiro Tsaparas, and Peter Alexopoulos, alleging fraud and breach of a contract to build the Nobu Hotel in Chicago's West Loop. The Court granted summary judgment in favor of NHC on liability with regard to the breach of contract claim against Centaur and Tsaparas. NHC's claims went to trial in August 2022 regarding liability and damages on the fraud claim and damages on the breach of contract claim. The jury found in NHC's favor against all three defendants on the fraud claim. The jury awarded NHC compensatory damages, and it also assessed punitive damages against each of the defendants.

Both parties have filed motions regarding the judgment. The defendants have moved under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law on all claims. In the alternative, the defendants have moved under Rule 59(a) and (e) for a new trial or to alter the damages award on the fraud claim. NHC, for its part, has moved

under Rule 59(e) to amend the judgment to include pre-judgment interest.  For the reasons below, the Court (1) denies the defendants' motion for judgment as a matter of law; (2) denies the defendants' motion for a new trial and/or to alter the judgment; and (3) grants NHC's motion to alter the judgment to include pre-judgment interest.

## Background

The Court assumes familiarity with this case's factual and procedural background, which this Court has discussed in prior written opinions.  *See, e.g.*, *NHC, LLC v. Centaur Constr. Co.*, No. 19 C 6332, 2022 WL 823878 (N.D. Ill. Mar. 18, 2022) ("*Summary Judgment Decision*"); *NHC, LLC v. Centaur Constr. Co.*, No. 19 C 6332, 2020 WL 4052657 (N.D. Ill. July 19, 2020) ("*Motion to Dismiss Decision*").  The following background is relevant to the post-trial motions and largely is taken from the Court's summary judgment decision, *see Summary Judgment Decision*, 2022 WL 823878, at *1–2, and the trial record.

### A.    The contract

NHC acquired the Chicago Nobu Hotel project from another developer in December 2017, and it entered into a written contract with Centaur regarding the project in April 2018.  The contract specified that, among other obligations, Centaur was to "pay subcontractors within seven days, provide accurate monthly reports of completion progress, and submit payment applications for completed work." *Summary Judgment Decision*, 2022 WL 823878, at *1.  It also stated that "the project would be subject to a guaranteed maximum price (GMP) of $48,257,000" and that "the 'contract sum' was to be identified in a 'Design Build Amendment.'"  *Id.*

Section 13.2.2 of the contract governed termination of the contract by NHC (as

2

the Owner) for cause after the parties executed a Design Build Agreement, and it included a subsection stating as follows:

> §13.2.2.4  If the unpaid balance of the Contract Sum exceeds costs of finishing the Work and other damages incurred by the Owner and not expressly waived, such excess shall be retained by the Owner.  If such costs and damages exceed the unpaid balance, the Design-Builder shall pay the difference to the owner.  The obligation for such payments shall survive termination of the Contract.

Third Am. Compl., Ex. 1, Standard Form of Agreement Between Owner and Design-Builder ("Master Agreement"), at 36.  In contrast, Section 13.1 governs "Termination or Suspension Prior to Execution of the Design-Build Amendment" and does not address costs and damages if NHC were to terminate the contract for cause before executing a Design Build Amendment.  *Id.* at 35.  The parties never executed a Design Build Amendment.

## B.    Trial testimony

Because the Court granted summary judgment in favor of NHC on liability regarding the breach of contract claim, the trial concerned only liability on the fraud claim and damages on both claims.  At trial, NHC's project lead Rodrigo Chapur testified that the $48.25 million guaranteed maximum price was the agreed-upon price rather than an estimate or projection.  He also stated that NHC would not have contracted with Centaur if it believed Centaur could not complete the project for that price, and his father Roberto Chapur testified that Centaur never indicated to NHC that the price could exceed $48.25 million.[1]  Tsaparas similarly confirmed that the Chapurs expressed an unwillingness to spend more than the guaranteed maximum price.  In addition,

---

[1] To avoid confusion, the Court will refer to Rodrigo and Roberto Chapur by their first names.

Tsaparas testified that although it was possible to build a twelve-story hotel for $49 million at the time of the contract, he believed that "under any circumstances" it would have been "absolutely impossible" to "build a hotel of the quality of the Nobu Hotel Chicago for $49 million." Defs.' Rule 59 Mot. for a New Trial, Ex. 1 ("Trial Tr."), Vol. 3-B, at 15:21–16:4.

The parties' witnesses also testified about the payment applications Centaur regularly submitted to NHC over the course of the project. It is undisputed that these payment applications did not accurately reflect "work actually performed prior to the date of the application" and that NHC paid Centaur the amounts indicated on each application. *Summary Judgment Decision*, 2022 WL 823878, at *2. Centaur contends that it "pegged each payment application amount to the February 2018 cashflow projection and did not bill based on work it had actually performed." *Id.* Rodrigo testified, however, that he received an email from Tsaparas that stated "[n]ext payment request will be on May 1st for work performed in April and payment will be due June 1st. That will be the case for the duration of the project." Trial Tr., Vol. 1-B, at 69:3–5. Rodrigo stated that based on this email and similar oral statements by Tsaparas, he understood that the amounts in the applications were based on work performed and amounts used for project expenses like paying subcontractors.

Alexopoulos testified that he signed the notarized payment applications, including a final application stating that "all amounts had been paid by the contractor for work" and that no subcontractor was owed any money. *Id.*, Vol. 3-A, at 128:15–129:16. Alexopoulos stated that he knew those statements were factually inaccurate but said he "was led to believe that the information that [he] was to be providing to [NHC] is at

4

[NHC]'s request." *Id.* at 129:19–30. NHC's accountant Manuel Nunez testified that in a December 2018 meeting, Tsaparas told him and Rodrigo that the expense reports were inaccurate because they did not reflect all of Centaur's spending on the project.

In early May 2019, Tsaparas informed Rodrigo that the project was over budget even though he had previously indicated otherwise. Rodrigo met with Tsaparas to discuss the project in August of that year. Rodrigo testified that during the meeting, Tsaparas explained that he had diverted "around 6 to 8 million dollars" from the funds NHC had sent Centaur "to other different things on projects and other items that he couldn't explain." Trial Tr., Vol. 1-B, at 110:1–6. Tsaparas claimed in that meeting that he did not know where he had transferred the money, but NHC's forensic accounting expert Dayna Anderson opined at trial that Centaur used more than $10 million of NHC's payments to pay expenses unrelated to the project. This included transferring $1.5 million and $400,000 to Tsaparas's and Alexopoulous's personal bank accounts, respectively.

As a result of Centaur's failure to pay, the subcontractors refused to perform further work on the project and filed liens against the property. Rodrigo testified that NHC incurred $9.4 million in paying the amounts covered by the liens and that NHC "had no more options than to terminate Centaur and hire a different company." *Id.*, Vol. 1-B, at 107:18–20. Similarly, Roberto stated that NHC "couldn't send [Centaur] any more money[] because contractors wouldn't get it and [he] needed somebody to tell the truth." *Id.*, Vol. 2-B, at 6:9–12. NHC hired Shawmut Construction and Design in August 2019, and it paid Shawmut $11.5 million to complete the project.

Rodrigo also testified that NHC incurred around $100,000 in legal fees relating to

an ongoing lawsuit by a subcontractor, and it paid another $50,000 in legal fees to settle claims with other subcontractors that did not involve a lawsuit.[2]  He stated that the $50,000 "also includes the amount [NHC] spent on attorneys negotiating a new contract with Shawmut as [NHC]'s general contractor" because he believed those costs were "damages that if [Tsaparas] or Centaur would have performed the job [NHC] wouldn't have to pay it."  *Id.*, Vol. 1-B, at 96:1–8.  Rodrigo was not asked on direct or cross-examination about how much of the $50,000 was due to negotiating a new contract with Shawmut.

Lastly, the jury heard testimony that the defendants offered on their financial condition.  Alexopoulos testified that he understood both Centaur's and his personal financial condition in August 2022 to be "nonexistent and dire."  *Id.*, Vol. 3-A, at 114:16–22.  Similarly, one of NHC's exhibits indicated that Centaur's only bank account contained less than two thousand dollars.  As for Tsaparas's financial condition, Mark Hunt, a real estate developer who worked on the Nobu Hotel Chicago project, stated that he was working with Tsaparas on more than 20 construction projects at the time of trial.

During closing argument, counsel for NHC asked the jury to award $9,487,290 in compensatory damages for payments it made directly to Centaur's subcontractors and $11,725,545 in compensatory damages for the additional cost to complete the project.  NHC also asked for punitive damages and argued that typically the amounts for punitive

---

[2] In a ruling on Centaur's motion in limine 10, the Court permitted NHC to "offer evidence regarding any attorney's fees and expenses it incurred vis-à-vis others as a result of the defendants' claimed fraud."  *NHC, LLC v. Centaur Constr. Co.*, No. 19 C 6332, 2022 U.S. Dist. LEXIS 140045, at *2 (N.D. Ill. Aug. 7, 2022).

and compensatory damages are the same.

## C.    Jury instructions and verdict form

Two aspects of the jury instructions and verdict form are relevant to the parties' motions.  The jury instructions permitted the jury to award "attorney's fees paid by NHC in lawsuits brought or threatened against NHC by subcontractors on the Nobu Hotel Chicago project."  Jury Instructions at 14.  The section of the verdict form regarding liability is reproduced below:

VERDICT FORM – Case No. 19 C 6332

JUDGE MATTHEW F. KENNELLY
UNITED STATES DISTRICT COURT

First claim – breach of contract (against defendants Centaur and Tsaparas):

There has been a finding of liability in favor of NHC and against defendants Centaur and Tsaparas.

Second claim – fraud (against defendants Centaur, Tsaparas, and Alexopoulos):

We, the jury, find as follows on NHC's second claim:

As to defendant Centaur   :      ✓    in favor of NHC

_____ in favor of Centaur

As to defendant Tsaparas:      ✓    in favor of NHC

_____ in favor of Tsaparas

As to defendant Alexopoulos:      ✓    in favor of NHC

_____ in favor of Alexopoulos

Defs.' Rule 50(b) Renewed Mot. for J. as a Matter of Law as to Count II at 6.  The section of the verdict form regarding compensatory damages is as follows:

7

Compensatory damages

We, the jury, award Centaur compensatory damages as follows:

$ *9,487,290.20* for payments to subcontractors that were not paid by Centaur

$ *10,800,000.00* for payments made to Shawmut Design & Construction to complete construction of the Nobu Hotel Chicago project

$ *150,000.00* for attorney's fees paid by NHC in lawsuits brought or threatened against NHC by subcontractors on the Nobu Hotel Chicago project **(this element of damages is available only if you have found in favor of NHC against one or more defendants on NHC's second claim (fraud))**

Pl.'s Resp. to Defs.' Rule 50(b) Renewed Mot. as to Count II at 11.

Counsel for defendants contended that the verdict form should include separate lines for damages for breach of contract and for fraud, but the Court rejected that argument. The Court concluded that the form made it clear which damages were for breach of contract and which were for fraud because it (1) allowed the jury to indicate whether it would find each defendant liable for fraud, and (2) the blank for attorney's fees instructed the jury to write in a number only if it found one or more of the defendants liable for fraud.

Counsel for defendants also argued that because the first two categories of damages—payments to subcontractors and payment to Shawmut—were recoverable damages for both breach of contract and fraud, it would not be possible to determine which defendants were liable for which damages under breach of contract as compared to fraud. The Court also rejected this argument, concluding that although "there might be some theoretically, hypothetical, plausible possibility that a defendant could be found liable for fraud but not responsible for each and every element of damages," neither party had offered "a satisfactory way to set that out on the verdict form" without apportioning damages among the defendants for fraud. Trial Tr., Vol. 4-A, at 52:22–

8

53:14.  The Court concluded that such apportionment was inappropriate under Illinois law and thus overruled the defendants' arguments regarding the verdict form.

As indicated above, the jury found for NHC on the fraud count against all three defendants.  It awarded $20,437,920,20 in compensatory damages, with $9,487,290.20 for payments to subcontractors not paid by Centaur, $10,800,000 for payments NHC made to Shawmut to complete the project, and $150,000 for attorney's fees paid by NHC in lawsuits brought or threatened by subcontractors on the project.  The jury also awarded punitive damages of $630,666 against Centaur, $1,500,000 against Tsaparas, and $400,000 against Alexopoulos.

## Discussion

### A.    Motions for judgment as a matter of law

Under Federal Rule of Civil Procedure 50(b), judgment as a matter of law is proper if "a reasonable jury would not have a legally sufficient evidentiary basis" to support a verdict for the nonmovant.  Fed. R. Civ. P. 50(a)(1), (b); *see Thorne v. Member Select Ins. Co.*, 882 F.3d 642, 644 (7th Cir. 2018).  On a Rule 50(b) motion, a court "construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012).  Courts are "obligated to review the record to ensure that sufficient evidence exists to support the verdict, but [courts] will not otherwise consider the weight of the evidence" or "reevaluate the credibility of witnesses." *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 515 (7th Cir. 1993).  Consequently, a jury verdict will be overturned only if the court concludes that "no rational jury could have found for the

prevailing party." *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017) (internal quotation marks omitted).

### 1. Breach of contract

The defendants contend that because NHC terminated the contract before the parties executed a Design Build Agreement, the jury erred in awarding damages on the breach of contract claim. This argument relies on the fact that the section of the contract governing termination after the parties execute a Design Build Agreement states "[t]he obligation for such payments shall survive termination of the Contract," whereas the section governing termination before a Design Build Agreement is executed contains no such provision. Master Agreement at 35–36. Relying on the maxim *expressio unius est exclusio alterius*, the defendants argue that this difference between the two provisions means that damages do not survive the termination of the contract when—as is the case here—the parties did not execute a Design Build Agreement. The Court finds both that the defendants forfeited this argument by failing to raise it in their motion for summary judgment prior to the Court's finding of liability and that in any event the argument is unpersuasive on the merits.

The defendants raised this argument in their Rule 50(a) motion, and the Court indicated at oral argument on the motion that it believed this issue concerned liability. Illinois law is clear that "[t]o succeed on a claim for breach of contract, a plaintiff must plead and prove the existence of a contract, the performance of its conditions by the plaintiff, a breach by the defendant, and *damages as a result of the breach*." *Kopley Grp. V., LLP v. Sheridan Edgewater Props., Ltd.*, 376 Ill. App. 3d 1006, 1014, 876 N.E.2d 218, 226 (2007) (emphasis added). Even if one reads "damages" in this

formulation to mean the fact that the plaintiff was injured rather than the amount of damages, the defendants appear to contend that the lack of a damages section in the governing provision precludes NHC from establishing that it had suffered any harm. This, however, would make the lack of "damages" a liability issue, as there would be no viable breach of contract claim if that were the case.

When asked by the Court about this issue during argument on the Rule 50 motion during trial, counsel for the defendants initially agreed with the Court's conclusion that it concerned liability. Counsel argued that this argument related to the availability of damages only after the Court ruled that any arguments regarding liability not raised at summary judgment—including this one—were forfeited. In their present motion, the defendants repeat verbatim the argument from their in-trial Rule 50(a) motion, adding only a conclusory statement near the end that this "is an issue of NHC's lack of damages, not liability" without further explanation or legal support. Defs.' Rule 50(b) Renewed Mot. for J. as a Matter of Law as to Count I at 5. This cursory reference is itself a forfeiture. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived"). In sum, the Court sees no basis to conclude that it erred in deeming this argument forfeited.

Even if the argument were not forfeited, it is unpersuasive. The defendants' position is that the absence of a section expressly stating that damages survive termination of the contract means that they are—as the Court ruled on summary judgment—liable for breach of contract but there are no damages. But "a contract must be construed in light of existing principles of law, and these principles become a part of

11

the contract unless the contract clearly provides otherwise," *Estate of Savage v. Golub*, 73 Ill. App. 3d 656, 659, 392 N.E.2d 263, 266 (1979), and "[a] person who breaches a contract can be held liable for any damages that may fairly and reasonably be considered as arising from the breach in light of the facts that the breaching party knew or should have known." *Wilson v. DiCosola*, 352 Ill. App. 3d 223, 225, 815 N.E.2d 975, 978 (2004) (internal citations omitted). In this case, the lack of a provision regarding the "amount and survivability of damages" does not "clearly provide[]" that damages do not survive the contract; it is just as easily read to mean that the common law rules regarding contract damages apply. In sum, there is no basis to grant the defendants' motion for judgment as a matter of law on the merits. *See Krause v. GE Capital Mortg. Servs.*, 314 Ill. App. 3d 376, 386, 731 N.E.2d 302, 310 (2000) (declining to apply *expressio unius* because it was a "double-edged sword" that "could equally be argued" to support both parties' positions).

   2.    **Fraud**

   The defendants raise various arguments in support of their motion for judgment as a matter of law on NHC's fraud claim. None are persuasive.

         a.    **Promissory fraud**

   The defendants first contend that NHC's fraud claim is not actionable under Illinois law because it is based on future promises. The Court disagrees; sufficient evidence supports the jury's verdict in favor of NHC. The defendants argue that even though the payment applications Centaur submitted to NHC did not reflect the work performed on the project, those applications were not misrepresentations because all parties were aware that they were inaccurate. The defendants support this argument by

pointing to (1) Alexopoulos's testimony that he was aware there was no correlation between the amounts on the payment applications and the work performed, and (2) NHC's accountant Nunez's testimony that Tsaparas informed him and Rodrigo in December 2018 that the expense reports did not reflect all of Centaur's spending on the project. Yet Rodrigo testified that he believed the amounts on the payment applications reflected the work performed, and he explained that this belief was based on oral statements by Tsaparas and an email stating that the "[n]ext payment request will be on May 1st *for work performed in April*." Trial Tr., Vol. 1-B, at 69:3–5 (emphasis added). The jury was free to consider Rodrigo's, Alexopoulos's, and Nunez's testimony "and resolve any inconsistencies in their testimony however it [saw] fit"; a Rule 50(b) motion does not call upon a court to "consider the weight of evidence" or "reevaluate the credibility of witnesses." *United States v. Hodges*, 315 F.3d 794, 799 (7th Cir. 2003); *McNabola*, 10 F.3d at 515. There is no basis to believe that there was insufficient evidence to support the jury's conclusion on this ground.

The jury also properly awarded NHC $10.8 million for the payments NHC made to Shawmut to complete the project. The defendants argue that any payments to Shawmut were based not on actionable fraud but rather on Centaur's failure to fulfill its promises to complete the project on time and within budget. Not so. Rodrigo and Roberto both testified otherwise. Rodrigo stated that he believed he had no choice but to hire another contractor after Centaur's failure to pay subcontractors resulted in liens on the project, and Roberto stated that NHC needed a partner who would be truthful and pay its subcontractors. In light of these statements, it was not unreasonable for the jury to conclude that NHC's decision to terminate Centaur was based on Centaur's past

behavior—failing to pay the subcontractors, redirecting funds, and misrepresenting the status of the project—rather than its inability to fulfill future promises.  As a result, the Court concludes that NHC's fraud claims are actionable under Illinois law.

### b. Restating breach of contract claim

There is also no merit to the defendants' contention that NHC's fraud claim merely restates the breach of contract claim.  A plaintiff must "identify [a] fraudulent act distinct from the alleged breach of contract."  *Greenberger v. GEICO*, 631 F.3d 392, 401 (7th Cir. 2011).  It was reasonable for the jury to conclude that NHC did so in this case. For example, whereas failing to pay the subcontractors is a basis for the alleged breach of contract, misleading NHC to believe that the funds actually were going to the subcontractors—while transferring approximately $2 million to Tsaparas's and Alexopoulos's personal bank accounts—was a "fraudulent act" that was "distinct from the alleged breach." *Id.*  In addition, before the parties entered into the contract, the defendants led NHC to believe it was possible to complete the project for $49 million. This was despite Tsaparas believing that it was "absolutely impossible" to build "a hotel of the quality of the Nobu Hotel Chicago" for that price.  Trial Tr., Vol. 3-B, at 15:21– 16:4.  Although the defendants contend that such statements about the price were promises of future performance, a reasonable jury could understand such statements as misrepresenting what was possible at the time of the contract.  Rodrigo's testimony regarding these acts provided the jury with sufficient evidence to permit it to find that the defendants committed fraud beyond, and in addition to, breaching their contract with NHC.  *See, e.g.*, *Boyd Grp. (U.S.) Inc. v. D'Orazio*, No. 14 C 7751, 2015 WL 3463625, at *9 (N.D. Ill. May 29, 2015) (declining to dismiss a fraud claim as duplicative of breach

of contract where the defendant's "alleged misrepresentations concerned present or past facts").  The Court therefore denies the motion for judgment as a matter of law on this ground.

### c.    Apportionment

The defendants next argue that the damages award should have been apportioned between the two claims and among the three defendants.  This is not the law.  Both the fraud and breach of contract claims concerned the same injury, and "damages are not assessed 'by defendant' or 'by claim' but 'for' an injury."  *Duran v. Town of Cicero*, 653 F.3d 632, 640 (7th Cir. 2011) ("Where a plaintiff has suffered a single, indivisible injury (as is ordinarily the case and was true here on each of the state tort claims), the jury's task is to award a sum of money to compensate the plaintiff for that injury, not to enter a damages award against each defendant who is or will be liable on the judgment.") (applying Illinois and federal law).

In this case, NHC suffered a single injury:  harm resulting from the failure to complete the Nobu Hotel Chicago on time and within budget.  The fact that the costs NHC incurred because of this injury were payments to various parties—the subcontractors and Shawmut—does not make its single injury divisible, and there is no basis to apportion damages when the contract and fraud claims overlapped with regard to injury.  The jury's obligation was therefore to "award a sum of money to compensate" NHC for the overlapping, indivisible injury, *Duran*, 653 F.3d at 640, and the defendants offer no legal authority indicating otherwise.  Rather, their response brief cites to legal support only to argue that Alexopoulos cannot be held liable for breach of contract.  But because the jury found Alexopoulos liable for fraud, it is unnecessary to determine what

damages were due to breach of contract versus fraud: regardless of the claim, the injury was the same (with the exception of the request to recover legal fees, which were recoverable only on the fraud claim), and Alexopoulos was found liable for having caused that injury.

Furthermore, the defendants' only proposed alternative was not viable. They suggested changes to the verdict form that would have (1) separated breach of contract damages from fraud damages, and (2) asked the jury to apportion among the three defendants the damages specific to the fraud claim. Yet as the Court pointed out during the jury instruction conference, these changes would have confused the jury and would have led it to believe it should split up damages, which is not the law. *See Duran*, 653 F.3d at 640; *Roberts v. Alexandria Transp., Inc.*, 2021 IL 126249, ¶ 32, 183 N.E.3d 701, 707 ("Illinois adheres to the rule of joint and several liability. . . [which] provides that when two or more individuals tortiously contribute to the same indivisible injury, each individual may be held jointly and severally liable for the entire injury."). Because the Court cannot approve a verdict form submitted by a party that fails to "comport accurately with the governing legal principles," *Carlson v. Bukovic*, 621 F.3d 610, 623 (7th Cir. 2010), it could not have appropriately adopted the defendants' proposed changes. Consequently, the Court denies the defendants' motion for judgment as a matter of law as it relates to apportioning the damages awards.

### d. Prima facie fraud

The defendants also contend that NHC did not establish a prima facie case of common law fraud because it did not show reasonable reliance or fraudulent intent. Based on the evidence presented at trial, the jury reasonably could have found

otherwise. Based on Rodrigo and Roberto's testimony regarding the guaranteed minimum price and the payment applications, *see* section A.2.a–b, *supra*, a rational jury could conclude—as the jury in this case did—that NHC reasonably relied on the defendants' statements in entering into a contract with and making payments to Centaur.

As for fraudulent intent, the evidence includes but is not limited to (1) Rodrigo and Roberto's testimony that NHC and Centaur had agreed on the $48 million as a guaranteed maximum price, and (2) Tsaparas's admission that he never believed a hotel like the Nobu Hotel Chicago could be completed for $48 million. In addition, NHC's forensic account expert Dayna Anderson opined that Tsaparas and Alexopoulos had transferred almost $2 million of the funds from NHC to their own accounts. Because the evidence permitted a finding that defendants never informed NHC of these transfers but instead indicated that they were paying subcontractors, it was reasonable for the jury to find that they acted with fraudulent intent.

For these reasons, the defendants are not entitled to judgment as a matter of law on this ground.

### e. Punitive damages

The defendants also argue that the jury's punitive damages award violates both Illinois law and the Fourteenth Amendment's Due Process Clause. Neither argument is persuasive.

"In determining whether an award is excessive in a given case, Illinois courts look to a fact-specific set of relevant circumstances, including: (1) the nature and enormity of the wrong; (2) the financial status of the defendant; and (3) the potential liability of the

defendant." *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1143, 818 N.E.2d 357, 371 (2004). The defendants contend that the punitive damages awards are excessive in light of their financial status, citing to Alexopoulous's testimony that his and Centaur's financial condition was "nonexistent and dire" and one of NHC's exhibits showing that Centaur's only bank account has under $2,000. Yet NHC pointed to third party testimony that Tsaparas is currently employed on twenty other projects, and NHC's forensic accounting expert testified regarding Tsaparas's and Alexopoulos's history of transferring funds from Centaur's accounts to their personal accounts. As a result, the Court cannot say that it was unreasonable for the jury—especially a jury that found Alexopoulos liable for fraud—not to credit his testimony regarding his financial condition.

Illinois law also "require[s] the award to be the product of passion, partiality, or corruption in order to be excessive." *Gehrett v. Chrysler Corp.*, 379 Ill. App. 3d 162, 180, 882 N.E.2d 1102, 1119 (2008) (upholding punitive damages of $88,000 and compensatory damages of $8,500 against a car dealership that misrepresented the features of a single vehicle leased to the plaintiff). The defendants argue that the jury's award in this case was a result of passion because it was not based on a mathematical equation and because one of the amounts awarded ended in the number 666. The latter argument is bizarre, to say the least. That aside, "as there are no punitive-damages guidelines . . . it is inevitable that the specific amount of punitive damages awarded whether by a judge or by a jury will be arbitrary." *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003) (noting that punitive damages against a hotel of $1,000 per bed-bug infested room was arbitrary but not excessive). Instead,

courts have deemed punitive damages awards to be based on passion when they are too high in comparison to the compensatory damages awarded. *Deal v. Byford*, 127 Ill. 2d 192, 204, 537 N.E.2d 267, 272 (1989) ("The award is certainly not so high that it indicates passion, partiality, or corruption on the part of the jury."). In this case, the punitive damages were a fraction of the compensatory damages, not a multiple. Under the circumstances, there is no basis to conclude that the award was "the product of passion, partiality, or corruption." *Gehrett*, 379 Ill. App. 3d at 180, 882 N.E.2d at 1119.

Similarly, courts "consider three guideposts to determine whether a punitive damage award is grossly excessive such that it offends due process: (1) the degree of reprehensibility of defendant's conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004). The defendants address only the reprehensibility factor, arguing that the punitive damages were excessive because their conduct did not involve physical harm or a reckless disregard for the health and safety of others. The Seventh Circuit has held, however, that a punitive damages award of 3.3 times compensatory damages was "easily permissible" under the Due Process Clause for an Illinois common law fraud claim. *Id.* Considering that the total punitive damages award in this case was around $2.5 million, less than one-eighth of the compensatory damages awarded, there was no Due Process Clause violation here.

For these reasons, the Court denies the defendants' motion for judgment as a matter of law regarding the awards of punitive damages.

**B.**    **Motions for a new trial or to alter or amend the judgment**

The defendants have moved under Rule 59 for a new trial or to alter or amend the judgment to exclude the attorney's fees awarded by the jury as part of compensatory damages on the fraud claim, and NHC has moved to amend the judgment to include pre-judgment interest.  A new trial is warranted under Rule 59(a) if the verdict was "against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018).  In making this determination, a court "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012).  The Seventh Circuit has cautioned that a court should grant a new trial "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017).  Similarly, "Rule 59(e) allows a court to alter or amend a judgment only if the petitioner can demonstrate a manifest error of law or present newly discovered evidence." *Obriecht v. Raemisch*, 517 F.3d 489, 494 (7th Cir. 2008).

**1.**    **Attorney's fees**

The defendants have moved under Rule 59(e) to amend or alter the judgment to exclude the $150,000 the jury awarded for attorney's fees.  They argue that there is no evidence to support the award, but this is factually incorrect.  It is not disputed that the jury instructions permitted the jury to award NHC "attorney's fees paid by NHC in lawsuits brought or threatened against NHC by subcontractors on the Nobu hotel

20

project."  Jury Instructions at 14.  At trial, Rodrigo testified to incurring $100,000 as a result of a lawsuit by subcontractors and $50,000 to settle claims by other subcontractors that did not bring lawsuits.

By arguing that there was no evidence substantiating the $150,000 in damages, the defendants appear to contend that Rodrigo's testimony was insufficient.  Yet they "ha[ve] given [the court] no ground on which to hold that [Rodrigo]'s testimony on this point is so implausible that the jury could not rationally believe it."  *Venson v. Altamirano*, 749 F.3d 641, 647 (7th Cir. 2014) (denying party's Rule 50(b) and Rule 59 motions because "the credibility of the [witnesses]' testimony . . . was for the jury, not [the court] to assess").  Even if Rodrigo did not state the exact words "NHC incurred $150,000 in attorney's fees because of the defendants' fraudulent actions," he testified that he understood the defendants were paying the subcontractors until Tsaparas informed him otherwise in August 2019.  It was reasonable for a jury to conclude based on Rodrigo's testimony that the full $150,000——including both the $100,000 NHC incurred as a result of lawsuits and the $50,000 it paid to settle other claims—resulted from the defendants' fraud.

The defendants are correct that the jury instructions did not cover attorneys' fees spent negotiating a new contract with Shawmut, the contractor that replaced Centaur on the project.  Rodrigo testified at trial that the $50,000 NHC incurred in settling claims included legal expenses that the company spent on negotiating with Shawmut. Defendants' counsel could have asked Rodrigo on cross-examination about the exact

amount of those legal expenses. Counsel chose not to do so, however,[3] and Rodrigo's exact response to the question "[d]id you incur any legal fees to settle claims with other subcontractors for liens that did not involve a lawsuit" was "[y]es, around 50,000." Trial Tr., Vol. 1-B, at 95:21–23. With only this information, the jury did not act unreasonably in awarding the full $50,000 on top of the $100,000 in attorney's fees.

The Court therefore denies the defendants' motion to amend or alter the judgment to exclude attorney's fees.

### 2. Pre-judgment interest

NHC has moved under Rule 59(e) to amend the judgment to include pre-judgment interest. The defendants oppose the motion. "In order to recover prejudgment interest, the amount due must be liquidated or subject to an easy determination." *Santa's Best Craft, L.L.C. v. Zurich Am. Ins. Co.*, 408 Ill. App. 3d 173, 191, 941 N.E.2d 291, 308 (2010). The defendants argue that damages cannot be easily determined in this case because there was no liquidated damages clause and the case went to trial on the question of damages. The defendants' theory, if accepted, would preclude any party from recovering prejudgment interest when damages are an issue at trial. This is not the law. "Where a party is liable for obtaining funds through fraudulent misrepresentation, prejudgment interest attaches as a matter of right from the date of payment as 'money received to the use of another and retained without the owner's knowledge.'" *Sheth v. SAB Tool Supply Co.*, 2013 IL App 110156, ¶ 98, 990

---

[3] There is no merit to the defendants' argument that it could not have cross-examined Rodrigo on this point because NHC did not disclose the relevant documents until three days before trial. Those documents were not shown to the jury, the jury determined the award based on Rodrigo's testimony, and counsel for defendants had ample opportunity to ask Rodrigo about this issue on cross-examination.

22

N.E.2d 738, 761 (citing 815 ILCS 205/2) (reversing denial of prejudgment interest after joint bench and jury trial on fraud claim); *see also Marcus & Millichap Real Estate Inv. Servs. Inc.*, No. 07 C 5369, 2010 WL 145785, at *8 (N.D. Ill. Jan. 12, 2010), *aff'd on other grounds*, 639 F.3d 301 (7th Cir. 2011) ("[P]rejudgment interest is proper on this claim to provide [the plaintiff] with full compensation since [the defendant] has had possession of these funds, and [the plaintiff] has not, since the overpayments were made . . . [and] because the jury found that [the defendant]'s behavior was fraudulent and such behavior must be deterred.").  It is also the case here that damages were easy to determine, as the jury awarded the exact amount NHC requested relating to payments to subcontractors and based the other elements of the compensatory damages award on Tsaparas's admission in one of NHC's trial exhibits.

As a result, the Court grants NHC's motion to amend the judgment to include $1,834,834.14 in prejudgment interest.

## Conclusion

For the foregoing reasons, the Court (1) denies the defendants' renewed motions for judgment as a matter of law [dkt. nos. 213, 214]; (2) denies the defendants' motion to amend or alter the judgment [dkt. no. 212], and (2) grants plaintiff NHC's motion to amend or alter the judgment [dkt. no. 215.  The Clerk is directed to enter an amended judgment consistent with the Court's ruling.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  March 15, 2022

23

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NHC, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19 C 6332 |
| | ) | |
| CENTAUR CONSTR. CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER ON DEFENDANTS' MOTION IN LIMINE 10</u>

In their motion in limine 10, defendants ask the Court to preclude NHC from seeking attorney's fees and costs as part of its damages at trial. In the Court's view, the best reading of Illinois law is that it does not permit a plaintiff in a fraud case to recover its attorney's fees and expenses incurred in pursuing the fraud defendant, but does permit recovery of attorney's fees and costs "as damages for fraud when the fraud embroiled the plaintiff in litigation with third parties or raised other legal obstacles for him to deal with . . . ." *In re Collazo*, 613 B.R. 60, 670 (N.D. Ill. 2020). To put it another way, attorney's fees may be recovered as an element of compensatory damages "to the extent the defendant's tortious conduct proximately caused the plaintiff to incur them *and they were not incurred in the same litigation in which they are recovered*." *Id.* (quoting *Calcagno v. Personalcare Health Mgmt., Inc.*, 207 Ill. App. 3d 493, 565 N.E.2d 1330, 1339 (1991)). Illinois generally follows the "American rule," under which attorney's fees are recoverable only when authorized by contract or statute. *See Chow v. Aegis Mortg. Corp.* 185 F. Supp. 2d 914, 917-18 (N.D. Ill. 2002).

NHC cites several cases to support its contention that it may seek as damages

the attorney's fees it incurred in connection with this case.  None of them are persuasive support for NHC's position.  *Dunston v. R.H. Love Galleries*, No. 07 C 5113, 2010 WL 11713177 (N.D. Ill. May 14, 2010), cited by NHC, included claims under federal and state statutes that expressly provide for fee-shifting.  *See id.* at *1.  *Father & Sons, Inc. v. Taylor*, 301 Ill. App. 3d 448, 703 N.E.2d 532 (1998), cited in *Dunston* for the proposition that "attorney's fees may be awarded in common law fraud actions," *Dunston*, 2010 WL 11713177, at *2 n.1, is not good law for that proposition in the Court's view.  *Father & Sons*, like *Dunston*, included a claim under a state statute specifically allowing for fee-shifting, and the case it relied upon, *Black v. Iovino*, 219 Ill. App. 3d 378, 580 N.E.2d 139 (1991), likewise involved a claim under a fee-shifting statute alongside a common law fraud claim.  Another federal case cited by NHC, *Neuman v. Superior Jamestown Corp.*, No. 02 C 7399, 2003 WL 1877635 (N.D. Ill. Apr. 11, 2003), improvidently relies on *Father & Sons* to support a fee award for common law fraud and thus is not well-reasoned in the Court's view.  *See id.* at *3.  *Baghdady v. Robbins Futures, Inc.*, No. 97 C 8794, 2007 WL 2409548 (N.D. Ill. Aug. 22, 2007), also cited by NHC, appears to have awarded attorney's fees pursuant to a contract, not as damages for fraud.  *See id.* at *4 (¶ 54).  As indicated, the Court does not consider any of these cases to persuasively support the proposition for which NHC cites them here.

For these reasons, the Court bars NHC from introducing evidence or making argument regarding attorney's fees and expenses it incurred in pursuing the defendants. The Court grants defendants' motion *in limine* 10 to this extent.  NHC may, however, offer evidence regarding any attorney's fees and expenses it incurred vis-à-vis others as a result of the defendants' claimed fraud, and it may seek any such sums as

2

compensatory damages.

Date:  August 7, 2022

MATTHEW F. KENNELLY
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NHC, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 19 C 6332 |
| ) | |
| CENTAUR CONSTRUCTION CO., ) | |
| SPIRO TSAPARAS, and ) | |
| PETER ALEXOPOULOS, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

NHC, LLC engaged Centaur Construction Co. to develop and build the Nobu

Hotel in Chicago's West Loop in late 2017. Nearly two years later, NHC terminated its

contract with Centaur after the project was over budget and behind schedule. NHC

sued Centaur, as well as Spiro Tsaparas (Centaur's CEO) and Peter Alexopoulos

(Centaur's President), for breach of contract and fraud. Both sides have moved for

summary judgment. The Court addresses those motions in this decision.

**Background**

The following facts are undisputed except where otherwise noted. NHC

purchased the Chicago Nobu Hotel project from another developer in December 2017.

Centaur was already the general contractor for the project at that point, but upon taking

over the project, NHC increased Centaur's role to that of design builder. The Nobu

Hotel was the largest project that Centaur had ever undertaken. These parties entered

into a written master agreement (the contract at issue) in April 2018, but the record shows that work started prior to that agreement.

Rodrigo Chapur led the project for NHC. In an e-mail Tsaparas sent to Chapur on February 19, 2018, Tsaparas asked NHC to wire Centaur $4,555,000. This amount was broken down into seven line items (e.g. Masonry - $300,000). The first line item specified $2.5 million for Centaur, which (in the same e-mail) Tsaparas explained would "be held in [his] company and [would] be used for positive cash-flow immediately to support the company in this effort." Pl.'s Resp. to Defs.' LR 56.1(D) Stat. of Facts, Ex. 15 (dkt. no. 138-15). The e-mail further specified that the "[n]ext payment request will be on May 1st for work performed in April and payment will be due June 1st. That will be the case for the duration of the project." *Id.*; *see also* Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶ 16 (dkt. no. 144).

On February 22, 2018, Chapur asked Tsaparas to send him a projected cashflow for the project based on a $48,687,000 budget. Tsaparas responded to this request with a table listing sixteen dates and amounts, the sum of which fell within the budget. The first entry listed February 23, 2018, for $4,555,000, which matched the February 19 e-mail. The next 15 dates listed the first of each month from June 2018 through August 2019, and the corresponding amounts ranged from $1,900,000 to $4,000,000. These amounts consisted of whole numbers in the hundred-thousands (e.g. $2,700,000, $3,300,000, etc.). The figures in this e-mail are critical to the parties' dispute: NHC says it understood them to be simply projections and thus non-binding; the defendants say they understood the figures to reflect how much they would bill NHC throughout the duration of the project notwithstanding any future agreements.

On April 16, 2018, NHC and Centaur entered into a written contract. Among other provisions, the contract specified that Centaur was to follow industry standards, seek approval for subcontractors, pay subcontractors within seven days, provide accurate monthly reports of completion progress, and submit payment applications for completed work. *See* Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶¶ 19–36 (dkt. no. 144). The contract also provided that Centaur would substantially complete construction of the project within 400 days after construction began and that the project would be subject to a guaranteed maximum price (GMP) of $48,257,000. *Id.* ¶¶ 24, 29. The contract further included a provision stating that the "contract sum" was to be identified in a "Design-Build Amendment," but no such amendment was ever executed. Pl.'s Resp. to Defs.' LR 56.1(D) Stat. of Facts ¶¶ 26–28 (dkt. no. 136). Lastly of note, the contract included an integration clause and a non-waiver provision. Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶¶ 24, 36 (dkt. no. 144).

The parties agree that throughout the hotel's construction, Centaur submitted payment applications that did not reflect work actually performed prior to the date of the application. Centaur says it understood the payment applications to be "'file stuffers' intended only to satisfy a formality of needing an invoice prior to releasing payment." Pl.'s Resp. to Defs.' LR 56.1(D) Stat. of Facts ¶ 41 (dkt. no. 136). Accordingly, Centaur contends, it pegged each payment application amount to the February 2018 cashflow projection and did not bill based on work it had actually performed. NHC denies this understanding and contends that it expected Centaur to send payment applications that were based on actual construction progress, in other words work actually performed. The payment application requested amounts do not perfectly align with the February

2018 table, but they are close. *Compare id.* ¶ 39, *with* Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶¶ 40, 47 (dkt. no. 144). Additionally, Alexopoulos signed each of the payment applications, which were also notarized.

From the execution of the contract through April 2019, Tsaparas consistently represented to Chapur that the project was within budget and on schedule. Then in early May 2019, Tsaparas informed Chapur that the project was $2 to $3 million over budget. Later that month, Tsaparas sent Chapur a spreadsheet indicating that NHC had paid $41,985,000 to date and that the total project cost would be at least $54.5 million. Centaur continued to submit payment applications to NHC through June 2019, though the parties contest whether and to what extent issues arose during that time over Centaur's payment of subcontractors. In August 2019, NHC hired a second construction company, Shawmut Construction and Design, to prepare a report assessing the state of the project and auditing the project's finances.

NHC served a notice of claim on Centaur on September 5, 2019, for alleged breaches of contract. NHC filed the present suit on September 23, 2019. In its third amended complaint, NHC has sued all three defendants for fraud and sues Centaur and Tsaparas for breach of contract, the latter under a piercing-the-corporate-veil theory. Both parties have now moved for partial summary judgment.

## Discussion

To obtain summary judgment, a party must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover*

4

*Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When parties file cross-motions for summary judgment, courts "construe all inferences in favor of the party against whom the motion under consideration is made." *Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters Local 727*, 869 F.3d 610, 616 (7th Cir. 2017) (citation omitted).

## A.    Fraud

A fraud claim under Illinois law requires the plaintiff to establish a false statement of material fact; the defendant's knowledge of the statement's falsity; the defendant's intent to induce the plaintiff to act based on the statement; the plaintiff's reliance on the statement's truth; and damages resulting from the reliance. *See, e.g.*, *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496, 675 N.E.2d 584, 591 (1996).

Only the defendants have moved for summary judgment on the fraud claim. They raise four arguments in their motion: 1) there is no justifiable reliance; 2) there is no fraudulent intent; 3) allegations of promissory fraud are not actionable; and 4) there is no evidence of gross fraud, which is necessary for punitive damages.

### 1.    Justifiable reliance

Among other allegedly false representations, NHC has premised its fraud claim on the payment applications that the defendants sent.  According to NHC, these payment applications induced it to pay Centaur the GMP despite the fact that the work actually completed was worth substantially less than what the applications represented.

In their motion for summary judgment, the defendants argue that NHC could not have justifiably relied on the payment applications because it knew that they were

inaccurate—i.e., that they were, to use the defendants' term, "file stuffers."[1]  The defendants cite the February 22, 2018, cashflow e-mail as explaining the corresponding amounts in the payment applications and thus as showing that NHC must have known the subsequent payment application amounts were based on preliminary projections rather than the work performed.

NHC contends that it understood otherwise.  To support this position, NHC points to the e-mail that Tsaparas sent Chapur on February 19, 2018, in which Tsaparas explained that the "[n]ext payment request will be on May 1st for work performed in April and payment will be due June 1st.  That will be the case for the duration of the project."  Pl.'s Memo. of L. in Opp. To Defs. Mot for Partial Summ. J. at 6 (dkt. no. 135).  NHC further relies on the payment applications themselves.  Each was notarized, signed by Alexopoulos, and stated, "[t]he undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents[] . . . and that current payment shown herein is now due."  *Id.* at 7.  At bottom, NHC's position is that it understood the e-mail and the payment applications to mean what they said—that Centaur was requesting payment only for work that had actually been performed.

The defendants have not carried their burden to establish the absence of a genuine factual dispute.  Especially when viewed in the light most favorable to NHC, a reasonable jury could find that NHC was justified in relying on Tsaparas's e-mail and the

---

[1] The defendants also assert summarily that the testimony of Roberto Chapur (Rodrigo Chapur's father)—in which he said that he could have completed the Nobu Hotel project without any issues—indicates that NHC's reliance was misplaced.  The defendants have not explained the connection between this testimony and reliance, and the Court does not see one either.  This contention lacks merit.

6

payment applications as truthful and accurate and as meaning what they said, particularly because they were signed by Alexopoulos. Furthermore, the fact that the payment applications largely aligned with the cashflow projection does not, without more, establish that NHC understood the applications to amount to meaningless papering of the file. Among other things, it is entirely possible that the projections could have ended up being accurate, such that the payment applications matched them *and* reflected the work performed. The evidence that NHC points to is sufficient to preclude entry of summary judgment for the defendants on this point. *See Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 722 (7th Cir. 2015) (explaining that summary judgment is improper where a fact "affecting the outcome of the case" is in dispute).

The Court concludes that there is a genuine factual dispute on the issue of justifiable reliance.

### 2. Fraudulent intent

The defendants argue that the evidence establishes that they did not harbor any fraudulent intent in sending the payment applications. In the same vein as their reliance argument, the defendants assert that they believed the applications never represented the work performed because, again, they viewed them as "file stuffers." Beyond reiterating their reliance argument, the defendants assert that Alexopoulos "had a limited role on the Project" and that Tsaparas never told Chapur "anything that he did not believe to be 100 percent true." Defs.' Memo. of L. in Supp. of Mot. for Partial Summ. J. at 10–11 (dkt. no. 129).

For the same reasons as discussed above, this issue involves factual disputes

that can only be resolved at a trial.  The February 18 e-mail and subsequent payment applications could give rise to an inference of fraudulent intent.  *See also Lane v. Fabert*, 178 Ill. App. 3d 698, 706, 533 N.E.2d 546, 551 (1989) ("Summary judgment is particularly inappropriate when the intent of the parties is at issue.").  The additional points regarding the individual defendants do not change the calculus either.  The contention that Alexopoulos had a limited role does not eliminate the possibility that he had the requisite intent, and more importantly, NHC's counterpoint that he signed off on each payment application raises a genuine factual dispute.  The defendants' contention that Tsaparas only spoke truthfully also falters when the evidence is viewed in the light most favorable to NHC, given the fact that he has admitted the payment applications did not, in fact, reflect the work performed.  *See* Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶ 45 (dkt. no. 144).

The defendants raise one final point in their supplemental brief and argue that the report of NHC's expert witness, Dayna Anderson, supports their position.  In short, the report indicated that Centaur's financial records for the project were "incomplete" and "unreliable."  Defs.' Suppl. LR 56.1(a)(1) Memo. of L. in Supp. of Mot. for Partial Summ. J. at 5 (dkt. no. 150).  The defendants see this as evidence demonstrating that they could not have possibly intended to defraud NHC.

This point does not provide a basis for entry of summary judgment.  For one, Anderson specifically disclaimed any opinion regarding the defendants' intent.  And again, viewing the evidence in the light most favorable to NHC, a jury could infer from the payment applications that the defendants intended to defraud NHC irrespective of their poor recordkeeping.  Put differently, the proposition that the defendants kept

incomplete and unreliable records does not foreclose the possibility that they intentionally submitted inaccurate payment applications.

The Court concludes that there is a genuine factual dispute on the issue of fraudulent intent.

### 3.    Promissory fraud

Promissory fraud, which involves false statements of future intent, is generally not actionable under Illinois law unless the statements are "part of a scheme to defraud." *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007); *see also Swervo Ent. Grp., LLC v. Mensch*, No. 16 C 4692, 2017 WL 1355880, at *5 (N.D. Ill. Apr. 13, 2017) ("[A] temporal element delineates the two causes of action: representations regarding future conduct generally fall under the doctrine of promissory fraud, whereas statements regarding present or past facts give rise to a claim for fraud in the inducement.").  The defendants argue that certain statements in NHC's complaint are not actionable as traditional fraud because they relate to financial projections, future promises, and statements of future intent.  *See* Defs.' Memo. of L. in Supp. of Mot. for Partial Summ. J. at 12–13 (dkt. no. 129).  Acknowledging the scheme to defraud exception to promissory fraud, the defendants contend that NHC failed to allege such a scheme in its complaint, meaning it has failed to show that these statements "comport with the 'deliberately high' standard for promissory fraud." *Id.* at 13.  Thus in the defendants' view, summary judgment is appropriate with respect to this aspect of the fraud claim.

This argument lacks merit because a court can consider promissory fraud under a typical claim of common law fraud of the type alleged by NHC.  *See, e.g., Swervo Ent.*

*Grp.*, 2017 WL 1355880, at *5 ("Where a complaint purports to bring a claim for fraud in the inducement, courts will nevertheless treat the claim as one for promissory fraud if the claim is more accurately characterized as such under state law.").  And NHC clearly included the statements that the defendants cite in its common law fraud claim.  *See* 3d Am. Compl. ¶¶ 25, 29, 54, 61 (dkt. no. 26).  Above all, however, "it is factual allegations, not legal theories, that must be pleaded in a complaint."  *Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014).  NHC did exactly that.

The defendants are not entitled to summary judgment on this point.

### 4.      Punitive damages

Under Illinois law, punitive damages may be awarded "when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others."  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017) (quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359 (1978)).  In a fraud action, "deceit alone cannot support a punitive damage award, but such an award is appropriate where the false representations are wantonly and designedly made."  *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 511 (7th Cir. 1997) (cleaned up).  The defendants argue that NHC has only alleged "garden variety" fraud, which in their view does not meet the standard for punitive damages.  Defs.' Reply Memo. in Supp. of Mot. for Partial Summ. J. at 13 (dkt. no. 142).

Like the issues of reliance and intent, this determination is appropriately left for the jury.  The evidence underlying NHC's fraud claim, when viewed in the light most favorable to NHC, could permit a jury to infer that the defendants made a series of deliberately false representations.  *Cf. Echo/Tennessee Holdings, LLC v. AvidPath Inc.*,

No. 13 C 309, 2014 WL 5420020, at *2 (N.D. Ill. Oct. 23, 2014) (awarding punitive damages when the defendants' "misconduct involve[d] a series of intentional false representations").

The Court cannot appropriately resolve this issue on summary judgment.

**B.     Breach of contract**

Both parties have moved for summary judgment on NHC's breach of contract claim. The defendants argue that three affirmative defenses bar the claim: waiver, estoppel, and unclean hands. NHC argues that it is entitled to summary judgment on the merits, including on its claim against Tsaparas based on a piercing-the-corporate-veil theory.

**1.     Defendants' motion**

**a.     Waiver**

Waiver is the "intentional relinquishment of a known right." *Lempera v. Karner*, 79 Ill. App. 3d 221, 223, 398 N.E.2d 224, 225 (1979) (citation omitted). A party claiming implied waiver—which is what the defendants claim—must prove "a clear, unequivocal, and decisive act of its opponent manifesting an intention to waive its rights." *In re Nitz*, 317 Ill. App. 3d 119, 130, 739 N.E.2d 93, 103 (2000). "Where the material facts are in dispute, or where reasonable minds might differ in the inferences to be drawn from undisputed facts, the existence of waiver or estoppel is a question of fact." *Lake Cnty. Grading Co. of Libertyville v. Advance Mech. Contractors, Inc.*, 275 Ill. App. 3d 452, 463, 654 N.E.2d 1109, 1119 (1995). Additionally, in light of the non-waiver provision in the parties' contract, the defendants must establish waiver by clear and convincing evidence. *See Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 277 (7th Cir. 1996).

11

The defendants argue that NHC impliedly waived its right to enforce three provisions in the contract: 1) approving subcontractor hires; 2) providing change orders; and 3) submitting accurate payment applications.

Summary judgment in favor of the defendants is warranted on the first provision. NHC admits that Centaur had full control over the hiring of subcontractors and did not need to ask for NHC's permission to hire them. Pl.'s Resp. to Defs.' LR 56.1(D) Stat. of Facts ¶ 38 (dkt. no. 136). Consequently, the defendants are entitled to summary judgment for any breach arising from this contractual provision.

The issues relating to waiver of compliance with the second contractual provision—concerning change orders—is a bit more complicated. The defendants claim that Chapur told Centaur not to draft written change orders, but the record does not support that assertion. Instead, the record reflects NHC's admission that it only expected to receive change orders that would have resulted in the project exceeding the GMP. *Id.* ¶ 36. Although this gives rise to a genuine factual dispute regarding whether NHC waived this contractual right, NHC does not rely on this provision in arguing for breach in its briefing for summary judgment, as will be discussed below.

The defendants premise their argument for waiver of the third contractual provision—the obligation to submit accurate payment applications—on their contention that the payment applications were merely file stuffers. Although summary judgment is not warranted on this issue as it relates to fraud, here, in contrast, no reasonable jury could find that NHC acted clearly, unequivocally, and decisively in waiving its contractual rights.

The defendants primarily rely on the February 2018 e-mails as support for their

12

waiver argument, but these e-mails predate the master agreement by two months. Furthermore, the final contract included an integration clause that "supersede[d] prior negotiations, representations or agreements, either written or oral." Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶ 24 (dkt. no. 144). Taking these two facts together, the e-mails cannot serve as the basis for waiver with respect to a claim for breach of this contractual term. The defendants also point to a statement by Chapur to Tsaparas that the two were businessmen and would figure it out in the end. *Id.* ¶ 33. But this runs into the same problem as the e-mail—it predated the execution of the contract, meaning it also cannot serve as the basis for a defense of waiver of the contractual term.

The defendants thus are not entitled to summary judgment on their contention that NHC waived its contractual right to receive accurate payment applications.

### b.    Estoppel

The defendants contend, summarily, that in the alternative to their defense of waiver, NHC should be equitably estopped from enforcing the contract as related to the three provisions just discussed. One big problem here is that the defendants do not bother to discuss the elements of equitable estoppel, let alone how the facts apply to those elements, such as by identifying a knowing misrepresentation by NHC upon which to premise the defense. Nor do the defendants cite any caselaw to support their argument. The Court considers this undeveloped argument forfeited. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir.2012).

### c.    Unclean hands

The doctrine of unclean hands "applies if the party seeking equitable relief is guilty of misconduct, fraud or bad faith toward the party against whom relief is sought if

13

that misconduct is connected with the transaction at issue." *Coexist Found., Inc. v. Fehrenbacher*, 865 F.3d 901, 908 (7th Cir. 2017) (quoting *Long v. Kemper Life Ins. Co.*, 196 Ill. App. 3d 216, 219, 553 N.E.2d 439, 441 (1990)). The defendants assert this as a defense to the claim that Tsaparas, via veil-piercing, should be held liable for breach of contract. According to the defendants, NHC should be barred from recovering against Tsaparas because it provided Centaur funding despite knowing the construction company's level of capitalization. They contend that NHC's agreement to fund Centaur per the February 19 e-mail—specifically, the $2.5 million line item that was to be "used for positive cash-flow immediately"—constitutes misconduct pertaining to the same subject matter as NHC's piercing-the-corporate-veil theory.

This argument lacks merit. No reasonable juror could find that providing $2.5 million for operational cashflow amounted to authorizing the misconduct upon which NHC has primarily premised its veil piercing theory—Centaur's transfer of funds to its principals for their personal use. *See* Pl.'s Memo. of L. in Opp. To Defs. Mot for Partial Summ. J. at 29 (dkt. no. 135). Additionally, knowledge of and assistance with Centaur's capitalization early on in the parties' professional engagement, especially when based on a straightforward funding request in a single e-mail, does not implicate any misconduct on the part of NHC—or, at least, a reasonable jury could find otherwise.

The defendants are not entitled to summary judgment on the defense of unclean hands.

### 2. Plaintiff's motion

#### a. Merits

As indicated, NHC has moved for summary judgment on its breach of contract

claim, against both Centaur and Tsaparas.  Under Illinois law, a plaintiff alleging breach of contract must show: 1) a valid and enforceable contract exists; 2) the plaintiff substantially performed its obligations; 3) the defendant breached the contract; and 4) damages resulted from the breach.  *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018).  The parties do not dispute the existence of a valid contract or that NHC substantially performed pursuant to that contract.  NHC also asserts that it was damaged by the alleged breach, and the defendants do not dispute this.  The amount of any damages would be an issue for trial.  Consequently, the issue for present purposes is whether NHC has established that Centaur breached the contract.

NHC outlines a series of breaches for which it seeks summary judgment: "Centaur failed to follow industry standards, complete the project for the prescribed GMP or on schedule, seek NHC's approval for subcontractors, provide accurate monthly percentages of completion, submit accurate payment applications, or pay subcontractors."  Pl.'s Memo. of L. in Opp. To Defs. Mot for Partial Summ. J. at 23 (dkt. no. 135).  As previously discussed, NHC waived its contractual right to have Centaur seek approval to hire subcontractors.  But as to the other alleged breaches, NHC has pointed to evidence backing most of its claims.  Specifically, the project ran behind schedule; the costs exceeded the GMP; the payment applications were inaccurate; and subcontractors were not fully paid, which is a basic tenet of construction industry standards.  *See* Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶¶ 55, 60, 104 (dkt. no. 144).  The only aspect of the breach of contract claim that the record does not support is the contention that Centaur failed to provide accurate monthly percentages of completion.  *See id.* ¶ 61.

15

Of these viable contentions, the only one to which the defendants respond on the merits is the contention that the costs exceeded the GMP. The defendants attempt to sidestep the GMP by focusing on the fact that the parties never formalized a contract sum, which was to be determined in a design-build amendment to the contract that was never executed. But as NHC explains, the lack of a finalized contract sum does not absolve Centaur of its obligation under the GMP provision. The defendants have cited no contractual language and no principle of law that would support the proposition that the absence of a contract sum somehow overrode the GMP provision or rendered it inoperative. In short, the defendants' argument turns on a non-issue.

The defendants' only other response to NHC's claim of breach is that the affirmative defenses of waiver and estoppel apply. But even viewing the evidence in the light most favorable to the defendants, no reasonable factfinder could find that NHC waived its right to enforce the contract—with the exception of the single provision discussed earlier. As the Court has discussed, the timing of the acts that the defendants cite, combined with the contract's integration clause, foreclose this as a defense. Additionally, to the extent that the defendants suggest, in a cursory way, that estoppel should apply, they have not developed this argument in any meaningful way and therefore have forfeited it.

The Court concludes that Centaur breached Sections 1.1 (industry standards), 1.4.15 (guaranteed maximum price), 1.1.7 (schedule), 9.3.1 (payment applications), and 9.6.2 (subcontractor payment) of the master agreement; no reasonable jury could find otherwise. Centaur is entitled to summary judgment on liability to this extent on its breach of contract claim against Centaur.

16

### b. Veil piercing

NHC argues that it is also entitled to summary judgment on its breach of contract claim against Tsaparas, which requires the Court to find that piercing the corporate veil is warranted. Illinois courts use a two-part test to determine whether a plaintiff has met this burden: 1) there is a unity of interest and ownership such that the separate personalities of the corporation and individual no longer exist; and 2) adherence to the fiction of a separate corporate existence would sanction fraud or promote injustice. *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 752 (7th Cir. 2012).

NHC offers sufficient evidence that the defendants used Centaur as a "dummy or sham" through numerous examples of commingling and diverting funds. *Id.* (quoting *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008)); *see also Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 503, 840 N.E.2d 767, 778 (2005) (listing, among other factors, "commingling of funds" and "diversion of assets" as relevant considerations for the unity of interest prong). For example, NHC references the fact that Tsaparas wired his romantic partner more than $750,000 directly from Centaur's account. Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶ 93 (dkt. no. 144). NHC also points to the fact that Centaur transferred more than $1.3 million to repay loans that had no relation to the Nobu Hotel project. *Id.* ¶ 94.

Rather than contesting the truth of these facts or disputing whether NHC has carried its burden under both parts of the veil piercing inquiry, the defendants' only response is that the defense of unclean hands bars veil piercing. For the reasons the Court has discussed, this argument lacks merit. Because that is the only issue the defendants asserted, the Court concludes that there is no genuine factual dispute on

the issue of piercing the corporate veil and grants NHC's motion for summary judgment as to liability on the claim of veil piercing.

## Conclusion

For the foregoing reasons, the Court grants summary judgment in favor of the defendants on the issue of waiver regarding the contractual requirement for approval of subcontractors. The Court grants summary judgment in favor of the plaintiff on its breach of contract claim against defendant Centaur with respect to Sections 1.1 (industry standards), 1.4.15 (guaranteed maximum price), 1.1.7 (schedule), 9.3.1 (payment applications), and 9.6.2 (subcontractor payment) of the master agreement, as well as against defendant Tsaparas based on piercing the corporate veil. Both parties' summary judgment motions are otherwise denied. The case is set for a telephonic status hearing on March 22, 2022 at 9:05 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

MATTHEW F. KENNELLY
United States District Judge

Date:  March 18, 2022

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NHC LLC,                                    ) Docket No. 19 C 6332
                                            )
                        Plaintiff,          )
                                            )
            vs.                             )
                                            )
CENTAUR CONSTRUCTION COMPANY INC.,          ) Chicago, Illinois
et al.,                                     ) August 17, 2022
                                            ) 9:00 o'clock a.m.
                        Defendants.         )

TRIAL TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
VOLUME 4-A

APPEARANCES:

For the Plaintiff:     VEDDER PRICE P.C.
                       BY:  MS. NICOLE JOY WING
                            MR. JOSHUA JASON OREWILER
                       222 North LaSalle Street, Suite 2600
                       Chicago, IL 60601
                       (312) 609-7500


For the Defendant:     SMITHAMUNDSEN LLC
                       BY:  MS. KIMBERLY ANNE HERRING
                            MR. MATTHEW WALKER HORN
                            MR. MICHAEL FRANK COCCIEMIGLIO
                       150 North Michigan Ave, Suite 3300
                       Chicago, IL 60601
                       (312) 894-3329



Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                       Official Court Reporter
                       219 S. Dearborn Street, Suite 2102
                       Chicago, Illinois  60604
                       (312) 435-5639

1    (The following proceedings were had in open court outside
2   the presence and hearing of the jury:)
3          THE CLERK:  Case 19 C 6332, NHC v. Centaur
4   Construction.
5          THE COURT:  All right.  Let's get counsel's
6   appearances on the record, please.
7          MS. WING:  Good morning.  Nicole Wing and Josh
8   Orewiler on behalf of the plaintiff.
9          MS. HERRING:  Kimberly Herring, Matthew Horn, and
10  Michael Cocciemiglio on behalf of the defendants.
11         THE COURT:  Anything to talk about before we resume?
12         MS. HERRING:  Judge, I have our list of admitted
13  exhibits from yesterday.
14         THE COURT:  Hand it to Melissa there if you wouldn't
15  mind.
16         Okay.  So the following exhibits have been admitted:
17  Plaintiff's 14, 31 and 32, 45, 52, 54, 56, 60, and 78 through
18  83; and then Defendants' 1, 33, 39, 103, 105, and 119 through
19  122.
20         Okay.  If we can get Mr. Tsaparas back up on the
21  witness stand, we'll get the jury.
22         MR. HORN:  Your Honor, last night, counsel for NHC
23  indicated that they did not intend to call Veronica Velez.  As
24  such, I believe that they rest their case.
25         THE COURT:  Got it.

1          MS. WING:  True.

2          THE COURT:  We'll deal with Rule 50 motions at a

3    break, if that's what you were going to ask.

4          MR. HORN:  I was.

5          THE COURT:  So then after this witness, we just have

6    one more then?

7          MS. HERRING:  Yes, Judge.

8          THE COURT:  I'm blanking on the name, but you told me

9    yesterday.

10     (The jury enters the courtroom.)

11         THE COURT:  Okay.  Everybody can have a seat.  We're

12   ready to resume.

13         Mr. Tsaparas, do you understand that you're still

14   under oath?

15         THE WITNESS:  I do understand that, your Honor.

16         THE COURT:  You can take your facemask off.  And

17   Ms. Herring, you can go ahead.

18                              - - -

19         SPIRO TSAPARAS, REDIRECT EXAMINATION

20   BY MS. HERRING:

21   Q.  Mr. Tsaparas, on cross-examination, Ms. Wing went through

22   some of Centaur's bank statements and asked you some questions

23   about those.

24         How many bank accounts did Centaur have during the

25   time of the Nobu Hotel project?

1    A.  One general account.

2    Q.  Did payments for more than just the Nobu Hotel project go

3    through that one account?

4              MS. WING:  Objection, leading.

5              THE WITNESS:  Yes.

6              THE COURT:  I'll let that answer stand, but don't

7    lead.

8    BY MS. HERRING:

9    Q.  I want to turn back to the Plaintiff's Exhibit 35 which is

10   what Ms. Wing showed yesterday.

11             THE COURT:  Sorry.  There you go.  It was up there

12   for a second.  Okay.  This thing is doing funny stuff today.

13   We're seeing it now.  Good.  Thanks.

14   BY MS. HERRING:

15   Q.  What's the month of -- actually, sorry.  Can we turn to

16   page 131, please.

17             What's the month of this bank statement, month and

18   year?

19   A.  January of 2019.

20   Q.  Okay.  If we scroll through, do you see any deposits, any

21   money that comes in from sources other than NHC to Centaur?

22   A.  I do.

23   Q.  Can you tell us the amounts of those?

24   A.  $24,493.18.

25   Q.  If we keep scrolling through, do you see anymore?

1  A.  50,000.

2  Q.  Do you see any other deposits that have come in?

3  A.  2.1 million.

4  Q.  Any more?

5  A.  If you could scroll out.  There you go.

6         $129,325.

7         A wire in from eDrop-Off, $50,000.

8  Q.  That's not related to the project, right?

9  A.  It's not.  None of those are related to the project.

10        30,000.  $59,545.  $2,000.  $3,000.

11  Q.  If we turn to page 147 of the pdf, what's the month and

12  year of this bank statement?

13  A.  It looks like March of 2019.

14  Q.  If we scroll through this bank statement, are there any

15  deposits or incoming funds that did not come from the Chapurs?

16        Scroll through.

17  A.  The $2 million at the top, I'm not sure where that's

18  coming from.  It's a cash management transfer.

19        Then another $150,000 came in from Burt Richmond.

20  Q.  If we keep scrolling.

21  A.  $4,000 deposit.  $51,000 deposit.  $30,000 deposit.

22  $60,000 deposit.

23  Q.  Did any of those deposits that you just named have

24  anything to do with the Nobu project?

25  A.  No.

1  Q.  Okay.  On cross-examination -- we can turn the bank

2  statements off.

3        On cross-examination, Ms. Wing asked you about

4  payments that were not made by Centaur to subcontractors.  Why

5  did Centaur stop making payments to subcontractors?

6  A.  Because money stopped coming in.

7        MS. HERRING:  I have no further questions.

8        THE COURT:  You're excused.

9        Thanks.

10       THE WITNESS:  Thank you.

11       THE COURT:  Just to cover one thing, it's my

12  understanding that -- there was some possibility of another

13  witness being called by the plaintiff, but I think that's not

14  the case now; is that correct?

15       MS. WING:  That's correct.  The plaintiff rests.

16       THE COURT:  So the plaintiff has now rested its case

17  in full?

18       MS. WING:  Yes.

19       THE COURT:  And we have some other issues to deal

20  with later, but you can call the next witness.

21       MS. HERRING:  Defendants call Mark Hunt.

22       THE COURT:  All right.

23    (Brief pause.)

24       MS. HERRING:  Judge, he says he's a few minutes away.

25       THE COURT:  We have a little bit -- I believe this

1  next witness is going to be the last witness.  We have some

2  more work to do on the jury instructions.  We've done a lot of

3  work on them off hours.  There's some more work to do which

4  we're going to have to do today.  We're going to start on it

5  right now and use this time usefully, and then when the

6  gentleman gets here, we'll bring you back in.  So we'll take a

7  break now.

8     (The jury leaves the courtroom.)

9        THE COURT:  So we actually are going to do what I

10  just said.  We're going to work on the jury instructions a

11  little bit.  Let me just pull them up here and put them up on

12  the screen.

13        This, of course, would be the time that my computer

14  chooses not to cooperate with me.

15        Okay.  So just so the record is clear, I got

16  responses yesterday evening from both sides.  I'm going to put

17  the draft that I sent you up on your screens so that you can

18  see it.

19        All right.  So you should be seeing the instructions

20  now.

21        So starting off with what I got from the plaintiff,

22  the first change that I -- proposed change that I saw is on

23  the instruction on the fraud claim which in this draft is page

24  12.

25        So I want to make sure I'm getting it.  It seemed to

1  me that it was really a change.  So the instruction as I

2  drafted it, element 3 -- element 3, intent to deceive and

3  induce NHC to continue to employ Centaur to continue to make

4  progress payments to Centaur, you wanted to add one thing to

5  that it looked like to me, and that would be intent to induce

6  the plaintiff -- no, you wanted to change one thing.

7        You wanted to change it to read:  The defendant made

8  the statement with the intent to induce the plaintiff to make

9  a progress payment, to induce the plaintiff to contract with

10 Centaur, or to induce the plaintiff to continue to employ

11 Centaur on the Nobu Hotel project.

12       So first of all -- actually, it turns out it's just

13 one and maybe two changes.  Besides switching the order, you

14 wanted to add "hire them in the first place" and not just

15 "continue to employ."  And then it looks like -- I don't know

16 if it was a deliberate change -- to change -- to make "a

17 progress payment", to make that singular rather than plural?

18 Was that a deliberate change?

19       MR. OREWILER:  No, your Honor.  Progress payments can

20 be plural.

21       THE COURT:  Okay.  So the hiring thing is the

22 substantive change.  I know there's another change to another

23 element.  That's the substantive change to that element.

24       MR. OREWILER:  There's that one, your Honor.  And

25 also in the Illinois pattern instructions as well as very

1  recent Illinois Supreme Court cases, the phrase "intent to

2  deceive" is not used as an essential element to the claim.  So

3  we would ask that that come out.

4          THE COURT:  Got it.  Oh, it's intent to -- so

5  basically, if we were going -- if I was going to red line this

6  -- let me just change it to what I think you're asking for and

7  then I will ask defense counsel what you think about it.

8          It really should be "and/or," although one of my late

9  former colleagues didn't think there was such a thing as

10  "and/or."  Judge Shadur.

11         So is what I just changed that to, element 3, is that

12  essentially what you're proposing?

13         MR. OREWILER:  Yes, your Honor.

14         THE COURT:  Let me hear from the defense on that.

15         MR. HORN:  Your Honor, to the first change to remove

16  "deceive NHC," deception is an integral part of fraud.

17         THE COURT:  How do you deal with this case that they

18  cite, *Lewis v. Lead Industries*, L-e-a-d, Industries

19  Association?

20         MR. HORN:  I've read many cases on fraud.  I mean,

21  they use intent to induce the plaintiff and intent to deceive

22  somewhat interchangeably.

23         THE COURT:  So then why do you need both if they're

24  used interchangeably?

25         MR. HORN:  I think it makes it clear to the jury as

1  to what is actually required.

2  THE COURT:  Okay.  I'll look at *Lewis*.  Aside from

3  that -- so you would -- I'm going to highlight the "deceive"

4  language in yellow.  So you want me to keep that in?

5  MR. HORN:  Correct.

6  THE COURT:  Aside from that, do you have a problem

7  with the other proposed changes?

8  MR. HORN:  Yes, your Honor.  The second change to

9  contract with Centaur.  So as you'll recall, your Honor, you

10 ruled on summary judgment, and in that summary judgment

11 ruling, you found that there was an integration clause in the

12 contract.  Any discussions, representations, agreements prior

13 to the execution of that contract really don't become a part

14 of the contract because it's fully integrated.

15 The other thing is in the contract itself, it

16 identifies Centaur's capabilities as essentially a warranty in

17 the contract.  And this goes to our larger discussion of the

18 fact that their fraud claims are just a restatement of the

19 breach of contract claims.

20 The other thing is to the extent that they were

21 defrauded into entering into the contract with Centaur, that's

22 fraud in the inducement.  So if they were defrauded into

23 entering into the contract, then from our perspective, the

24 contract is void.

25 THE COURT:  Okay.  Not necessarily going into all of

1   that, here's my question. My question is what's the evidence

2   regarding a knowing misrepresentation to induce NHC to

3   contract with Centaur in the first place? What's the theory

4   on that?

5           MS. WING: The theory on that is that they claimed

6   that they could do the project for $48 million and then said

7   that they actually knew at the time that it was impossible to

8   do the project for $48 million. It was based on that budget

9   that they decided to contract.

10          THE COURT: Okay. How do you deal with the other

11  arguments that defense counsel made? So basically the

12  argument is that a representation made prior to the contract,

13  A, it's a whole different type of claim, which it kind of is.

14  It's a fraud in the inducement claim. We might actually have

15  to have a whole separate jury instruction for it quite

16  honestly, but putting that aside, it's a separate type of

17  claim. And in a case where you've got an integration clause

18  as well as the other points he made, basically, the argument

19  is that's not appropriate. So how do you deal --

20          MS. WING: Well, we have that separate and

21  independent from the contract that we're talking about here,

22  these emails and these verbal representations, that we can do

23  this project cradle to grave for $48 million which was a false

24  representation. And that was prior to the contract and is

25  separate from the contract.

1          THE COURT:  You want to respond to that?

2          MR. HORN:  Yes, your Honor.  I mean, the fact that

3   Centaur indicated that it could do the project for $48 million

4   is really their primary, if not sole, breach of contract

5   claim.  So any statements that they could do that really

6   relates to a breach of contract which goes to our larger

7   arguments on all of these points.  But the testimony here from

8   my perspective has shown that everyone acknowledges the hotel

9   could be done for $48 million.  It just wasn't done for $48

10  million.

11         THE COURT:  All right.  I got to think about that

12  too.

13         The other significant change that I see on here from

14  the plaintiff's side is adding -- so it focuses on "knowingly"

15  here in the first element.  "Defendant knowingly made one or

16  more false statements of fact or knowingly concealed one or

17  more facts."

18         So the proposal is to split off the intent

19  requirement into a separate element, I think, and modify it to

20  say, "knowingly" -- well -- and then -- yeah, "knowingly or

21  reckless disregard of truth or falsity."

22         So what's the authority for reckless disregard?

23         MS. WING:  Judge, it's also in the *Lewis* case and in

24  Illinois pattern instructions, that second clause that we

25  included, "defendant knew or believed the statement was false

1   or the defendant made the statement in reckless disregard,"
2   that's both in Illinois pattern instructions and in the
3   elements as stated by the Illinois Supreme Court in *Lewis*.
4           THE COURT:  So you're saying that's in *Lewis*.  Okay.
5           Let me hear from the defense on that one.
6           MR. HORN:  Your Honor, I don't quite follow.  So --
7           THE COURT:  Well, what they've proposed to do is kind
8   of reconstruct this instruction in a way, but the proposed
9   first element is "false statement of material fact or knowing
10  concealment of one or more facts."  That's number one.  That
11  much has not changed.
12          Number two, "defendant knew or believed the statement
13  was false or made the statement in disregard of whether it was
14  true or false."  That's an additional element basically adding
15  "reckless disregard."
16          MR. HORN:  Again, your Honor -- sorry.
17          THE COURT:  I guess the idea is to collapse
18  materiality which I had as a separate instruction which is
19  going to stay that way, by the way.  So we just have to have
20  an extra element.
21          Then the third thing is intent -- so it's really the
22  reckless disregard issue.  That's what we're talking about.
23          So the question is do you think that -- is it the
24  defendants' position that under Illinois law, which I guess we
25  can all look at, but under Illinois law that reckless

1  disregard for truth or falsity is not sufficient for a fraud
2  claim?

3          MR. HORN:  I mean, if you look at their cite in the
4  footnote below --

5          THE COURT:  Yeah, but that's a quote of a sentence.
6  I mean, we can all look at Illinois law.

7          MR. HORN:  Right, but it said even under *Lewis* as
8  they've cited, point two says "known or believed to be false
9  by the person making it."  So to the extent that's an accurate
10 representation of Illinois law, it doesn't say anything about
11 reckless disregard.  It says "known or believed to be false by
12 the person making it."

13         THE COURT:  Okay.  Did the witness just come in?
14         MS. HERRING:  No.

15         THE COURT:  I saw somebody come in the room.  I
16 wondered if it was the witness.

17         MS. WING:  Judge, it's the pattern instructions that
18 you have to look at for the reckless disregard.

19         THE COURT:  Yeah, so it would -- I would prefer to
20 look at something a Court has said.  I know the Illinois
21 Supreme Court approves these, just like the Seventh Circuit
22 approves our pattern instructions.  It doesn't mean they carry
23 the force of law.

24         All right.  I'll take a look at that.

25         You know, some of the other things that you're

1  proposing to do on this is basically just shuffling stuff

2  around and making it, in my humble opinion, more complicated.

3  So if they're not substantive changes, I'm not going to make

4  them.  I prefer simple to more complicated.

5          MS. WING:  That's fine.  In fact, just with the

6  change that you have on the screen, if that was the only

7  change made, plaintiffs are satisfied with that.

8          THE COURT:  Well, I'll look at the recklessness

9  thing.

10          MS. WING:  Thank you.

11          THE COURT:  The other -- yeah, I want to deal with

12  punitive damages kind of all at once because both sides had

13  some issues on that.

14          So the punitive damages thing was the only other, I

15  think, proposed change from the plaintiff.  I'll look at what

16  I got from defense counsel.

17          Okay.  So the first one is on the damages instruction

18  for the contract claim.  The proposal -- I proposed to do this

19  a little bit differently than you said.  I think that's the

20  change that you're asking for; is that right?

21          MR. HORN:  That's correct, your Honor.

22          THE COURT:  Payments to subcontractors that Centaur

23  owed but did not pay.  I get it on that.  Do you have any

24  problem with that?  That's to distinguish them from other

25  progress payments I suppose.

1    MS. WING:  No, no problem.

2    THE COURT:  Okay.  I have to say on the second bullet

3  point, you wanted to add at the very end of it.  So right now

4  it reads, "Payments made to Shawmut Design and Construction to

5  complete construction of the Nobu Hotel Chicago project."  You

6  added in "that are owed by Centaur."  So I'm not sure I'm

7  understanding it there.  It doesn't really seem to fit the

8  sentence.  Can you tell me what you're getting at?

9    MR. HORN:  Yeah.  I can't remember if it was Dayna

10  Anderson or Michelle from Shawmut.  I think it was Dayna

11  Anderson.  She indicated that -- my recollection, she

12  indicated that NHC made payments of $16 million to Shawmut,

13  but Dayna Anderson only identified 12 of those as being

14  recoverable damages because additional work was done, changes

15  were made, extras were added to the project after Shawmut took

16  over.

17    THE COURT:  Why isn't this covered by the general

18  principle that's in the instruction that you should determine

19  the amount of money that would put NHC in as good a position

20  as it would have been in if Centaur had performed all of its

21  obligations?

22    MR. HORN:  I just think you've got those two numbers,

23  and the jury -- you know, if you say payments made to Shawmut

24  by NHC, that would be the $16 million.

25    THE COURT:  Let me ask plaintiff's counsel a

1  question.  So do you agree with -- do you agree with him that

2  there's this 16 number out there and then there's the 12

3  number that Ms. Anderson testified about?

4       MR. OREWILER:  Yes.  To be clear, we're asking for

5  the lower number.

6       THE COURT:  You're going to ask for the 12.  I don't

7  think this is an issue.  I mean, if it -- I don't think it's

8  an issue.  I think it's covered by the rest of the

9  instruction, and I don't think it's an issue and you can make

10 it clear in your closing arguments.  So I'm not going to

11 change that one.

12       I will make the other change.

13       So look, let's all put our cards on the table here.

14 Honestly, we all know -- when I say "we", I start off with

15 me -- that largely what this trial is about is the fraud

16 claim, right, because judgments for fraud have certain

17 consequences that judgments for breach of contract don't have

18 in other floors of this building, primarily the 7th and 8th

19 floor, maybe the 6th, depending on how many floors the

20 bankruptcy court has these days.

21       It is not the law, and you've completely failed to

22 persuade me earlier, at the beginning instructions and now on

23 the defense side, that if you have a contract and a fraud

24 claim, the contract claim wipes out the fraud claim.

25       So the proposal to eliminate the first two bullet

1  points --

2       MR. HORN:  Your Honor --

3       THE COURT:  I'm in the middle of a sentence.  The

4  proposal to eliminate the first two bullet points on the fraud

5  damages instruction is basically a no go because it basically

6  says you can't recover damages for fraud if you recover them

7  from breach of contract.  That's not the law.  That's just not

8  the law.

9       I will make the same change that I did on the first

10  element.  I put it in the wrong place, that Centaur owed but

11  did not pay.  I'm not going to change the other one.

12      So that proposal is overruled.  What more did you

13  want to tell me about that?

14      MR. HORN:  Your Honor --

15      THE COURT:  I get your cite in here about a

16  fraudulent act has to be separate and distinct from an alleged

17  breach of a contractual premise.  That's the question of

18  whether somebody has a viable fraud claim.  That's I assume

19  what you're going to argue in your Rule 50 motion and, if you

20  lose, in your post trial Rule 50 motion.  That's not a

21  question of what damages are recoverable.  It's a question of

22  whether you can maintain a fraud claim.  And I know that you

23  have an issue on that.

24      MR. HORN:  Your Honor, at this juncture, it's not

25  that I'm saying that they cannot maintain a fraud claim.  I'm

1  saying that to the extent the damages for the fraud and the

2  breach of contract are identical, then the fraud claim

3  necessarily restates the contract claim.

4  During the morning yesterday, your Honor, you

5  appropriately acknowledged that the only injury that they had

6  suffered stemming from fraud, separate and apart from the

7  injury they suffered from breach of contract, was the alleged

8  attorneys' fees that they incurred in the other actions

9  dealing with the subcontractor.

10  THE COURT:  I got to cut you off in the middle of

11  that because that is not what I said.  That is -- that sounds

12  like a Sunday morning talk show politician restatement to suit

13  your purposes of what I actually said.

14  What I said is that the elements of damages that they

15  are asking for on the fraud claim overlap with the elements of

16  damages that they are asking for in the breach of contract

17  claim.  That's what I said.  I did not say what you just

18  attributed to me, period.  Okay?

19  I'm overruling your argument for the reasons that I

20  described.

21  Is the witness now here?

22  MS. HERRING:  Yes, Judge.

23  THE COURT:  Okay.

24  MR. HORN:  Your Honor, there were some other changes.

25  THE COURT:  I know we're not done.  I was going to go

1   into one more.

2          On the punitive damages instruction, which we have a

3   lot to talk about here, your proposal is to take out breach of

4   trust, right?

5          MR. HORN:  That's correct.

6          THE COURT:  Basically because it doesn't apply in

7   this kind of situation?

8          MR. HORN:  That's correct.

9          THE COURT:  Which I have kind of thought all along

10  too.  I actually only had it in there because I think it was

11  in your original one.

12         Is there any problem with taking that out?

13         MS. WING:  Yes, your Honor.  We think that we've

14  brought out enough evidence to establish a fiduciary type

15  relationship with the heightened level of trust that was

16  required --

17         THE COURT:  Tell me what you think that evidence is.

18         MS. WING:  Sure.  Nick Martorano, Peter Alexopoulos,

19  and Spiro Tsaparas all testified that a design-builder role

20  was a much heightened role over a general contractor and

21  caused NHC to have to place a great deal of trust with

22  Centaur.

23         THE COURT:  I don't think that's enough to give rise

24  to a fiduciary relationship.  So I'm going to take it out.  It

25  will help in simplifying this instruction too, but that's not

1   the reason I'm taking it out.

2          We're going to pause right here.  The witness can get

3   up on the witness stand, and I'm going to get the jury, the

4   witness being you.

5          MS. WING:  Judge, let's pull these instructions down

6   before they come in.

7          THE COURT:  Sorry?

8          MS. WING:  Can we pull this down before they come in?

9          THE COURT:  That would be a good idea, wouldn't it?

10  Thanks for the reminder.

11    (The jury enters the courtroom.)

12         THE COURT:  Okay.  Everybody can have a seat except

13  the witness.

14    (Witness sworn.)

15         THE COURT:  Ms. Herring, you can go ahead.

16                            - - -

17              MARK HUNT, DIRECT EXAMINATION

18  BY MS. HERRING:

19  Q.  Good morning, Mr. Hunt.  Can you please introduce yourself

20  to our members of the jury.

21  A.  Hi.  My name is Mark Hunt.

22  Q.  What do you do for a living?

23  A.  I'm a developer.

24  Q.  And who do you work for?

25  A.  Myself.

1  Q.  What's the name of the company?

2  A.  M Development.

3  Q.  How long have you been a developer for M Development?

4  A.  Since probably 1990.

5  Q.  Since 1990, what kinds of projects has M Development

6  developed?

7  A.  I've done a bunch of apartment buildings, condominiums,

8  hotels, mainly commercial, high street retail buildings.

9  Really kind of all aspects of development.

10  Q.  From a dollar amount perspective, can you give us an idea

11  of what kinds of projects you've worked on?

12  A.  Individually?

13  Q.  Just the size of the projects from a dollar perspective.

14  A.  I mean, they range from, you know, small infill properties

15  that could be a million dollars up to $300 million.

16  Q.  Were you involved in the Nobu Hotel Chicago project?

17  A.  I was.

18  Q.  How did you get involved in that?

19  A.  I had purchased the property, the land, and looked at what

20  to do with it, and explored doing a hotel there; was

21  successful in changing the zoning and ultimately getting plans

22  approved for Nobu.

23  Q.  When did you purchase the land?

24  A.  Oh, I don't even remember the year.  There's been a lot of

25  properties.  If I had to guess, it was probably -- I don't

1   even -- I don't recall.

2   Q.  Approximately how many years ago?

3   A.  Seven?

4   Q.  Okay.  After you purchased the land, did you do any

5   construction?

6   A.  I did.

7   Q.  What was the scope of that construction?

8   A.  It was -- at the time, it was demolition of some existing

9   buildings, some excavation, shoring up the adjacent property's

10  building, yeah, excavating and foundation.

11  Q.  Can you give us a general idea of what it is that you were

12  building when you started construction?

13  A.  We were building Nobu Hotel.

14  Q.  And did you -- were you working with Nobu when you were

15  doing that?

16  A.  I was.

17  Q.  Okay.  Do you recall having budgets for the Nobu Hotel

18  Chicago?

19  A.  Yes.  Yeah, we had various budgets along the way.  I mean,

20  the building, through an approval process, we were bidding out

21  what we were hoping we were going to get, what we ultimately

22  got; and, you know, through kind of the design, as the design

23  matured, so did the budget.

24  Q.  Okay.  I'm going to put up on our screen here Defendants'

25  Exhibit 25.

1     This is an email, Mark -- if we zoom in, perfect --

2   that you're copied on.  It's from someone named Jeff Richman.

3   Do you know who Jeff Richman is?

4   A.  I do.  He's my in-house counsel.

5   Q.  And he was sending, if we look at this, it looks like he

6   was sending a budget to Rodrigo Chapur; is that right?

7   A.  Yes.

8   Q.  Now, if we scroll through to page 2 of this, do you

9   recognize this?

10  A.  Yes.

11  Q.  What do you recognize it to be?

12  A.  The budget to construct Nobu Hotel.

13  Q.  What was the total project cost on this budget?

14  A.  $72,638,432.

15       MS. HERRING:  Okay.  If we could pull up Defendants'

16  Exhibit 95, please.

17  BY MS. HERRING:

18  Q.  This is an email from Nancy Turken.  Do you know who that

19  is?

20  A.  I do.  She is our CFO.

21  Q.  The CFO of M Development?

22  A.  Of M Development, yes.

23  Q.  If we turn to page 3, do you recognize what this document

24  is?

25  A.  Yes, it looks like the exact same.

1  Q.  Another budget sent by M Development to the Chapur family?

2  A.  Correct.

3  Q.  And what is the total project cost on this budget?

4  A.  $72,638,432.

5        MS. HERRING:  If we could pull up Defendants' Exhibit

6  54.  If we scroll to page 2, page 3.

7  BY MS. HERRING:

8  Q.  Do you recognize this, Mark?

9  A.  I do.

10  Q.  What is this?

11  A.  It's a hotel report from HVS.

12  Q.  What is HVS?

13  A.  They're a group, you know, that a lot of people, lenders,

14  hire in order to value, you know, our property.

15  Q.  Okay.

16  A.  Appraisal.

17  Q.  Did M Development hire HVS to value the Nobu Hotel

18  Chicago?

19  A.  I believe we did, yes.

20  Q.  Did HVS send M Development a valuation of the Nobu Hotel

21  Chicago?

22  A.  I believe they did, yes.

23  Q.  If we scroll through this, do you recall what the

24  valuation was that HVS sent to M Development for the Nobu

25  Hotel Chicago as of 2021?

1  A.  Yeah, they have a range of roughly 90,000 -- roughly 90

2  million to 101 million.

3          MS. HERRING:  We can put this exhibit to the side.

4  BY MS. HERRING:

5  Q.  Who was your general contractor when you were constructing

6  the Nobu Hotel Chicago project?

7  A.  Centaur.

8  Q.  Had you worked with Centaur Construction before?

9  A.  I have.

10 Q.  When was the first time you worked with Centaur

11 Construction?

12 A.  I believe our relationship started in 2015.

13 Q.  Approximately how many projects have you worked on with

14 Centaur Construction?

15 A.  No, actually, our first project, I'm sorry, was 2007.

16 Q.  From 2007 to the present, approximately how many projects

17 have you worked on with Centaur Construction?

18 A.  It has to be over 20.

19 Q.  How about Mr. Spiro Tsaparas, how many projects have you

20 worked on with him?

21 A.  All of them.

22 Q.  What do you mean all of them?

23 A.  I mean, he had the company Centaur.  So from 2007 to

24 current day, I've -- you know, my main contact with Centaur

25 was Spiro Tsaparas.

1  Q.  You mentioned current day.  Are you currently working on
2  any projects with Centaur?
3  A.  I am not.
4  Q.  Are you currently working on any projects with Spiro
5  Tsaparas?
6  A.  I am.
7  Q.  What are they?
8  A.  We are probably working on upwards of 20 projects
9  currently.
10  Q.  Can you give us just a general sense of what kind of
11  projects?
12  A.  Yeah.  They are anywhere from renovations, single-family
13  homes, mainly commercial, hotels, large retail boxes,
14  apartment buildings, condominiums all over the country.
15              MS. HERRING:  I have no further questions.
16              THE COURT:  Cross.
17              MR. OREWILER:  Yes, your Honor.
18                            - - -
19              MARK HUNT, CROSS-EXAMINATION
20  BY MR. OREWILER:
21  Q.  Good morning, Mr. Hunt.  My name is Josh Orewiler and I am
22  an attorney for the plaintiff NHC.
23              MR. OREWILER:  Could we pull up Defendants' Exhibit
24  25, Michael, please.  Could we turn to page 2.
25  BY MR. OREWILER:

1  Q.  Mr. Hunt, you testified on direct examination this was a

2  budget that was prepared under M Development, correct?

3  A.  Yes.

4  Q.  Was it your understanding that this budget was accurate at

5  the time it was prepared?

6  A.  I believe so.

7          MR. OREWILER:  Could we scroll down towards the

8  middle of the page, Michael.

9  BY MR. OREWILER:

10  Q.  So towards the bottom of the screen, Mr. Hunt, do you see

11  the words "general construction cost"?

12  A.  Yes.

13  Q.  And just to the right of that, there's a number that's

14  $45,500,000; is that right?

15  A.  Correct.

16  Q.  And then in the column all the way to the right, there's a

17  number that's $41,352,631; is that right?

18  A.  Correct.

19  Q.  Is that $41 million number the general construction cost

20  that was in the budget for the Nobu Hotel under M Development?

21  A.  I don't recall exact numbers.  I'd have to kind of study

22  the two different columns.  There may be some -- again,

23  looking at the -- we're comparing two different columns.  I

24  don't know if something in there is value engineering.

25          MR. OREWILER:  Could we scroll up to the top of the

1  page, Michael.  Zoom in on the very top.

2  BY MR. OREWILER:

3  Q.  At the very top of the page for the columns, do you see

4  the phrases "adjusted budget," "spent to date," and "left to

5  fund," Mr. Hunt?

6  A.  Yes, I do.

7  Q.  And so if we could scroll back down all the way to the

8  middle of the page, the number all the way in the right-hand

9  column, that 41 million number, that would be the number of

10  general construction costs left to fund as of the date of this

11  budget?

12  A.  Correct.

13  Q.  Mr. Hunt, are you friends with Spiro Tsaparas?

14  A.  I am.

15  Q.  And you testified on direct examination that you're

16  currently working on approximately 20 projects with Spiro

17  Tsaparas; is that right?

18  A.  Correct.

19  Q.  So based on your personal knowledge, Spiro Tsaparas is

20  actively working in the construction industry currently?

21  A.  He's currently working with me.

22  Q.  Spiro Tsaparas is currently working with you in the

23  construction industry?

24  A.  Correct.

25  Q.  And Mr. Hunt, after M Development sold the Nobu Hotel

1    Chicago, did you have any involvement whatsoever with the Nobu

2    Hotel Chicago after that point?

3    A.  Zero.

4            MR. OREWILER:  Thank you, Mr. Hunt.

5            THE COURT:  Any redirect?

6            MS. HERRING:  Briefly.

7                           - - -

8            MARK HUNT, REDIRECT EXAMINATION

9    BY MS. HERRING:

10   Q.  Could we pull up Defendants' Exhibit 25.  Could we zoom in

11   on the general construction cost that Mr. Orewiler just asked

12   about.

13           It says there was just a little over $4 million spent

14   to date, right?

15   A.  Where are you seeing the $4 million?  Oh, the middle

16   column.  Yes.  Yes.

17   Q.  Who paid that $4 million?

18   A.  We did, M Development.

19   Q.  If we scroll out, zoom out a little bit, what's FF&E and

20   OS&E?

21   A.  Furnitures, fixtures, and equipment for the property, and

22   operating systems.

23   Q.  And why would that be on a budget for a hotel and

24   restaurant?

25   A.  Well, you need furniture, fixtures, and equipment and

1  operating systems to operate a hotel or a restaurant.

2  Q.  How about professional fees, what are those?

3  A.  Architects, engineers.  There's a whole list of

4  professional fees that you need.

5  Q.  Why would those be on a budget for a hotel and restaurant?

6  A.  They need to be designed.  They need to be drawn,

7  permitted.  Those are the groups that basically help design

8  what you're going to build and how you're going to build them.

9  Q.  If we scroll up to the top section, it says "owner, other

10  costs," what are those?

11  A.  Legal fees, accounting fees, you know, real estate taxes.

12  I mean, there's a whole list here.  Architects, building

13  fee -- building permit fees, a lot of fees that go towards the

14  city from the right-of-way permits, utility connections,

15  insurance.

16  Q.  Same question, why would those be on a budget to build a

17  hotel or restaurant?

18  A.  You can't build one without them.

19          MS. HERRING:  I have no more questions, Mark.

20          THE COURT:  Thanks.  You're excused.

21          Are there any other witnesses for the defendants?

22          MS. HERRING:  No, Judge.

23          THE COURT:  And anything in rebuttal for the

24  plaintiff?

25          MS. WING:  No, your Honor.

1   THE COURT:  All right.  So you've heard all the

2   evidence.  So now where we are is we need -- we actually did

3   quite a bit of work during the 15 minutes or so that you were

4   out on the instructions.  We have some more to do.  There's a

5   couple other legal issues I have to deal with.  You've heard

6   all the evidence.

7   I'm going to say we probably have another 40-ish

8   minutes of work that the lawyers and I have to do outside of

9   your presence.  But you'll be hearing at least some of the

10  closing arguments and maybe all of them this morning before

11  the lunch break.  If it straddles the lunch break, it may

12  straddle the lunch break by a little bit.

13  So you've heard all the evidence.  You can't start

14  deliberating yet.  You need to continue to keep an open mind

15  because there's two big things you haven't seen or heard.

16  Number one is my instructions on the law, which I'll give you.

17  That'll be the first thing that you'll hear after you come

18  back.  And then the lawyers' arguments.

19  So don't start deliberating on the case, and we'll

20  get this done as promptly as we can, and we'll get you back

21  down here.

22  (The jury leaves the courtroom.)

23  THE COURT:  Okay.  So let me put my screen back up

24  again.

25  Okay.  There we go.

1          Okay.  So I think the last thing we did is I took the
2    breach of trust language out of the punitive damages
3    instruction.
4          So now we're to these definitions, and there was a
5    lot of back and forth on it.  So first of all, I've taken out
6    the definition for breach of trust because it's not in the
7    instruction anymore.  It's gross fraud, malice and
8    willfulness.
9          Okay.  So one of the things we need to make sure not
10   to do or at least I need to make sure not to do is to not have
11   definitions that are contradictory or that go in all sorts of
12   different directions.  So that's one of the things -- as I'm
13   dealing with some of the suggestions or proposals that folks
14   have made, that's one of the things I'm interested in.
15         So the plaintiff proposes changing the definition of
16   gross fraud to "conduct that involved malice, evil motive, or
17   reckless indifference."  So I see two problems with that:
18   One's substantive -- one of them is substantive, and one of
19   them I guess something other than substantive.
20         The one that's something other than substantive is if
21   we define gross fraud to mean malice, we actually have malice
22   already in here, so then gross fraud maybe almost literally
23   drops out of the picture because if gross fraud means malice,
24   why do we need to have gross fraud?  Why don't we just go with
25   malice?  Because these are all alternatives.  It's not "and";

1  it's "or" between all of gross fraud, malice, or willfulness.

2  The second problem, the more substantive one, is the

3  reckless indifference issue.  And I know you cited a district

4  court case from the '90s on that, *Richeson*, R-i-c-h-e-s-o-n.

5  You know, okay, it's a district court case.  I really don't --

6  I really don't think that what the Illinois Supreme Court is

7  telling us about punitive damages allows it for fraud

8  constituting recklessness because basically what they're

9  saying is it's not just fraud; it's fraud plus.  And the plus

10  comes from, you know, these add-ons.  And if it was

11  recklessness, that's almost arguably fraud minus or at least

12  not -- nothing more than ordinary fraud.  So I'm not really

13  persuaded by including recklessness in here.

14  But, you know, these things are ors, okay?  They're

15  alternative ways of doing it.  And I guess if -- it would seem

16  to me that since there's three different alternative paths to

17  proving punitive damages, one being gross fraud, one being

18  malice, and one being willfulness, if the plaintiff just

19  wanted to pick one of those or two, we could cut out the other

20  ones and make the instruction simpler.

21  So if you really think that gross fraud means malice,

22  you could say I don't need gross fraud in there because I got

23  malice.  So we can come back to that at the end.  I mean, I

24  think the first thing to do is to get the definitions adjusted

25  and then you can look at them, but you're going to have to do

1  it pretty quickly.  You can look at them and say, "Okay.  We
2  don't really need that one in there.  We'll just go with these
3  other alternatives."

4          So, first of all, I don't think that we can include
5  "reckless indifference" in the first one.  I'm not sure what
6  including "evil motive" gets you other than -- beyond what
7  "intentional, deliberate, and outrageous" already get you.

8          My issue with the term "outrageous" is I don't know
9  what it means, and if I don't know what -- and this one is
10  coming from the defendant.  If I don't know what it means, I
11  can bet you good money that many of the jurors will not know
12  what it means.

13          And so one of the other problems that I'm trying to
14  avoid with this instruction is, you know, we started off with,
15  I think, a tendered instruction by the defendant that just had
16  the terms in it:  gross fraud, malice, and willfulness.  I
17  said we needed definitions of those.  It's not helpful if we
18  get definitions that include things that need more
19  definitions.

20          So what does outrageous mean in this context?  That's
21  my question.

22          MR. HORN:  Your Honor, I don't even see where
23  "outrageous" is in the instruction.

24          THE COURT:  Look on your screen.

25          MR. HORN:  Oh, I'm sorry.  The last word of gross

1  fraud.  We can take that out, your Honor.

2      THE COURT:  You don't have a problem with taking it

3  out on the plaintiff's side, I assume, right?

4      MS. WING:  Correct.

5      THE COURT:  I'm going to change it to "intentional

6  and deliberate."

7      Okay.  Now we're down to malice.  So I think I took

8  this definition from the plaintiff.

9      Let's see.  Let me make sure I'm looking at the right

10  stuff here.

11      No.  I took this definition from the defendant, my

12  mistake.

13      Yeah.  I just want to see if there's a further

14  modification in the defendants' later submission.  I don't

15  think there is.  There's not.

16      So the plaintiff proposes to modify it as "Malice

17  means intent without justification or excuse to commit a

18  wrongful act or the reckless disregard of the law or of a

19  person's legal rights."

20      Now, that's different from ordinary recklessness, as

21  I see it.  "Reckless disregard of a person's legal rights"

22  means something different from just "reckless conduct."

23      The problem -- but I don't think it -- I just have to

24  say I -- do you have any authority for reckless disregard of

25  the law or a person's legal rights beyond this 1997 district

1  court case?

2  MS. WING:  Judge, both the definitions from malice

3  from defendant and plaintiff come from *Black's Law Dictionary*.

4  Theirs is the 6th edition; ours is the 11th edition.  That's

5  all we were going on.

6  THE COURT:  Yeah.  Okay.  I'll cut you off right

7  there.  I'm not basing a jury instruction on *Black's Law*

8  *Dictionary*, unless Black has become the chief justice of the

9  Illinois Supreme Court since I last looked.

10  MS. WING:  Not that I'm aware of.

11  THE COURT:  Yeah.  So we're not going with that.

12  So let me just go -- does anybody remember off the

13  top of your head whether there's a pattern instruction on

14  punitives in Illinois in the IPI?

15  MS. HERRING:  There is, Judge, but it's willful and

16  wanton towards the injury side of punitive issues.

17  THE COURT:  Yeah.

18  MS. HERRING:  It's not on fraud.

19  MR. HORN:  Your Honor, I apologize, and I hate to

20  back us up.  My associate informed me that I spoke out of turn

21  on outrageous, if I could revisit that briefly.

22  THE COURT:  Okay.  Tell me what it means then.

23  MR. HORN:  Yeah, so --

24  THE COURT:  I got dead silence when I asked that

25  question.

1    MR. HORN:  I understand.

2    So the definition without outrageous in there is

3    essentially fraud.  Gross fraud includes outrageous conduct,

4    and outrageous conduct is defined in the case law as similar

5    to the outrage associated with a crime.

6    THE COURT:  Yeah.  So here's the problem with that

7    definition.  It's just -- it doesn't work for a jury

8    instruction because then we're going to have to instruct the

9    jury on what the criminal elements are of fraud, and I'm going

10   to tell you they're the same as this.  They're no different.

11   Okay?  That's language that an appellate court has put in a

12   case to do I don't know what, but it doesn't help on defining

13   a jury instruction.

14   If somebody deliberately makes a false written

15   statement to somebody else, "I've done this," that you haven't

16   done in order to get paid by you, guess what?  You can be

17   charged with a crime for that in Illinois and pretty much

18   every other jurisdiction in the world.  So there's really --

19   that add-on is -- it's actually unhelpful.  It's

20   counterproductive because it doesn't tell you -- first of all,

21   it's probably not correct; and, second of all, it doesn't tell

22   you anything that helps with a jury because then we'd have to

23   tell the jury, "Okay.  What's the requirements for fraud for

24   criminal law?"  And I'm going to tell you you look at it, and

25   you're going to see exactly this.  It's intentional

1  misrepresentation of a fact to induce somebody to pay money.

2  Actually, reliance isn't even required on the

3  criminal side, so the requirements are actually less.

4  MR. HORN:  Your Honor, then my suggestion just

5  because that definition from my perspective is duplicative of

6  the definition of fraud, the intentional and deliberate

7  conduct, is just to take out "gross fraud" altogether.  If

8  they get to fraud -- if they satisfy fraud, then they get to

9  punitive damages.

10  THE COURT:  Let's table gross fraud for a second.

11  Let's talk about the rest of this.

12  My problem with the definition of malice is that last

13  clause:  "under circumstances that the law will imply an evil

14  intent."  A, I don't know what it means; and, B, we can't tell

15  the jury that without telling the jury, "Okay.  When does the

16  law imply an evil intent?"  So my proposal on that is we cut

17  out the last clause, unless somebody can tell me what it means

18  in a way that I can define it to a jury.

19  So the floor is open.

20  MS. WING:  We're fine with that, Judge.

21  MR. HORN:  Your Honor, again, just the way --

22  THE COURT:  Give me a definition.  If you want to

23  keep it in, give me a definition.  What are the circumstances

24  where the law will imply an evil intent?

25  MR. HORN:  How about we take out "under circumstances

1  that the law will imply an evil intent" and just leave in "The
2  term 'malice' means intention of doing a wrongful act without
3  just cause or excuse"?

4      THE COURT:  Are you looking at the red line that I'm
5  looking at here?

6      MR. HORN:  Yes, I am.  So after that, just take --
7  remove the redlined part and after "injury," just put "and
8  evil intent."

9      THE COURT:  Why would it be "and"?  You have it in
10  here as "or."

11      MR. HORN:  Well, then "with evil intent."  I'm trying
12  to remove "under circumstances that the law will apply."

13      THE COURT:  First of all, it's an "or," all right?
14  That's actually the main point here.

15      The definition, as I got it from the plaintiff, it's
16  "intentionally doing a wrongful act without just cause or
17  excuse with intent to inflict an injury, or under
18  circumstances that the law will imply an evil intent."  "Or"
19  means they're alternatives.  It's not -- the plaintiff doesn't
20  have to prove both.  If the plaintiff doesn't want to take on
21  the burden of proving the second part, they don't have to.

22      I'm taking it out.  It doesn't add anything, and it's
23  confusing for the reasons I said.

24      Okay.  So now we've got malice to bed.

25      Now we're on willfulness.

1          So the plaintiff -- okay.  So the definition that I

2    got here came from the defendants.  There's all sorts of

3    issues with it.

4          "Positive and aggressive conduct showing actual and

5    deliberate intent beyond recklessness" -- okay.  So we're

6    putting in a term that the jury doesn't know what it means

7    which is recklessness.

8          Secondly, I don't know what aggressive means.  Does

9    that mean that, you know, somebody got right up in somebody's

10   face and shook their fist at them or what?  So it's a

11   problematic definition as it is.

12         The plaintiff proposed changing it to --

13         MS. WING:  Judge, I already have a proposal to our

14   proposal.

15         THE COURT:  -- "The quality, state or condition of

16   acting purposefully or by design showing deliberateness or

17   intention."

18         MS. WING:  Judge, I would propose that we take out

19   the --

20         THE COURT:  Your 12th grade composition teacher is

21   rolling in her grave right now, but, anyway, what's your

22   proposal?

23         MS. WING:  My proposal is to take out "quality, state

24   or condition" and just say "The term 'willfulness' means

25   acting purposely or by design showing deliberateness and

1  intention."

2  THE COURT:  That?

3  MS. WING:  Yes, your Honor.

4  THE COURT:  That's on the table.  What do the

5  defendants have to say about that?

6  MR. HORN:  Your Honor, this definition, again, is

7  just -- I mean, it's essentially restating the requirement for

8  fraud.

9  THE COURT:  Okay.  That's not -- that's not -- that's

10 not a bad argument.  I recognize that what I just said

11 constitutes damning with mild praise.

12 So here's my suggestion, folks.  I mean, really, I

13 think everything ought to come out of here other than "malice"

14 because we're just -- we're talking about how many angels

15 dance on the head of a pin at this point.  They're alternative

16 definitions to begin with.  They're all kind of pointing in

17 the same direction that the defendant has to have done

18 something deliberately to try to cause harm.  That's what the

19 malice definition says.  It's the simplest and most

20 straightforward.  My proposal is we just go with that.  And I

21 can even --

22 MR. HORN:  Defendants are agreeable to that, your

23 Honor.

24 MS. WING:  Plaintiff objects.

25 THE COURT:  Ah, you want to take on more of a burden,

1   in other words?

2         MS. WING: No, in fact, they're ors which we believe

3   makes a less burden.

4         THE COURT: Okay.

5         MS. WING: The reality is is there's different ways

6   to show punitive damages, especially with three different

7   defendants acting in different ways, and we were planning on

8   proving our punitive damages by different ways that these

9   folks acted.

10        THE COURT: Okay. Is there one case that somebody

11   can tell me that I can read that's going to have most of this

12   stuff in it where I can -- and I know some cases got cited

13   when we were talking about this earlier. There was a Seventh

14   Circuit case cited called *Robo-* --

15        MS. HERRING: *RoboServe*, Judge.

16        THE COURT: -- *RoboServe* or something like that.

17        Do you remember off the top of your head whether

18   *RoboServe* was a business dispute like this one? It kind of

19   looks like from the title that it might have been.

20        MS. HERRING: I do not remember off the top of my

21   head.

22        THE COURT: All right. Well, let me look it up here.

23        MS. HERRING: I'll pull it up.

24        THE COURT: I can look it up here.

25        MR. OREWILER: Plaintiff has another case we could

1    provide to the Court as well.

2            THE COURT:  Is it a Seventh Circuit case?

3            MR. OREWILER:  Yes, your Honor.

4            THE COURT:  What is it?

5            MR. OREWILER:  *Jannotta v. Subway Sandwich Shops*.

6    Would you like the cite?  125 F.3d 503.

7            THE COURT:  Is that the case about the footlong?

8            MR. OREWILER:  That, I don't know.

9            THE COURT:  If it's the one where they -- there was a

10   case where the footlong was only 11 inches and so they sued.

11   I think that might be it.

12           MR. HORN:  Your Honor, just following up on your

13   earlier question, *RoboServe* is a business dispute.

14           THE COURT:  Yeah.  That's kind of what I thought.

15           Okay.  Let me just read this to myself for a second

16   here.

17           Do you have a page cite from --

18           MS. WING:  511.

19           THE COURT:  I'm sorry?

20           MS. WING:  511.

21           THE COURT:  Thanks.

22           MS. HERRING:  Josh, can you tell me that cite again

23   for your *Subway* case?

24           THE COURT:  125 F.3d 503 at page 511.

25           You know, so I've read both of those cases, and, you

1  know, they both cite a whole slew of Illinois cases and, you

2  know, perhaps, unsurprisingly, they don't all point in

3  precisely the same way.

4       So what the *RoboServe* case seems to say is that the

5  lynchpin of punitive damages is intent to cause harm.

6       The *Jannotta* case, also from the Seventh Circuit,

7  which is a business dispute as well -- it's not the case about

8  the footlong; it's about some sort of a lease.  It

9  says "evidence indicating that the fraud was designed to

10  enrich the defendant without regard to its effect on others or

11  was intended by him to harm the plaintiff."

12       MS. WING:  Judge, we would --

13       THE COURT:  That's in the context of, I think, trying

14  to define gross fraud, but, really, just talking more about

15  punitive damages generally.

16       So let me just -- don't say anything.  Let me just

17  kind of ponder for a second.

18   (Brief pause.)

19       THE COURT:  Okay.  I'm going to put this up.  This is

20  what I'm proposing to change it to.  I'll hear arguments.

21  I'll make whatever -- and I'll make a ruling.

22       So rather than having this whole boatload of

23  definitions, this is what I'm proposing to change it to.  And

24  this is based on *RoboServe* and *Jannotta*, which, as I say, cite

25  a whole slew of Illinois cases.

1  So we have this all in the elements of punitive

2  damages, so changing element number two to say -- this is on

3  the individual defendants -- "The defendant's conduct

4  constituted gross fraud or malicious conduct.  This requires

5  NHC to show that defendant acted with the intent to harm NHC,

6  or acted with the intent to enrich himself or Centaur without

7  regard to the effect of his actions on NHC."

8  So let me hear objections by the defendant first.

9  MR. HORN:  Your Honor, the second part of that,

10  again, from my perspective, "acted with the intent to enrich

11  him or Centaur without regard to the effect of his actions on

12  NHC," again, just restates the elements of fraud.

13  Our suggestion would be in looking at *Jannotta* --

14  cited in *Jannotta* is *RoboServe*.  And again, understanding that

15  this is geared toward not attorney laymen, but it's Westlaw

16  Keynote 3, it says:

17  "We often have noted that punitive damages are not

18  favored in Illinois and that an award of such damages is

19  appropriate only in cases of intentional, outrageous

20  misconduct."

21  From our perspective, either malice or that

22  definition, "intentional outrageous misconduct," will be more

23  readily understood by a jury.  So we would propose one of

24  those two methods.

25  THE COURT:  Okay.  So among the things that I

1 disagree with on what you just said is that I don't think that

2 there's anything in the fraud instruction about the intent to

3 enrich one's self, so I don't -- or intent to harm, quite

4 honestly, so I don't think that it duplicates the fraud

5 instruction.

6 And, secondly, the last point you made -- which

7 you'll see me putting up the realtime now so I can refresh my

8 memory.

9 Yeah, I don't think putting a term like "outrageous

10 conduct" in here, which we couldn't come up with a good

11 definition of anyway, would help because I think it would just

12 add more confusion, so that objection's overruled.

13 Plaintiff?

14 MS. WING: No objection.

15 THE COURT: This is the way we're doing it.

16 So the objections to this are overruled.

17 I'm -- so then, I've changed the instruction on

18 punitive damages again, Centaur to conform with that. The

19 second element would be "The conduct of an officer or employee

20 of Centaur constituted gross fraud or malicious conduct, as

21 defined earlier on this page," so it just incorporates that.

22 Then we eliminate the definition page. I changed the

23 page number to page 2.

24 Okay. So I want to go back to the -- just to point

25 out a couple things on the -- I made a little tweak or two.

1          So, first of all, I looked at the *Lewis* case, and I

2   looked at the case it cited, which was called, I want to say,

3   Doe, D-o-e.  It was another Illinois Supreme Court case

4   regarding this intent to induce or intent to deceive.  I don't

5   think the Illinois courts require intent to deceive.  I think

6   intent to induce the party to act is the right intent, so I'm

7   going to overrule the defendants' objections taking that

8   language out of the element 3.

9          I'm changing the -- so one of the things I've done

10  here, just to put the cards on the table -- it's obvious to

11  everybody, but I want to make it obvious for the record.  What

12  I got from one side or both was two fraud instructions:  one

13  involving misrepresentation, one involving concealment.  In a

14  case that involves both, it's just completely

15  counterproductive and unhelpful to give the jury two

16  instructions.  It's really all one thing, and so I've combined

17  the thing.

18         I've changed -- because the element of knowingly --

19  yeah, I did something.  "The defendant made one or more false

20  statements of fact to NHC that the defendant knew or believed

21  to be false," that's, I think, the correct definition as it's

22  set out in *Lewis* and other cases, a bunch of them, so I made

23  that change.

24         And then down further on the page, because I used the

25  term "concealed" up here and I just noticed that I had used

1  the term "withheld" further down the page, I changed all those
2  to -- the "withhelds" to "concealed."

3       I added the language in element 4 about "continue to
4  employ Centaur on the Nobu Hotel project," and I'm sustaining
5  the defense objection to including "continue to induce NHC to
6  contract with Centaur in the first instance."

7       Here's why. So it wasn't pled. I mean, I looked
8  back at the Third Amended Complaint or whatever the current
9  version is, and it's all about misrepresentations made after
10  the contract was made. So that's the first thing.

11       And the second thing's all the problems that were
12  pointed out by the defense about integration clauses and
13  things like that, so I just don't think that's appropriate.

14       So if anybody wants to make any further objections to
15  this one -- let me make it a little smaller so you can see the
16  whole thing -- now's the time.

17       And then we're going to go on to the verdict form
18  which is -- I think there's some more issues on.

19       Anybody want to say anything else about this one?
20  This is the fraud instruction.

21            MS. WING:  Nothing from plaintiff.

22            MR. HORN:  Nothing other than what we've already
23  raised.

24            THE COURT:  Other than what you've already said,
25  understood.

1          Okay.  All right.  So now we're onto the verdict
2    form.

3          So the verdict form comments are all from the
4    defense.  So I'm going to need you to articulate them, but
5    basically, what the proposal is is to do separate damages
6    lines on the verdict form for breach of fraud and for
7    contract.  So I think I kind of explained yesterday why I
8    thought that was a bad idea, but I'll give you a shot at
9    convincing me.

10         Go ahead.

11         MR. HORN:  Yeah.  Again, your Honor, just thinking
12   through this and envisioning the jurors filling it out,
13   there's no apportionment among the claims or the defendants
14   for damages.  If this verdict form is used --

15         THE COURT:  So let's break that -- if you wouldn't
16   mind breaking that down between apportionment among the claims
17   and apportionment among the defense because I think those are
18   actually two distinct points.

19         MR. HORN:  That's correct.  So as it relates to
20   breach of contract damages, we now have two elements of breach
21   of contract damages which are the same as two of the three
22   elements of the fraud damages.

23         On this -- based on this verdict form, it doesn't
24   indicate whether breach of contract damages were awarded --
25   I'm sorry.  The breach of contract damages would be awarded

1 against Centaur, but as to the fraud damages, we don't know

2 whether the fraud damages are awarded, if found, against

3 Mr. Tsaparas, Mr. Alexopoulos, or Centaur.

4 THE COURT: Okay. So that's apportionment among

5 people. I thought you were also arguing for breakdown of

6 contract and fraud.

7 MR. HORN: That's correct, your Honor. I mean, to

8 the extent you're not going to sustain our objection relating

9 to the overlapping damages -- and this is really what the

10 argument stems from.

11 THE COURT: Yeah, I get it.

12 MR. HORN: We have duplicative damage claims under

13 contract and fraud. Your Honor raised the fact that that

14 raises the possibility for a duplicative award or a double

15 award. And so to the extent that we're going to have

16 duplicative damage claims, the payments to subcontractors and

17 the payments to Shawmut on there, we need to have them

18 separated as to whether they were awarded on the breach of

19 contract claim or whether they were awarded on the punitive

20 claim. And if they're -- I'm sorry.

21 THE COURT: The fraud claim.

22 MR. HORN: The fraud claim. And if they're awarded

23 on the fraud claim, who they're awarded against of the three

24 defendants.

25 THE COURT: Okay. So let me just leave out the very

1  last line of that.  That's apportionment among people.

2  So the difficulty with it is it's really the same

3  thing we talked about the other day when we were having the

4  discussion about overlapping damages.  And I think the -- I

5  think basically what the Seventh Circuit has told us is that

6  you don't get damages for claims; you get damages for

7  injuries.

8  It is accurate that the injuries that are claimed as

9  the result of the breach of contract are the same or at least

10  a subset of the injuries that are claimed for the fraud.

11  Specifically, two things:  the payments to subcontractors and

12  the payments to Shawmut Design and Construction.  Those are

13  claimed as breach of contract damages.  Those are also claimed

14  as fraud damages.

15  So I don't -- the Seventh Circuit has said you get

16  damages for injuries, not for claims, so I don't -- it's

17  correct to say, "Okay.  Your breach of damages is this, your

18  fraud damages is this, and now we got to sort them out."

19  And so it, A, creates a potential for jury confusion

20  because the jury would say, "Well, am I giving these people

21  double recovery?"  And so then we'd have to give the -- then

22  we have to give the jury an instruction on that, and I'll just

23  tell you nobody tendered me a satisfactory instruction on

24  that, on sorting that out.

25  Basically, one side said -- one side said, "The way

1 it gets sorted out, ladies and gentlemen of the jury, is if

2 you award damages for breach of contract, the fraud claim goes

3 away, which, as I've explained probably about a half a dozen

4 times now, I don't agree with. I don't think it's right

5 legally.

6 The way the plaintiff proposed to do it is the

7 plaintiff will decide later. I don't think that's right

8 either, so I didn't get a satisfactory instruction from

9 anybody.

10 Then we had a further discussion about what are the

11 elements of damages that were claimed on the fraud claim? It

12 turns out that two of them are the same: subcontractor

13 payments and the payments to Shawmut. The one thing

14 additional that's claimed is the payment for attorneys' fees.

15 It seems to me that that lends to relative simplicity in the

16 jury determining what amount of money compensates the

17 plaintiff for each of the injuries that the plaintiff claims

18 to have suffered; injuries being the thing that the Seventh

19 Circuit has told us that damages compensate for.

20 And then in terms of sorting out what their -- what

21 the damages are for, we're going to know that from the rest of

22 the jury instructions.

23 So first of all, the jury has been told that NHC --

24 or, excuse me, that Centaur and Mr. Tsaparas are liable on the

25 breach of contract claim, so the damages that they award on

1  the first two elements are going to be the damages that are

2  the breach of contract damages.  And the other instructions

3  tell the jury that the plaintiff has to prove their damages by

4  a preponderance of the evidence.  The verdict form isn't

5  another instruction; it's where the jury memorializes its

6  determinations based on the other instructions.

7         And then -- so we're going to know what the breach of

8  contract damages are from the first two blanks on the

9  compensatory damages.  We're going to know what the fraud

10  damages are -- A, if that third blank is filled out, it's

11  going to be all three blanks.  We're going to know who those

12  are awarded against because the jury is going to be told,

13  "Check off yes or no who wins as to the plaintiff -- as

14  between the plaintiff and, number one, Centaur, and, number

15  two, Mr. Tsaparas, and, number 3, Mr. Alexopoulos."  So we're

16  going to know who's liable on the fraud claim.

17         So now, if you're -- if your claim or if your

18  argument, in part -- so that -- I don't think the

19  apportionment between claims is an issue for those reasons.

20         So if your issue on apportionment between people is

21  that -- is it that the jury could find that a particular

22  defendant might be -- might have caused the damages consisting

23  of the payments to subcontractors but not the damages that

24  consist of the payments to Shawmut or something like that?

25         MR. HORN:  That's correct.

1      THE COURT:  Okay.

2      MR. HORN:  One of the concerns.

3      THE COURT:  What's the other one in terms of

4  apportionment among people or defendants?

5      MR. HORN:  Just the way that your Honor has

6  envisioned it.

7      So my understanding now is you're saying if they

8  enter damages on the third line item for attorneys' fees paid,

9  then we'll know that they are awarding damages for fraud,

10  right?

11      THE COURT:  Yeah, we will --

12      MR. HORN:  But how --

13      THE COURT:  -- because there's a big, bold print

14  thing there that says, "Only fill this out if you've found in

15  favor of the plaintiff on the fraud claim."

16      MR. HORN:  But then who do we -- how do we know as to

17  the first two elements, which are overlapping breach of

18  contract and fraud damages --

19      THE COURT:  Yeah.

20      MR. HORN:  -- how do we know if those are breach of

21  contract against Centaur or fraud against Spiro or fraud

22  against Mr. Alexopoulos or fraud against Centaur?

23      THE COURT:  Okay.  So to me, you're just repeating

24  the point about apportionment among claims which I've ruled on

25  like 19 times now.  Okay.  That's an exaggeration for effect,

1  but I've ruled on it a bunch of times now.

2         I get that there might be some theoretically,
3  hypothetical, plausible possibility that a defendant could be
4  found liable for fraud but not responsible for each and every
5  element of the damages, maybe just one or maybe just one of
6  the other ones.  I get that part.  I haven't been given a
7  satisfactory way to set that out on the verdict form.

8         And the problem is is it basically comes back to the
9  same conceptual problem.  If I tell the jury, "Okay.  What are
10  the compensatory damages against Centaur?  What are the
11  compensatory damages against Mr. Tsaparas?  What are the
12  compensatory damages against Mr. Alexopoulos?" the jury's
13  going to say, "Okay.  Does that mean I'm splitting them up, or
14  does that mean something other than I'm splitting them up?"

15         The initial inclination is going to be, "I'm
16  splitting them up," and there's no such thing as -- I mean, if
17  people are -- commit the same fraud, you don't get to split up
18  the damages; it's joint and several liability.  That's the way
19  it works.

20         So, I mean, I get that maybe there is some plausible
21  scenario under which a defendant could be found liable for,
22  you know, one of these elements or two of these elements but
23  not all three, but you guys have not given me a verdict form
24  that does that in a way that doesn't create more problems than
25  it solves.  So if you can come up with a way of doing it, I'm

1  more than willing to entertain it, but, you know, I mean, I'm

2  entitled to insist on people giving me a verdict form that

3  works.  And, I mean, honestly, just to put a fine point on it,

4  in order to preserve it for appeal, you're going to have to

5  have done that.

6          MR. HORN:  Your Honor, the verdict form that we gave

7  you, all it really -- all it does is it makes breach of

8  contract damages and the breach of contract award separate

9  from --

10         THE COURT:  No, it doesn't.  It does more than that.

11  That is just flat-out wrong.  It doesn't.  I am looking at it.

12         You have a blank that says, "The total amount of

13  attorneys' fees paid by NHC in lawsuits, brought or threatened

14  against NHC by its subcontractors on the Nobu Hotel project,"

15  you added this language:  "which are apportioned amongst the

16  defendants as follows."  So it also does that.

17         So what you just told me is just wrong.  I'm not

18  going to tell you what I wrote in the margin here when I read

19  that.  That's just -- we can't do it that way without telling

20  the jury how to do it.  I mean, it's basically telling them,

21  "Okay.  You guys figure out on your own some form of

22  comparative fault," which doesn't apply in intentional fraud

23  cases.

24         You know, it's like you would have in a car crash

25  case where there are two cars that crash into one, that this

1 defendant is this much percent liable, and that defendant's

2 that percent liable. We don't have that in fraud cases. We

3 just don't. The Illinois Supreme Court has said that multiple

4 times.

5 So what you've given me here asks me to do something

6 that's unlawful. So that's the problem with it, okay?

7 MR. HORN: Your Honor, if your issue with that is the

8 apportionment, that's fine.

9 But, again, just to clarify things, why would we not

10 separate the breach of contract damages from the fraud damages

11 so we're clear what the fraud damages are and what the breach

12 of contract damages are? Again, I still don't understand.

13 Let's say they award -- let's say they award on the

14 three items. Let's say they award on all three, all right?

15 How are we going to determine after the fact whether the first

16 two items which are the same in contract and fraud, how are we

17 going to determine what those have been awarded on?

18 THE COURT: Okay. So look, I really can't say what

19 I've been saying for essentially the last 25 minutes in any

20 more ways than I have already said it. You have given me an

21 instruction here that -- the verdict form that you have given

22 me apportions or it subdivides compensatory damages between

23 claims. The Seventh Circuit has stated in so many words in a

24 case that I don't recall the name of it right now, we

25 discussed it the other day, that that's not how it works.

1   That's not how it works, okay?

2         Perhaps, you are identifying a different problem now,
3   but I -- honestly, every time I ask you about this, you go
4   back to the same thing that I have now ruled on more times
5   than I care to, and I'm not going to rule on it anymore.  I'm
6   not going to rule on it anymore.

7         Maybe I'm just going to -- because, look, here's the
8   deal, folks.  The way this works, and you all know this, okay?
9   So I've been trying cases as a lawyer and as a judge for
10  41 years now, okay?  And I knew this as a lawyer, I knew it as
11  a judge.  You guys had a chance to give me jury instructions,
12  including a verdict form.  All of this -- I could have stopped
13  right there.  I could have stopped right there.  Didn't have
14  to give people the opportunity to give me revised versions of
15  this, which we're now on three or four revisions.  I asked you
16  for definitions on the punitive damages.  I asked you for
17  something about, you know, overlapping damages.  I asked you
18  -- you know, I gave you the verdict form.  And I'm getting
19  nothing helpful.

20        We're going with it this way.  The objections are
21  overruled.  That's the answer.

22        Do you want to make your Rule 50 motion?

23        MR. HORN:  Yes, your Honor.  We actually have two
24  separate Rule 50 --

25        THE COURT:  Okay.

1      MR. HORN:  -- motions which have been filed in PACER.
2    I also have copies here.

3      THE COURT:  Let me just pull them up so I can look at
4    them.

5      Okay.  So they got filed about 9:15, it looks like,
6    this morning.

7      Count 1, it looks pretty short.  Let me just take a
8    second to read them.

9      Okay.  The way that the Rule 50 motion on Count 1,
10   the breach of contract claim, reads to me is that there's no
11   liability.  That's the way it reads to me.  There was no --
12   that NHC terminated the contract before complying with an
13   express condition precedent, and, therefore, there's no
14   liability.

15     MR. HORN:  That's correct.

16     THE COURT:  Okay.  So I have two questions for you:
17   Number one, was that argument made on the summary judgment
18   motion?  Was it made on the summary judgment motion?

19     MR. HORN:  I don't believe so.

20     THE COURT:  Okay.  It's forfeited.  I have found
21   liability.  Liability was determined on the summary judgment
22   motion.

23     I don't think this argument was made.  If it was
24   made, that probably means I rejected it.  I don't have a
25   perfect recall of that.  There was no motion to reconsider

1 filed. Liability was determined at that point in time.

2 This isn't a motion that the damages weren't caused

3 by the breach of contract which is the only issue that's on

4 the table here. So the Rule 50 motion on Count 1 is denied

5 because the issue is forfeited.

6 MR. HORN: Your Honor, just to be clear, it does

7 relate to the recoverability, the survivability of damages.

8 THE COURT: So, look, I asked you a question, you

9 gave me an answer, you didn't hedge. It was definitive, okay?

10 You'll look back at the transcript some day, and you'll see

11 that it was. That's my ruling.

12 Now we're going to talk about the motion for judgment

13 as a matter of law on Count 2. Let me take a couple minutes

14 to read this.

15 (Brief pause.)

16 THE COURT: Okay. There's three arguments, and I'm

17 going to ask the plaintiff to respond to the third one.

18 There's three arguments on the fraud claim. Argument

19 one is that it's a promissory fraud claim, and, therefore, not

20 actionable under Illinois law. And it takes the position that

21 the fraud claim is premised on future representations that the

22 project would be finished on time and on budget. I just think

23 that's wrong because I've understood the primary basis of the

24 fraud claim is -- at least one significant basis to be that

25 false representations were made in the request for the

1 progress payments. The subcontractors were being paid and so
2 on. It's not just about promises. So I don't think that's a
3 viable basis to dismiss the fraud claim at this point.

4 Second is the argument that's been made -- and I'm
5 not criticizing you for making it. It's an appropriate
6 argument for you to make; that it really isn't -- the fraud
7 claim is really not distinguishable from the breach of
8 contract claim.

9 I ruled on that -- I think I ruled on that in the
10 summary judgment motion. I don't think that that's the case
11 here, so that one is overruled.

12 The third argument has to do with the sufficiency of
13 the evidence on justifiable reliance and on fraudulent intent.

14 So let's do those in reverse order. So give me in a
15 nutshell on the plaintiff's side what your argument is that
16 the evidence supports a verdict on the question of fraudulent
17 intent.

18 MS. WING: Judge, we've introduced evidence that
19 there was a scheme here to make up past debts from past
20 projects. These defendants knew that they were deeply in debt
21 and had the intent to use this largest project that they've
22 ever gotten as a way to make up those past debts and to line
23 their own pockets as they received these large payments.

24 We've shown elements of intent in that way.
25 Excuse me a moment.

1    (Brief pause.)

2        MS. WING:  Judge, the standard that we're talking

3    about with intent here is an intent to induce the payment from

4    NHC, and there's been plenty of testimony here that they

5    signed these payment applications knowing that they were

6    false.  They considered them just to be file stuffers, and

7    they intended to submit them just to have payment because they

8    said it's what was needed to get payment which shows an intent

9    to induce NHC to make those payments to them.

10        THE COURT:  Okay.  On the question of justifiable

11   reliance?

12        MS. WING:  The justifiable reliance is that NHC

13   believed these statements, particularly on the payment

14   applications, that work was done, that liens were waived, and

15   made the payment.  They justifiably relied on these under-oath

16   statements in order to send money.

17        THE COURT:  You want to respond to those points?

18        MR. HORN:  Yes.  So to the first one, your Honor, to

19   fraudulent intent, Ms. Wing indicated that there was evidence

20   that Centaur was using project funds on this project to

21   satisfy other project debts.  There was no evidence of that;

22   in fact, to the contrary.  The only evidence indicated on that

23   issue indicated that there were no project funds used to

24   satisfy other project debts.

25        MS. HERRING:  Mr. Martorano, if you wouldn't mind us

1  tag teaming this, Judge.

2  THE COURT:  That's okay.  Go ahead.  That's fine.

3  MS. HERRING:  Mr. Martorano and Mr. Harris both

4  testified to this issue, and they both said that they thought

5  that this had happened on prior projects, but they both had no

6  knowledge of this happening on the Nobu project.

7  THE COURT:  When you say "this," what's the this?

8  MS. HERRING:  Payments being made for -- to make up

9  for past projects.  They said it had happened in the past that

10  Centaur would pay subcontractors on the project more on the

11  current project in order to make up for a past project, but

12  they said it did not happen on the Nobu project.  They had no

13  knowledge of that happening on this Nobu project.

14  THE COURT:  So be prepared to respond to that,

15  Ms. Wing.

16  Go ahead and finish your other point then, Mr. Horn.

17  MR. HORN:  As to justifiable reliance, we heard very

18  clear testimony and saw very clear documentation relating to

19  the treasurer for NHC, Mr. Israel Navarro, where he was

20  sending emails to Centaur attaching the cash flow projections,

21  referencing the cash flow projections, asking them to send him

22  an invoice in line with the cash flow projections so that he

23  could process that payment.  I believe we also saw an email

24  from Rodrigo Chapur requesting that same thing.

25  So, you know, to the extent some people from NHC

1  relied on the applications and some people knew that they

2  weren't accurate and requested invoices is enough.

3  I mean, the fact that Mr. Navarro, the treasurer of

4  NHC, was emailing Centaur attaching the cash flow projections,

5  asking for an invoice identical to the cash flow projections

6  is enough to show that there was no justifiable reliance on

7  the part of NHC as an entity.

8  Now, whether one person at NHC understood differently

9  is irrelevant.

10  THE COURT:  Can you respond to both points then,

11  Ms. Wing?

12  MS. WING:  Certainly, Judge.

13  We agree that Howard Harris -- I don't believe that

14  Nick Martorano testified on the topic, but Howard Harris said

15  that Centaur had run this scheme of making up for past debts

16  in the past, but he didn't have it happen to him on this

17  project.  But Rudy Ramirez, the drywall contractor, said that

18  it did happen, so we have that evidence to put in front of the

19  jury on that topic.

20  With regard to the justifiable reliance, the fact

21  that the numbers matched up with the cash flow, Rodrigo Chapur

22  testified that he understood that to mean that everything was

23  on progress, and Mr. Nunez did not send any emails saying this

24  has to match up exactly with the cash flow.  He said, "Send me

25  the cash flow, and send me your invoice for the July payment."

1  I know exactly what email they're referring to when they make
2  that argument.

3        All of the NHC witnesses testified that they
4  understood that it was for work performed, not just the cash
5  flow projection.  DeAnna Van Senus, Spiro's assistant,
6  testified to the same, that she understood it to be work
7  performed, not the cash flow projection.  And so we have
8  credibility that needs to be assessed between the various
9  witnesses on that topic because we have contrary testimony.
10  That needs to be weighed by the jury.

11        THE COURT:  So on that part of the Rule 50 motion,
12  the law allows me to reserve ruling, so I'm reserving ruling
13  until post verdict.

14        Okay.  So I got to send these things to the printer.
15  Do you want -- are folks going to project these?  Do you want
16  me to email you the instructions?

17        Okay.  I'll do that first actually.

18        Does anybody need a hard copy --

19        MS. WING:  Not plaintiff.

20        THE COURT:  -- like now?

21        MS. HERRING:  No, Judge.

22        THE COURT:  No?  Okay.

23        All right.  So let me send them to the printer, and
24  then I'll email them.

25        And then, so figure it's going to be about 10 or

1  15 minutes before I get everything duplicated, so you've got a
2  break for that long.

3        So then, it will take about 15 to 20 minutes to read
4  the instructions.

5        And you said you got about 40 minutes, right?
6        MS. WING:  Maybe even less.
7        THE COURT:  Okay.  And you think you've got?
8        MS. HERRING:  A little over a half an hour.
9        THE COURT:  Yeah.  I got to tell you my preference is
10 going to be to try to get these done before lunch -- all at
11 once before lunch rather than splitting them up.  It's going
12 to require me to move something else that I was planning to
13 do -- a settlement conference I was actually planning to do
14 over the lunch hour, so I got to work on that.  But I'll get
15 to work on that.

16       And so we'll just kind of see how it goes.  I mean,
17 people could go longer or shorter, but you're on break right
18 now.  You've probably got about 15 minutes.

19    (Short break.)

20    (The jury enters the courtroom.)

21       THE COURT:  Okay.  You can all have a seat.  And you
22 should see on your chairs there a set of the instructions.
23 I'm also going to read them.  That's what judges do.  I'm also
24 going to put them on the screens, so you'll see them on the
25 screens.

1  Members of the jury, you've seen and heard all the
2  evidence, and you're about to hear the arguments of the
3  attorneys.

4  Now I will instruct you on the law.

5  You have two duties as the jury.  Your first duty is
6  to decide the facts from the evidence in the case.  This is
7  your job, and yours alone.

8  Your second duty is to apply the law that I give you
9  to the facts.  You must follow these instructions, even if you
10  disagree with them.  Each of the instructions is important,
11  and you must follow all of them.  You must also continue to
12  follow the instructions that I gave you at the start of the
13  trial, that you may not communicate about the case or about
14  people involved in the case with anyone other than your fellow
15  jurors until after you've returned your verdict.

16  Perform these duties fairly and impartially.  Each
17  party to the case is entitled to the same fair consideration.
18  Do not allow sympathy, prejudice, fear, or public opinion to
19  influence you.  You should not be influenced by any person's
20  race, color, religion, national ancestry, age, or sex.

21  Nothing I am saying now, and nothing I said or did
22  during the trial, is meant to indicate any opinion on my part
23  about what the facts are or about what your verdict should be.

24  To the extent that these instructions differ from the
25  instructions that I read you at the beginning of the case, the

1  instructions that I'm giving you now are the ones that will
2  govern your consideration of this case.

3      The evidence consists of the testimony and the
4  exhibits, as well as the parties' stipulations.  A stipulation
5  is an agreement that certain facts are true.  Certain
6  testimony was presented by reading depositions.  You should
7  give this testimony the same consideration that you would give
8  it if the witnesses had testified here in court.

9      For witnesses who testified in Spanish, you may
10 consider only the evidence provided through the official
11 interpreter.  Although some of you may know Spanish, it is
12 important that all jurors consider the same evidence,
13 therefore, you must base your decision on the evidence
14 presented in the English translation.

15     In determining whether any fact has been proved, you
16 should consider all of the evidence bearing on that fact,
17 regardless of who offered the evidence.

18     You must make your decision based on what you recall
19 of the evidence.  You will not have a written transcript of
20 the testimony to consult.

21     Certain things are not evidence.  I will list them
22 for you:

23     First, if I told you to disregard any testimony or
24 exhibits or struck any testimony or exhibits from the record,
25 such testimony or exhibits are not evidence and must not be

1  considered.

2       Second, anything you may have seen or heard outside

3  the courtroom is not evidence and must be entirely

4  disregarded.  This includes any press, radio, Internet, or

5  television reports that you may have seen or heard.  Such

6  reports are not evidence, and your verdict must not be

7  influenced in any way by such publicity.

8       Third, questions and objections are not evidence.  A

9  lawyer or a party representing --

10      You know what?  That's a mistake.  That is what we

11 call a cut-and-paste error that comes from a prior case where

12 I had a party representing himself.

13      So here's what you're going to do:  You're going to

14 take your pens and line out the words "or a party representing

15 himself."  Sorry about that.

16      So here's how the sentence should read.  There's

17 going to be one error further along that just occurred to me

18 that I'm going to point out too.

19      A lawyer has a duty to object when he or she believes

20 the question is improper.  So strike out the words "or a party

21 representing himself."

22      Okay.  So I'm going to read it again.

23      A lawyer has a duty to object when he or she believes

24 a question is improper.  You should not be influenced by any

25 objection, and you should not infer from my rulings that I

1  have any view about how you should decide the case.

2  Fourth, the parties' opening statements and closing

3  arguments to you are not evidence.  Their purpose is to

4  discuss the issues and the evidence.  If the evidence as you

5  remember it differs from what was stated in the opening

6  statements and closing arguments, your memory is what counts.

7  Any notes you've taken during this trial are only

8  aids to your memory.  The notes are not evidence.  If you have

9  not taken notes, you should rely on your independent

10  recollection of the evidence and not be unduly influenced by

11  the notes of other jurors.  Notes are not entitled to any

12  greater weight than the recollections or impressions of each

13  juror about the testimony.

14  You should use your common sense in weighing the

15  evidence and consider the evidence in light of your own

16  observations in life.

17  In our lives, we sometimes look at one fact and

18  conclude from it that another fact exists.  In law we call

19  this an inference.  A jury is allowed to make reasonable

20  inferences, so long as they are based on the evidence in the

21  case.

22  You may have heard the phrases "direct evidence" and

23  "circumstantial evidence."  Direct evidence is proof that does

24  not require an inference, such as the testimony of someone who

25  claims to have personal knowledge of a fact.  Circumstantial

1  evidence is proof of a fact, or a series of facts, that tends
2  to show that some other fact is true.

3          You're to consider both direct and circumstantial
4  evidence.  The law allows you to give equal weight to both
5  types of evidence, but it is up to you to decide how much
6  weight to give to any evidence in the case.

7          You must decide whether the testimony of each of the
8  witnesses is truthful and accurate, in part, in whole, or not
9  at all.  You also must decide what weight, if any, you give to
10 the testimony of each witness.

11         In evaluating the testimony of any witness, including
12 any party to the case, you may consider, among other things:

13         The ability and opportunity the witness had to see,
14 hear, or know the things that the witness testified about;

15         The witness' memory;

16         Any interest, bias, or prejudice the witness may
17 have;

18         The witness' intelligence;

19         The manner of the witness while testifying;

20         The reasonableness of the witness' testimony in light
21 of all the evidence in the case; and

22         Any inconsistent statements or conduct by the
23 witness.

24         It's proper for an attorney to meet with any witness
25 in preparation for trial.

1          The law does not require any party to call as a

2   witness every person who might have knowledge of the facts

3   related to this trial.  Similarly, the law does not require

4   any party to present as exhibits all papers and things

5   mentioned during this trial.

6          You may find the testimony of one witness or a few

7   witnesses to be more persuasive than the testimony of a larger

8   number of witnesses.  You need not accept the testimony of the

9   larger number of witnesses.

10          The plaintiff in this case is NHC LLC.  The

11  defendants are Centaur Construction Company, Spiro Tsaparas,

12  and Peter Alexopoulos.

13          NHC had a contract with Centaur Construction relating

14  to the design and the construction of the Nobu Hotel Chicago.

15  Spiro Tsaparas and Peter Alexopoulos are the owners of

16  Centaur.

17          NHC alleges that Centaur breached the contract and

18  that NHC was damaged as a result.  There has been a finding

19  that Centaur breached the contract in certain ways.  You, the

20  jury, will have to determine the amount of damages.

21          NHC also alleges that Centaur, through Mr. Tsaparas

22  and Mr. Alexopoulos, submitted requests for payment in which

23  they intentionally misrepresented, among other things, certain

24  work had been done on the construction project and that

25  certain subcontractors had been paid.  NHC alleges that it was

1  damaged as a result.

2  Centaur denies that NHC was damaged as a result of
3  any action or inaction by Centaur involving the construction
4  contract.  Centaur, Mr. Tsaparas, and Mr. Alexopoulos each
5  deny that they knowingly or intentionally made any
6  misrepresentations to NHC.  They contend that NHC was fully
7  aware of the status of the project and was not misled in any
8  way.  Centaur, Mr. Tsaparas, and Mr. Alexopoulos also contend
9  that NHC was not damaged as a result of any claimed
10 misrepresentations.

11 In these instructions, I will use the term
12 "preponderance of the evidence."  When I say that a party "has
13 to prove a proposition by a preponderance of the evidence," I
14 mean that the party must persuade you that the proposition is
15 more probably true than not true.

16 I will also use the term "clear and convincing
17 evidence."  When I say that a party "has to prove a
18 proposition by clear and convincing evidence," I mean that the
19 party must persuade you that it is highly probable that the
20 proposition is true.  This is a higher standard of proof than
21 "preponderance of the evidence."

22 NHC's first claim is a claim for breach of the
23 construction agreement.  As I have stated, there has been a
24 finding that Centaur breached various provisions of the
25 contract and that Centaur and Mr. Tsaparas are liable to NHC

1 for the breach. You, the jury, must determine the amount of
2 damages to award to NHC for the breaches.

3 I will address the question of damages later in these
4 instructions.

5 The contract provisions that were breached are as
6 follows:

7 Section 1.1, entitled Industry Standards;

8 Section 1.4.15, entitled Guaranteed Maximum Price;

9 Section 1.17, entitled Schedule;

10 Section 9.3.1, entitled Payment Applications; and

11 Section 9.6.2, entitled Subcontractor Payments.

12 NHC's second claim is a claim for fraud. NHC is
13 asserting this claim against Centaur, Mr. Tsaparas, and
14 Mr. Alexopoulos. You must consider each defendant separately.

15 To succeed on this claim, NHC must prove each of the
16 following propositions by clear and convincing evidence as to
17 the particular defendant you're considering. There are five
18 propositions:

19 Number one, the defendant made one or more false
20 statements of fact to NHC that the defendant knew or believed
21 to be false or knowingly concealed one or more facts from NHC;

22 Number two, the false statement or concealed fact was
23 material; in other words, NHC would have acted differently if
24 it had known the truth;

25 Number three, the defendant acted with the intent to

1  induce NHC to continue to employ Centaur on the Nobu Hotel
2  Chicago project and/or to continue to make progress payments
3  to Centaur;

4         Number four, NHC reasonably believed the statement,
5  or, in the case of a concealed fact, reasonably relied on the
6  facts as it understood them and continued to employ Centaur on
7  the Nobu Hotel Chicago project or continued to make progress
8  payments to Centaur as a result; and

9         Number five, NHC was damaged due to its reliance on
10 the false statement or, in the case of a concealed fact, due
11 to its reliance on the facts as it understood them.

12        As I have stated, there has been a finding that
13 Centaur and Mr. Tsaparas are liable to NHC for breach of
14 contract.  You must decide how much money, if any, would
15 fairly compensate NHC for the breaches listed in the
16 instruction entitled First Claim.

17        NHC has the burden of proving by a preponderance of
18 the evidence its damages and that they occurred as a direct
19 and natural result of the breaches of the contract.  In
20 calculating NHC's damages, you should determine the amount of
21 money that will put NHC in as good a position as it would have
22 been in if Centaur had performed all of its obligations under
23 the contract.  Specifically, NHC requests damages for the
24 following:

25        Payments to subcontractors that Centaur owed but it

1  did not pay; and

2       Payments made to Shawmut Design and Construction to
3  complete construction of the Nobu Hotel Chicago project.

4       If you find in favor of NHC against one or more of
5  the defendants on NHC's second claim, then you must decide the
6  amount of money that will reasonably and fairly compensate NHC
7  for any of the following elements of damages that NHC has
8  proven by a preponderance of the evidence resulted from the
9  conduct of the defendant or defendants:

10       Payments to subcontractors that Centaur owed but did
11 not pay;

12       Payments made to Shawmut Design and Construction to
13 complete construction of the Nobu Hotel Chicago project; and

14       Attorneys' fees paid by NHC in lawsuits brought or
15 threatened against NHC by subcontractors on the Nobu Hotel
16 Chicago project.

17       On its second claim for fraud, NHC is also requesting
18 an award of punitive damages.  Punitive damages may be awarded
19 only on NHC's fraud claim, not on its breach of contract
20 claim.

21       You must address punitive damages separately as to
22 each defendant, if any, that you have found to be liable to
23 NHC on its fraud claim.

24       Punitive damages may be awarded against an individual
25 defendant, namely, Mr. Tsaparas and/or Mr. Alexopoulos, only

1   if:

2           Number one, you find in favor of NHC and against the

3   defendant on NHC's fraud claim; and

4           Number two, the defendants' conduct constituted gross

5   fraud or malicious conduct.  This requires NHC to show that

6   the defendant acted with the intent to harm NHC or acted with

7   the intent to enrich himself or Centaur without regard to the

8   effect of his actions on NHC.

9           Punitive damages may be awarded against Centaur only

10  if:

11          Number one, you find in favor of NHC and against the

12  defendant on NHC's fraud claim;

13          Number two, the conduct of an officer or employee of

14  Centaur constituted --

15          Whoops, we got "constituted" in there twice.  That's

16  not the error I said was coming up, so just scratch out the

17  second "constituted."  I'll read the sentence as it's supposed

18  to read.

19          -- (continuing) the conduct of an officer or employee

20  of Centaur constituted gross fraud or malicious conduct, as

21  defined earlier on this page; and then

22          Number three, one or more of the following, and there

23  are three alternatives:

24          Centaur through its management, authorized the doing

25  and the manner of the conduct of the officer or employee;

1          I have to say I'm embarrassed at myself that there
2  are three typos.  So scratch out "of" and change it to "or" if
3  you wouldn't mind.

4          The second bullet point is -- or the second bullet
5  point:

6          The conduct was that of a manager or employee of
7  Centaur who was acting in the scope of his employment or
8  Centaur, through its management or managerial employee,
9  ratified or approved the conduct.

10          Okay.  This is the one where I know there's a
11  mistake, which we're going to get to in a minute here.

12          If you find the elements for an award of punitive
13  damages that are listed on page 16, that should say page 15,
14  so it's the previous page, have been shown -- the reason for
15  that is the paging changed as we did this.  I neglected to
16  change the pages.

17          I'm just going to tell you what I'm going to do.

18          While the closing arguments are happening, I'm going
19  to fix these typos, print out new copies for each one of you
20  that has them all fixed, and then when you leave after the
21  closing arguments, I'll give you the accurate version of them
22  so that we don't have to worry about the typos.

23          And, again, I apologize for that, and I apologize to
24  the extra trees that are going to get knocked down because of
25  my error.

1    If you find the elements for an award of punitive

2 damages that are listed on page 15 have been shown as to -- or

3 a particular defendant, and if you further believe that

4 justice and the public good require it, you may, in addition

5 to compensatory damages, award to NHC and against the

6 particular defendant an amount that will serve to punish the

7 defendant and to deter the defendant and others from similar

8 conduct.

9    In determining the amount of punitive damages, you

10 should consider the following three questions.  The first

11 question is the most important to determine the amount of

12 punitive damages.

13    Number one, how reprehensible was the defendants'

14 conduct?  On this subject, you should consider the following,

15 and there are six things:

16    A, the facts and circumstances of the defendants'

17 conduct;

18    B, it should say the financial vulnerability of

19 NHC -- so that's one of the typos I'm going to fix.  The word

20 "financial" was omitted -- the financial vulnerability of NHC;

21    C, the duration of the misconduct;

22    D, the frequency of the defendants' misconduct;

23    E, whether the harm was physical as opposed to

24 economic; and

25    F, whether the defendant tried to conceal the

1  misconduct.

2  Then the second question is what actual and potential

3  harm did the defendants' conduct cause to NHC?

4  And the third question is what amount of money is

5  necessary to punish the defendant and to discourage the

6  defendant and others from future wrongful conduct, in light of

7  the defendants' financial condition?

8  The amount of punitive damages must be reasonable and

9  in proportion to the actual and potential harm suffered by

10 NHC.

11 Once you're all in the jury room, the first thing you

12 should do is choose a presiding juror.  The presiding juror

13 should see to it that your discussions are carried on in an

14 organized way and that everyone has a fair chance to be heard.

15 You may discuss the case only when all jurors are

16 present.

17 Once you start deliberating, do not communicate about

18 the case or your deliberations with anyone except other

19 members of your jury.  You may not communicate with others

20 about the case or your deliberations by any means.  This

21 includes oral or written communication, as well as any

22 electronic method of communication, such as by using a

23 telephone, cell phone, smartphone, iPhone, Android,

24 Blackberry, or any type of a computer; by using text

25 messaging, instant messaging, the Internet, chat rooms, blogs,

1  websites, or social media, including services like Facebook,
2  LinkedIn, Google+, YouTube, Twitter, Instagram or Snapchat, or
3  by using any other method of communication.

4         If you need to communicate with me while you're
5  deliberating, send a note through the court security officer.
6  The note should be signed by the presiding juror or by one or
7  more members of the jury.  To have a complete record of this
8  trial, it's important that you not communicate with me except
9  by a written note.  I may have to talk to the lawyers about
10 your message, so it may take me some time to get back to you.
11 And you may continue your deliberations while you wait for my
12 answer.

13        If you send me a message, don't include the breakdown
14 of your votes; in other words, don't tell me that you're split
15 4 to 4 or 5 to 3 or whatever your vote happens to be.  And
16 you'll forgive me for the bad math there.  This comes from a
17 case where I had 8 jurors, not 10.  It should say 5 to 5 or 6
18 to 4 or something like that, but you get the point.

19        A verdict form has been prepared for you, and you
20 will take this form with you to the jury room.

21        Page ahead two pages, and you'll see something that
22 looks like this.  It's the verdict form.  It's pretty simple.

23        First claim, breach of contract, it says, "There's
24 been a finding of liability in favor of NHC and against
25 defendants Centaur and Tsaparas."  So you don't have to make a

1   finding of liability on that one.

2   Second claim, fraud against all three of the
3   defendants -- for each of the defendants, it says -- it asks
4   you to check off whether you've found in favor of the
5   plaintiff and against that defendant or in favor of that
6   defendant and against the plaintiff.

7   Then there's a section for compensatory damages.  It
8   says, "We, the jury, award Centaur compensatory damages as
9   follows."  And there's a blank for each of the types of
10   compensatory damages that are claimed.

11   And as you'll see when you cross-reference these
12   instructions, the first two blanks there cover both the
13   contract claim and the fraud claim.

14   "Payments to subcontractors that were not paid by
15   Centaur," I'm going to tweak that one a little bit when I give
16   you the revised version, so make sure you use the revised
17   version.

18   And the second one is payments made to Shawmut Design
19   and Construction to complete construction of the Nobu Hotel
20   Chicago project.

21   The third blank, as you'll see in that bold print
22   down there at the end, "Attorneys' fees paid by NHC" and so
23   on, this element of damages is available only if you've found
24   in favor of NHC against one or more defendants on the fraud
25   claim.  So you'll only fill out that third blank if you've

1  found in favor of NHC against one, two, or three of the

2  defendants on the fraud claim.

3  The next page of the verdict form is about punitive

4  damages.  As I said, you have to do that separately for each

5  defendant.

6  Then there's a place for everybody to sign.

7  Going back to where I left off two pages earlier,

8  when you've reached unanimous agreement, your presiding juror

9  will fill in and date the verdict form, and each of you will

10  sign it.

11  Advise the court security officer once you've reached

12  your verdict.

13  When you come back to the courtroom, I'll read the

14  verdict out loud.

15  I'm going to take these off the screen and tell you

16  how we're going to proceed at this point.

17  So the way the closing arguments work is the

18  plaintiff has the burden of persuading you on these claims and

19  on their damages, so they go first.  Then the defendants give

20  a closing argument, then the plaintiff's allowed to give a

21  rebuttal.

22  Based on the time estimates I've gotten on this, my

23  goal, and I think we can do it, is to do all of these before

24  sending you off to lunch, but that means pushing lunch to

25  1:00 o'clock.  I think we can get it all done by 1:00.

1       The reason I'd prefer to do it that way is I think it
2  will be beneficial if you hear the arguments all at once,
3  rather than in chunks.  That's going to kind of depend on how
4  things go, so I'm reserving the right to call an audible, if
5  you will, as we go, but that's kind of the plan right now.  So
6  we're not going to take a break in between based on what I've
7  gotten as the estimates.  If things go longer, which they
8  sometimes do, then we'll make an adjustment and we'll take a
9  break.

10      So you'll hear first the closing argument on behalf
11 of the plaintiff by Ms. Wing.

12                          - - -

13              MS. WING, CLOSING ARGUMENT

14      MS. WING:  All we need to show you in this case is
15 one lie from each of these defendants that NHC relied on in
16 making those progress payments to Centaur, and what you've
17 heard in this case is lie after lie after lie after lie.

18      "The project was on budget."  That was a lie.

19      "I paid $350,000 to this particular contractor."
20 That was a lie.

21      "I swear under oath that all of the subcontractors
22 have been paid, that we've waived all liens, that all work has
23 been done and paid for," more lies.

24      "Look at this check to RES drywall; it's proof that I
25 paid RES."  That bounced check was another lie.

1       We told you from the beginning this case was about
2   fraud and Centaur's embezzlement of millions of dollars
3   including $4 million to Spiro and Peter themselves --
4   2 million, excuse me, to Spiro and Peter themselves to their
5   personal account, money these defendants sent to themselves,
6   to Spiro's girlfriend, to loan their creditors, to anywhere
7   and to anyone other than where they were supposed to send it,
8   to the subcontractors on this project.

9       And we're going to talk more about the fraud claim,
10  but I want to take a step back and talk about that breach of
11  contract claim, the easy part of this case.

12      Centaur Construction and Spiro Tsaparas have already
13  been found liable for breach of contract.  They failed to
14  finish the contract on time, they failed to finish the
15  contract for the amount of the GMP, and they didn't pay their
16  subcontractors.  There's no dispute; that's already been
17  found.

18      The question for you to decide is how much are the
19  damages?

20      You'll be instructed on the law -- or you have been
21  instructed on the law, and what you've learned is that you
22  have to put NHC in the position that it would have been in had
23  the breaches not happened.

24      Well, what position is that?  NHC would have spent
25  $48,257,000 and received the beautiful Nobu Hotel.

1    What actually happened was NHC paid $70.2 million in
2  order to receive that same hotel, more than 22 million over
3  the actual contractual guaranteed maximum price.

4    Now, we expect that Centaur will argue that's too
5  much -- 22 million is too much because there was changes on
6  this project that NHC wanted.

7    You know what?  They're right; there were some
8  changes that NHC wanted and we've deducted that.  You heard
9  from Dayna Anderson who analyzed everything very carefully and
10  said, "You're right; there's $800,000 in changes here that NHC
11  demanded," and so we've deducted that from the 22 million to
12  get what NHC is seeking here on the breach of contract
13  damages.

14    But even with those changes, if Centaur had honored
15  this contract, NHC would have saved itself $21 million.
16  That's the amount we're asking for today on the breach of
17  contract.

18    Now, you saw and heard repeatedly in this case that
19  Centaur agreed that the amount over the GMP was its
20  responsibility.  That's what the word "guaranteed" means.

21    Both Spiro and Peter had to admit that, yes, paying
22  the subcontractors was Centaur's responsibility.  They have to
23  pay their bills.

24    But who wound up paying the balances of the
25  subcontracts?  You learned that it was NHC, and you have the

1  exact amount which is something you're going to need for that

2  verdict form.  You have the exact amount here that they paid

3  to subcontractors:  $9,487,290.20.

4         Now, Centaur did admit that both these subcontractor

5  payments and the cost overruns, which is the cost to complete

6  the additional $11 million, they admitted that that was their

7  responsibility.

8         What did Spiro say in his texts?

9         "I take full responsibility for the contract

10  overruns, Rodrigo."

11        What did he say in his email?

12        "Centaur's responsibility according to the contract

13  of those overruns is $4 million in addition to 5.5 million."

14        What did he say in that reconciliation spreadsheet

15  that he created for Rodrigo?

16        "The contractor's responsibility is $10.8 million."

17        Quite close to the number that we're asking for, the

18  actual number that it cost to complete this project after

19  paying off the subcontractors.

20        And what did you hear Spiro say on the witness stand

21  here at trial?

22        He agreed, "Any cost overruns when there wasn't a

23  change order, which everybody was quite clear there wasn't,

24  was Centaur's responsibility."

25        We all know what the word "guarantee" means.

1 "Guaranteed maximum price" is not some fancy term in the

2 construction industry.  It means what it says.  There was a

3 guarantee.  There was a ceiling.  NHC was not going to pay

4 more than that.

5 　　　　Whatever NHC incurred over that amount was guaranteed

6 by Centaur, and we ask you to hold Centaur to its contractual

7 guarantee and award that $9,487,290 for what they didn't pay

8 to the subcontractors and then the cost to complete above and

9 beyond that of $11,725,545.

10 　　　　Now I'll go back to that fraud claim.

11 　　　　The judge has told you what I need to prove to you,

12 and we'll take another look at that.

13 　　　　We have to prove by clear and convincing evidence

14 that there was a false statement of fact or something that

15 Centaur concealed or the Defendant Spiro or the Defendant

16 Peter concealed.  We have a fraud claim against all three of

17 them.

18 　　　　We have to show you that the false or concealed fact

19 was material, meaning that NHC would act differently had it

20 known the truth.

21 　　　　We need to show you that the defendant that made the

22 statement did so with the intent to induce NHC to do

23 something, to make a progress payment to Centaur or to keep

24 Centaur employed on this project.

25 　　　　We have to show you that NHC reasonably believed the

1   statement, and we have to show you that NHC was damaged based
2   on its reliance on the statement.

3          So let's talk about what we saw.

4          You heard this project started off with a lie, that
5   Spiro and Centaur could build this project for $49 million.
6   They knew that project was false at the time they said it.
7   They knew that building for $49 million was, as you heard
8   Spiro say on the stand, "absolutely impossible."  He knew he
9   couldn't do it; yet, he spent all those dozens of hours
10  sitting down with the Chapur family, working through the
11  numbers, claiming that he could because he wanted to get this
12  job.

13         That's an intent to induce NHC to act.  That's an
14  intent to induce NHC to start sending payments to Centaur.
15  And you know it's material.  You heard what Rodrigo said:

16         "A dime more, they weren't going to do this project.
17  It needed to come in on budget or they were not going to buy
18  the project."

19         And you heard that NHC relied on this statement.
20  They moved forward with Centaur.  They kept Centaur on as the
21  contractor because they said they could do it for the price
22  that the Chapurs said it needed to be.

23         And that last element of fraud, damages, you heard
24  the damages already that I talked about in breach of contract.
25  NHC had to pay $21 million over this guaranteed -- this

1    supposedly guaranteed price.

2           That's all five elements of fraud on one lie.  That's

3    it.  That's enough to show fraud as to Spiro and Centaur

4    acting through Spiro because, remember, it said, "acting

5    through the officers or the management of Centaur."  Spiro's

6    the CEO.  Peter's the president.  That was a lie by Spiro and

7    a lie by Centaur.  That's fraud.

8           Before the contract was signed -- this is February

9    19th, 2018 -- Spiro lied to Rodrigo again.  He said that "The

10   next payment request would be for work performed, and that

11   will be the case for the duration of the project."

12          Everybody from Centaur sat here on the witness stand

13   and told you that that statement was a lie because their

14   position now is that everything was based on a cash flow

15   projection, not work performed.  They claimed that Rodrigo

16   knew that, but the black and white paperwork shows you the

17   email that was actually told to Rodrigo shows you what Rodrigo

18   was told, that it's going to be for work performed.  Yet,

19   apparently, that wasn't true, and they were just going to send

20   their round numbers from the cash flow projection no matter

21   what was actually being done.  They had no regard for what the

22   work performed was, and so this statement from Spiro to

23   Rodrigo in February 2018 was a lie.

24          What was Spiro asking NHC to do in this email?  Send

25   them money.  And he told him about work performed in order to

1  get what he needed:  money.

2       NHC relied on this statement.  It sent the money when

3  Spiro requested it, and NHC was damaged, again, for the same

4  reasons that I said before.

5       Now, what else does Spiro and Centaur say in this

6  email?  They say that the money is going to be used for things

7  like the model room, the windows, the masonry, the electric,

8  concrete delays, consultants, and all you have to do is look

9  to the bank statements to see that those are more lies in that

10 particular email.

11      Centaur, Spiro, their office people, they were the

12 ones writing the checks; they knew where their money was

13 going.  So let's look at the bank statements to see where it

14 went instead.

15      We see money going out to Spiro's personal checking

16 account.  We see money going out to 707 Orleans, Sophia Bush,

17 Burt Richmond, Peter Alexopoulos, Jason Sher, Brad Ribar,

18 Broadsmore Capital.  It was either personally to Spiro or

19 Peter or to these entities that they admitted to you had

20 absolutely nothing to do with the project.  They did not use

21 the money where they said they were going to use it.

22      Let's look at the next fraudulent statement, very

23 similar.  We see the same thing on May 31st, 2018:  "We're

24 going to use this money for windows, for HVAC, for concrete,

25 for man hoist," all these various things, and all we have to

1   do is look at the bank statements to see that it's not true.

2        Less than half of the money for the concrete went out

3   to the concrete contractor, and absolutely nothing went out to

4   that HVAC contractor, and you heard Spiro admit that to you on

5   the witness stand.  NHC made this large payment of

6   $2.9 million based on that email and what was said to NHC,

7   that "We are going to pay our subcontractors with this money,"

8   and Centaur didn't do it.  It was a lie.

9        March 12th, 2019, Spiro told Rodrigo, "We've received

10  $37.8 million," that would be from NHC, and the job has

11  incurred 37.5 million.  That wasn't true.  They hadn't paid

12  out nearly even close to 37.5 million.  They paid out

13  25.7 million.

14       The rest?  Missing.

15       Spiro told you there was $8.2 million that just

16  disappeared.  Nobody can find where it is.  It's money that

17  was misallocated, but they've never been able to figure out

18  where that money went.

19       March 25th, 2019, another false statement, that

20  "Payments have happened via certified checks, payroll service,

21  direct deposits, wire transfers, credit cards."  Now, we don't

22  deny some payments were made.  We've seen that $25 million was

23  paid out to the subcontractors.  What we're worried about is

24  the remainder that wasn't.

25       But while some payments were made by these methods,

1   Centaur, unbeknownst to NHC, left dozens of subcontractors in

2   the lurch, over $10 million unpaid to the contractors, and,

3   again, Spiro and Centaur were the ones that knew where this

4   money was really going, so they knew that this was false, that

5   they couldn't show paperwork showing that everybody had been

6   paid by certified checks and wire transfers.

7        On April 11th, 2019, we see more misrepresentations

8   about subcontractors being paid.

9        If we go down and we look -- we go down this list and

10  we look at the bank statements, I've given an example on the

11  bottom right of one where, yes, $33,250, if we go back, was,

12  in fact, paid to 4 Province, the masons, but he said in this

13  email that they were going to get a hundred thousand, and that

14  happens all the time.

15       If you actually pore through these bank statements,

16  like Dayna Anderson did in her analysis, you see that they

17  make these statements, "I'm giving them a hundred thousand

18  dollars," and they'll just pay them enough to be able to push

19  them off.  It's the proverbial "Check's in the mail."  They

20  gave them a little bit, but not the full amount.

21       What did they do with the rest?  They sent it to

22  themselves.

23       So when we look at this bank statement, you'll be

24  able to see that some of these subcontractors were paid, a few

25  were paid in full, most were paid some portion of what Spiro

1  said they would be, and some were paid not at all.

2  This email Spiro says something that's not true:

3  "This is for the $1.4 million that you're going to send me is

4  to cover payments that already went out last week and hitting

5  the account today."

6  If you look at the bank statements, the payments had

7  gone out, but all of those checks had bounced. That's not an

8  honest statement, that he's covering everything that already

9  went out. He'd already bounced nearly a million dollars in

10  checks to the subcontractors. And Rudy Ramirez testified and

11  told you how he was never able to get that money back from

12  Spiro and Centaur. Eventually, it was Rodrigo that had to

13  write him the check that made him whole.

14  Another lie that Spiro told Rodrigo that you heard

15  from Rodrigo, and we see in black and white in this email,

16  when Rodrigo was asking about the HVAC contractor, Spiro said,

17  "Don't worry. I paid him $200,000 two weeks ago."

18  Well, now Spiro admits in this email:

19  "That's not true. I didn't pay him two weeks ago,

20  two weeks prior to August 8th. The last time they were paid

21  was in May."

22  That was another misrepresentation made to NHC that

23  they knew was false. They knew when State Mechanical had

24  gotten paid last. They're the ones with those records, and

25  Spiro admits it, that they hadn't gotten paid since last May,

1  and it was intended to induce NHC to make payment.  "We're

2  paying the subcontractors" is the reason that NHC continued to

3  send payment over and over again to Centaur.

4          Even setting these documents aside, Rodrigo also told

5  you that Spiro told him over and over again, "This project was

6  on budget."  That's another material misrepresentation, a

7  false statement of fact.  This project was never on budget.

8  It started to go over budget almost immediately, as you heard

9  from Howard Harris and Nick Martorano.

10          Then as of November 13th, 2018, Howard Harris and

11  Nick Martorano both told you they knew the project was over

12  budget at this time.  They both sat down and told Spiro that

13  the budget was over at this time.

14          Howard Harris said that he encouraged Spiro to do

15  something about it, but Spiro, of course, said, "I can handle

16  it.  I've got this.  I've got this."  And he chose to proceed

17  by not telling Rodrigo at all and instead telling Rodrigo the

18  opposite:  "We're on budget.  We're on schedule."

19          I've just walked you through ten false statements of

20  material fact, statements that Spiro and Centaur knew were

21  false or recklessly disregarded their truth all with the

22  intent to get this job, keep this job, and get paid on this

23  job.

24          NHC chose Centaur for this job based on lies, kept

25  Centaur employed based on lies, and made these progress

1  payments based on lies.  That's reliance, that element of
2  fraud that we need to show you.

3  And you already know the consequence:  the damage to
4  NHC.  And we don't need to show you fraud ten different times.
5  We only need to show you once, one example.  This was
6  pervasive.  This was everywhere, and you're going to consider
7  that when you consider punitive damages, the duration of the
8  fraud:  the number of times that the fraud was committed over
9  and over and over.  Find Spiro and Centaur liable for their
10 fraud based on all of these statements that we've just talked
11 about.

12 I want to turn to Mr. Alexopoulos and Centaur.
13 Because Mr. Alexopoulos is the president of Centaur, an
14 officer of Centaur, and so when we talk about
15 Mr. Alexopoulos's fraud, his false statements, then we're
16 talking about his actions as an officer of Centaur.

17 So I'm shifting from talking about Spiro and Centaur
18 to Peter and Centaur.

19 Remember, Peter was the one that negotiated this
20 contract with the attorneys for NHC, and he was the one that
21 put that guaranteed maximum price in there that Spiro told you
22 was an impossible number that they knew from the beginning
23 could not happen.  They knew from the beginning it was a lie.

24 Now, Peter's biggest lie were those sworn payment
25 applications that he submitted month after month to NHC that

1  he told you were all bogus.  They don't deny that they were

2  bogus.  Their defense is only supposedly that NHC required

3  them without caring whether or not they were true.

4         First, let's take a look at what the payment

5  applications say.

6         Peter swore under oath that these payment

7  applications represented work performed.  He told you in court

8  that that wasn't true.  He was just asking for the flat

9  amounts without regard to the work performed.

10        Peter swore under oath in these payment applications

11  that the subcontractors had been paid when they hadn't,

12  oftentimes with money going to Peter himself instead of going

13  to these subcontractors.

14        Peter swore under oath that nothing was due for any

15  of the materials or the work when we, again, know that that

16  wasn't true, $10 million not paid to these subcontractors by

17  Centaur.

18        So what about this defense that everybody knew these

19  were inaccurate documents, that these were somehow just sort

20  of file stuffers that NHC asked for to get paid?  That doesn't

21  actually make any sense.  The construction industry is

22  concerned primarily with three things:  time, materials,

23  budget.  If those things are so important, why would you just

24  sign inaccurate file stuffers that are, in reality, the most

25  important documents in the entire project about time,

1  materials, and budget?

2  Peter claims he didn't know what was going on, didn't

3  know what was going on with these crucial monthly documents

4  that is getting them paid, and then all of a sudden, $400,000

5  shows up in his personal bank account from that money that NHC

6  sent.  And that's not a bad payday for somebody who didn't

7  know what was going on.

8  Peter was asked, "Why did you sign these?"

9  And he said, "It's what we needed to get paid."

10  I agree.  That sounds right.  They knew what they had

11  to sign in order to get paid.  They didn't care if it was

12  true.  They didn't care if NHC thought it was true.  They

13  didn't care if NHC relied on it.  They cared if they got paid.

14  Neither Spiro or Peter ever said once on the witness

15  stand that they actually said to NHC:  "These are file

16  stuffers.  These are inaccurate."  Nobody in their office that

17  testified said they ever heard the term "file stuffers."

18  And what did you hear from Rodrigo?  He expected them

19  to be accurate.  He wasn't going to send millions of dollars

20  if they were inaccurate.

21  And who would pay $48 million based on information

22  that was a file stuffer?  That just doesn't make sense.

23  Remember, Spiro had told him that every single month

24  the next payment request was going to be for work actually

25  performed, and that would be for the duration of the project.

1  And if these were only file stuffers and nobody cared if they

2  were actually accurate or not, why was Rodrigo constantly

3  throughout this project asking for more backup, asking for

4  more paperwork, asking for more proof?

5       "Spiro, I need this info."

6       "Hey, Spiro, we need the information that accounting

7  is requesting."

8       "Hey, Spiro, are we getting this information?  We

9  need it for the auditors."

10      Manuel Nunez was one of those people that testified

11  by deposition, and he said in his deposition that he looked

12  for backup documentation over and over again.  "We're

13  collecting paperwork.  At this time, we didn't receive

14  anything from you and it's urgent."

15      Are those the actions of somebody who doesn't care if

16  these numbers are accurate or not?  Why ask for backup

17  paperwork if you don't care?  Why send Manuel Nunez up to

18  Chicago from Mexico to actually meet in person with Spiro and

19  go through all of those files if you don't care if the numbers

20  are accurate?  All of those actions are the actions of a

21  company that did care where their $48 million was going.  And

22  there's no document that you will see that tells NHC, "This is

23  just a file stuffer.  None of this is true."

24      NHC believed that the information they were getting

25  in these payment applications were true.  They were signed

1   under oath and stamped by a notary.  And that notary testified
2   and she said she expected every single thing in those payment
3   applications to be accurate.

4       NHC required these documents to be accurate, and
5   Peter signed them under oath as if they were, but they were
6   not.

7       Now, Spiro did admit to you that the final payment
8   application, that one in Plaintiff's Exhibit 7 that's in late
9   May, he admitted that -- he admitted to you that that one was
10  accurate.  He tried to deny it.  He tried to talk around it,
11  but we looked at his deposition testimony and heard what he
12  said:  "Yeah, I have to admit to you this one was a real
13  invoice."

14      So all we need to show you is one material
15  misrepresentation to prove fraud against Peter about these
16  documents that he signed.  And that loan payment application
17  that they actually do admit was a, quote/unquote, "real
18  invoice," that one is enough to show you that Peter committed
19  fraud.

20      Now, we've shown you fraud over and over again, but I
21  want you to remember that.  Just showing it one time is
22  enough.

23      There's no question that the other elements of fraud
24  have been -- that we've shown them to you against Peter for
25  the same reasons that we showed them to you against Spiro.

1    Peter made these statements with the intent to induce
2    NHC to make a progress payment to Centaur.  Of course, he did.
3    These are the documents that were required to get a payment.
4    He said, "I signed these because we needed payment."

5    NHC justifiably relied on these documents, making the
6    payments every single time and in full that they asked for.
7    And NHC was damaged for the same reason, that $9.4 million to
8    the subcontractors that Centaur was supposed to pay but just
9    didn't and the $11 million to have Shawmut finish the job that
10   Centaur didn't.

11   I want to move on to the topic of punitive damages
12   which are damages that are available to NHC on its fraud
13   claims.

14   You were just instructed on punitive damages and when
15   you can award them.  It's when the defendants' conduct
16   constituted gross fraud or malicious conduct.  This requires
17   NHC to show that the defendant acted with intent to harm NHC
18   or acted with the intent to enrich himself or Centaur without
19   regard to the effect of his actions on NHC.

20   $1.5 million Spiro sent to himself over the course of
21   this project.  $400,000 Peter sent to himself over the course
22   of this project.  In total, $14 million went out to other
23   things when they'd only had $4 million come in from other
24   sources.  That's gross fraud.  That's enriching himself and
25   Centaur at the expense of NHC.  Instead of paying for this

1   project, they paid themselves.

2          Everything that my colleague, Mr. Orewiler, told you

3   on opening statement that you would see and hear in this case,

4   you've seen and heard.  You've seen and heard the web of lies

5   that he told you you'd see.  You've seen the bank transfers,

6   the $14 million out to other people.  You've heard from the

7   unpaid subcontractors and the damage that Centaur caused to

8   their business, the trouble they put them in with paying

9   vendors, with paying unions.

10          The same can't be said of the defendants and what

11  they told you on opening statement.  They told you on opening

12  statement that that price wasn't real because there was no

13  final budget.  Yet, you heard Mr. Alexopoulos admit that

14  $48 million was the final budget.  You heard Spiro say that

15  $48 million was the budget, and that that was the same number

16  that was going to go into this design-build amendment that was

17  never done because $48 million was it.  That was the number.

18          They told you on opening statement that that number

19  couldn't be right because there was actually no designs done,

20  no architectural or interior designs done.  And you heard from

21  the witnesses that that wasn't true.  Karen Herold told you

22  her designs were done.  Except for some furniture and some art

23  and some FF&E and OS&E changes that occurred, those designs

24  were done by the time NHC came on the scene.

25          Nick Martorano told you the same thing:  "The

1  drawings were done."

2      They told you on opening statement that NHC didn't

3  care about the paperwork, but you heard from the witnesses and

4  saw from the documents that that wasn't true either.  NHC

5  constantly asked for more paperwork and went so far as to hire

6  an international auditing firm when they couldn't get the

7  paperwork that they needed to see.

8      Is hiring an expensive auditor something that a

9  company does if they don't care what the paperwork says?  No,

10  it's not.  It's something -- it's coming from a company that

11  really thought seeing this proof was important, and that's why

12  they needed to hire an auditor.

13      They told you that NHC only brought one cost-saving

14  vendor to the table, and they made a big deal out of this.

15  They were going to save money on this project because NHC was

16  going to bring its vendors to the table.

17      You heard the reason that they only used one

18  cost-saving vendor of NHC's:  "Spiro said, 'No.'  Spiro said,

19  'It's going to delay the project.'"

20      Now, here's one of those times where you heard two

21  different things from two different witnesses.  That's what

22  Rodrigo said:  "Spiro didn't want to use his vendors because

23  he said it would delay the project."

24      "Spiro said, 'I didn't want to use his vendors

25  because they were more expensive.'"

1    You have to weigh the credibility of the witnesses in

2  this case and decide who is more credible, who has more to

3  lose, who has something to gain, who has a bias, who was the

4  most believable.  That's up to you to decide.

5    Regardless of what either of them said about why

6  Spiro didn't use Rodrigo's vendors that he proposed, I posit

7  that there's a real reason that nobody said.  If they used

8  Rodrigo's guys, then Spiro wouldn't have been able to pull off

9  his scheme.  Rodrigo would know if his guys were getting paid

10  or not.  Spiro couldn't funnel money off the project if it was

11  Rodrigo's guys who would report to Rodrigo that they weren't

12  getting paid.  Spiro's scheme required that he use his

13  subcontractors that he could provide his excuses to and push

14  them off to do the same thing he did with other projects:

15  incur debts, make it up next time.

16    Why didn't Spiro want to use a title company on this

17  project?  Here's another one of those times where two

18  witnesses testified to two different things.

19    Rodrigo and his father both said they wanted to use a

20  title company and Spiro told him, "No, no, no, that will delay

21  the project.  Let's not use a title company."

22    Spiro said that he begged for NHC to use a title

23  company.  We saw zero proof of that.  If he was begging for

24  NHC to use a title company, wouldn't he have sent one single

25  email that said, "In Chicago, we use Near North Title," or

1   something like that?  We saw no requests from Spiro about what
2   he was supposedly begging for them to do.

3        And it's Spiro who had the motivation not to use a
4   title company.  He wouldn't have been able to short the
5   subcontractors $10 million and send that $1.5 million to
6   himself if there had been a title company.  A title company
7   would have prevented us from being in this room.

8        Normally, a title company is involved and the money
9   goes to the title company, it goes in an escrow account, and
10  then, from that escrow account, it pays out to the
11  subcontractors with a clear record of what was paid and what
12  was being paid for and to whom it was paid.  That wasn't done
13  here.

14       Spiro told Rodrigo that it would slow things down,
15  but we believe that the real reason is that a title company
16  would have prevented this from happening.  The records from
17  the title company would have outed Spiro and how much he had
18  shorted to the subcontractors.

19       We see the same story with Spiro telling Rodrigo not
20  to use an owner's representative:  "Use us.  Let us be it."
21  That's what Peter said, "We were it on this project.  We were
22  everything.  We were the owner's representative."

23       Rodrigo asked about using a separate owner's
24  representative and Spiro again said, "No, that'll delay
25  things.  If you want this project to move fast, and

1   undoubtedly the Chapurs did, they needed it to move fast to

2   get the hotel open and making money.  But Spiro's real problem

3   with using an owner's representative, he doesn't want somebody

4   looking over his shoulder, catching him embezzling millions

5   off of this project, sending money to his creditors to pay off

6   his past debts and sending money to himself.

7        This was not nearly an accounting mess like they want

8   you to believe.  This is intent.

9        The defendants acted with a purpose.  They knew they

10  had significant past debts.  They knew they had a client that

11  was thousands of miles away, a client with pretty deep pockets

12  who had an ability to pay them millions of dollars every month

13  on the largest project that they'd ever had.

14       So the defendants took advantage and they put

15  safeguards in place to make sure that they couldn't get

16  caught.  You'll see that in the elements of punitive damages:

17  Did they conceal their wrongdoing?

18       Think about that bounced check to Rudy Ramirez.

19  Spiro showed that check to Rodrigo and said, "Look, this is

20  proof that I paid RES drywall."  There was no way Rodrigo knew

21  that that check was bounced.  He thought it was true proof.

22  But Spiro was using those bounced checks to conceal what he

23  was up to.

24       This was a deliberate scheme to misuse NHC's funds.

25  And you heard that Spiro admitted that.  He sat down with

1 Rodrigo in August of 2019, and Rodrigo told you what he said:
2 "I screwed up.  I diverted funds.  Give me a chance to make it
3 right."

4           Spiro at the same time called Meir Teper, said the
5 same thing, "I screwed up.  I misused funds."

6           You know what you didn't hear Spiro talk about on the
7 witness stand at all in this trial?  Those two conversations
8 because he can't deny them.  Those two conversations happened.
9 Spiro admitted what he did wrong here.

10           You also heard why Centaur needed to have this
11 scheme:  They owed money to their subcontractors from past
12 projects.  Now you heard from Howard Harris that they did this
13 repeatedly, where they'd owe money from past projects and make
14 it up on a new one.  He said, "That didn't happen to him with
15 this project," but you know who said it did happen to him?
16 Rudy Ramirez.

17           Rudy Ramirez testified that he was owed significant
18 money from past projects and that Nobu, the biggest project
19 they'd ever done, the golden goose, was going to make it up to
20 him:

21           "We can't pay you this time, but we'll get you next
22 time, so go ahead and fluff up your contract a little bit
23 because this is a big one.  We can really get you paid on this
24 project."

25           That's what he told Rudy Ramirez:  the opportunity

1   for a big payday because he had been stiffed in the past.

2   That's not sloppy paperwork.  That's not heads in the sand and

3   not knowing what's actually in the documents or not realizing

4   who hadn't been paid.  That's a Ponzi scheme.  And Ponzi

5   schemes eventually catch up to the schemer, and that's what's

6   happened here.  That's why we're in this room.  It finally

7   caught up to them.  They got in so far over their heads,

8   $10 million worth, that it caught up to them.

9        The instructions on the law tell you to award

10  punitive damages if the defendants had the intent to enrich

11  themselves without regard to the effect of their actions on

12  NHC.

13       You've heard from all three Centaur witnesses, Spiro,

14  Peter, and Nick Martorano, about the trust that Centaur's role

15  required of NHC.  NHC had to put so much trust into Centaur

16  because Centaur was it, Centaur was everything, Centaur was

17  the owner's representative.  They were controlling the

18  designs, they were controlling the construction, they were

19  controlling all five buckets that Spiro told you about.

20       And you heard what the defendants did with that

21  trust:  They stomped all over it.  They stole for their own

22  benefit $2 million out to their own accounts.

23       Punitive damages send a message.  Punish these

24  defendants for their conduct.  Let them know it's not

25  acceptable.  Let others know that they can't get away with

1  this kind of scheme.

2      We ask that you find all three of these defendants

3  liable for fraud and send them a message with punitive

4  damages.  We ask you to hold them liable for that $21 million

5  in compensatory damages broken down to $9.487 and 11.725.  And

6  then hold them liable for punitive damages.  Typically, you

7  see the same amount of compensatory damages awarded against

8  each defendant in the form of punitive damages.

9      And remember too that NHC had to defend itself

10  against all of these unpaid subcontractors who filed liens.

11  They had to defend lawsuits, they had to settle lien claims,

12  and that was another $150,000, and there's a blank on your

13  verdict form to award that as well.

14      Let these defendants know that the message that they

15  can't get away with this has been received.

16      THE COURT:  Okay.  Next you'll hear the argument on

17  behalf of the defendants.

18                          - - -

19              MS. HERRING, CLOSING ARGUMENT

20      MS. HERRING:  Members of the jury, NHC would have you

21  believe that this matter is as simple as the defendants not

22  living up to their word, but the word that the defendants got

23  from NHC, from RCD, from the Chapur family, was "We'll figure

24  it out later.  Don't worry about it.  We'll sort out the price

25  later.  We'll sort out the construction plans later.  We'll

1   true up this project later.  Just get building."

2          They told Centaur that "We're RCD.  We have hotels

3   all around the world.  We build them.  We design them.  We run

4   them.  We know construction.  We know what this is going to

5   cost.  We know how much time it's going to take.  We'll figure

6   it all out later.  Just build us a hotel.  Get constructing."

7          The hotel's beautiful.  Shawmut attested to its

8   quality.  But Centaur was not given an opportunity to figure

9   it out later.

10          Let's start with the fraud claims.

11          Judge Kennelly has instructed you on the law.  In

12   NHC's second claim, they allege fraud against Centaur, Peter

13   Alexopoulos, and Spiro Tsaparas.

14          If we pull up page 12 of the instruction, please.

15          The top paragraph of page 12, it's clear that each

16   defendant, Centaur, Spiro, and Peter, must be considered

17   separately.

18          Next, you're instructed that NHC must prove each of

19   the following by clear and convincing evidence as to the

20   particular defendant that you're considering.

21          So if we turn to page 10, you'll see that clear and

22   convincing evidence means that the party, here NHC, must

23   persuade you that it's highly probable that the proposition is

24   true.  This is a higher standard of proof than preponderance

25   of the evidence.

1           So as we can see here on page 10, this is a higher
2   standard of proof than more probably true than not true.
3           So then we get to the elements of the fraud claim.
4           If we could turn to page 12.
5           To succeed on its claim for fraud against Peter,
6   Spiro, and/or Centaur, the plaintiff must prove by clear and
7   convincing evidence all five of these propositions below.
8           So let's go through them one by one.
9           Proposition one:  That defendant made one or more
10  false statements of fact to NHC that the defendant knew or
11  believed to be false, or knowingly concealed one or more facts
12  from NHC.
13          So what did the evidence show?  Much has been made
14  about the invoices, the payment applications, the lien
15  waivers, those forms that we saw.
16          If we could split screen with Defendants' Exhibit 2.
17          You've seen this email.  On February 22nd, 2018, if
18  we scroll down a little bit below, Rodrigo Chapur asked Spiro,
19  because his father insisted, for a cash flow projection, a
20  forecast of how much money would be paid out on this
21  construction project and when.
22          So when Mr. Tsaparas was asked by his client for a
23  projection, he did what his customer asked.  At the time that
24  he drafted this projection, there was no design-build
25  amendment, there were no final plans.  Now, the plaintiff just

1　made a big deal about the fact that there were plans.  There

2　were plans, but there were no final plans.  The scope of work

3　had not been determined.  The contract that you saw says in

4　the contract that the scope of work has not yet been

5　determined.

6　　　　　At the time that this email was sent, there were no

7　contracts with vendors, there was a preliminary design to

8　budget:  $48 million.  It was a target.  It was a where do we

9　want to end up?  What's our final number?  We're going to try

10　to hit that target.

11　　　　　It was a development budget.  Mr. Tsaparas told you

12　that:  "There was no construction budget."

13　　　　　How are we building?  What are we building?  What are

14　we going to do to take Mark Hunt's budget of $72.6 million and

15　cut it down to the target of $48 million?  Are we going to

16　eliminate the luxury items that Mr. Tsaparas talked about

17　yesterday?  The dynamic glass or the venetian plaster?  No.

18　These fancy finishing touches which enhanced the guest

19　experience were something that Nobu wanted in the hotel, so

20　they were put in the hotel.

21　　　　　Mr. Alexopoulos told you on that witness stand

22　yesterday that "$48 million was a stepping stone to get the

23　project moving," that the GMP price of $48,257,000 was a

24　budgetary number because there was no final scope for this

25　project.  Centaur always contemplated that there would be a

1  design-build amendment which would contain the final scope and
2  the final price.

3        This cash flow projection, Defendants' Exhibit 2,
4  which is up on your screen, was written when the scope of work
5  for this construction project was undefined.  But the cash
6  flow projection was written, and then from February 23rd of
7  2018 until June 1st of 2019, more than a year, except for
8  once, NHC paid Centaur exactly the amounts that were listed on
9  this projection in the corresponding month that is written on
10  this projection.  The payments were exact, down to the penny,
11  down to the even round numbers that you see on your screen.

12        Now, Mr. Alexopoulos signed the payment applications
13  that we've seen.  And he told you that he sent them to NHC to
14  correspond with the sheet.  The invoices that he sent, the
15  payment applications that he sent, the lien waivers that he
16  sent all matched up with this cash flow projection except for
17  once to the penny.

18        Mr. Alexopoulos was not hands on in this project.  He
19  went to the site four or five times.  He told you that he did
20  not intend for them to be representations of work performed or
21  work completed or payments made to subcontractors or payments
22  left to be made to subcontractors.  He testified that he
23  filled out these documents, these forms, because NHC
24  represented to Centaur that they were looking for payment
25  documentation that reflected this cash flow projection.

1    NHC wanted to pay out money on this project in
2  accordance with this chart, so that's what Centaur did.
3  That's what Peter did.  That's what Spiro did.  They did what
4  their client wanted.  After all, they were told, "We'll figure
5  it out later.  We'll true it all up later."

6    Let's look at some of the emails that NHC sent to
7  Centaur about this cash flow projection that's on your screen.

8    If we could pull up Defendants' Exhibit 15, please.

9    This email says, "Hi, Spiro.  Good morning.  Can you
10  send me the invoice for the wire transfer for today?
11  Regards," and then there's a chart with the cash flow
12  projection.

13    Mr. Tsaparas testified that when he received this
14  email, he understood it to mean that he was supposed to send
15  an invoice for the July amount here of $3.3 million, the July
16  line in the cash flow projection.  He was on the stand
17  yesterday, and that's what he told you.

18    And if we look at Defendants' Exhibit 33.

19    This is an email from Rodrigo Chapur to Spiro on
20  June 18th of 2018:  "Can you resend the cash flow program
21  again and how much you will need for July 1st?"

22    The email doesn't say, "How much work have you
23  performed on the project?"  The email doesn't say, "How much
24  money have you spent on the project?"  The email doesn't say,
25  "How much money have you paid subcontractors on the project?"

1   The email doesn't say, "I need you to swear that no liens will

2   be placed on the project." The email doesn't say, "I need to

3   know how much work is left to be performed on this project."

4   It says, "Send me the cash flow projections so I can

5   pay you whatever it says," and NHC did pay it down to the

6   penny.

7   Now, if we look back at the jury instructions, in

8   addition to the first proposition, in order to succeed on its

9   claim for fraud against Peter, Spiro, and/or Centaur, the

10  plaintiff must prove by clear and convincing evidence that the

11  false statement or concealed fact was material; in other

12  words, NHC would have acted differently if it had known the

13  truth; and then proposition 3, that the defendant acted with

14  the intent induce NHC to continue to employ Centaur on the

15  Nobu Hotel Chicago project and/or to continue to make progress

16  payments to Centaur.

17  I'm going to address elements 2 and 3 together.

18  Would NHC have acted differently if it had known the

19  truth about the payment applications?

20  It knew the truth. It sent emails with a chart of

21  the cash flow projection, and it asked Centaur to submit

22  payment applications and invoices that correspond to the

23  chart, those round, even numbers.

24  You heard testimony, it was read into the record, but

25  it was testimony from NHC's Manuel Nunez, their project

1    accountant.  He told you that Spiro told him that the billing

2    summaries were inaccurate.  Manuel Nunez, the project

3    accountant for NHC, knew that the billing summaries were

4    inaccurate because Spiro told him.

5           Would NHC have acted differently if it had known that

6    the $48 million was just a budgetary number, that Centaur was

7    targeting that price, that the hotel would cost more?

8           NHC did know.  Section 9.1 of the contract says, "The

9    contract sum is stated in the design-build amendment."  There

10   was no design-build amendment.  It doesn't say, "The contract

11   sum is $48 million."  It says, "The contract sum is stated in

12   the design-build amendment which will come later."

13          Then Section 3.1.4.3 of the contract says that "At

14   the time of execution of this agreement, the full scope of

15   work was not yet determined."  They didn't have a construction

16   budget.  They didn't have a final plan.  When the contract was

17   executed, when the $48 million figure was put into writing by

18   NHC's attorney, the full scope of work had not yet been

19   determined.

20          Would NHC have acted differently if it had known that

21   change orders were being executed on this project?

22          They knew.  They have 40 years of experience in the

23   hotel industry.  They know what things cost.  They know how

24   long things take.

25          In cross-examination, Rodrigo Chapur admitted that he

1   had never ever once worked on any other construction project

2   that had no change orders.  He knew there were change orders.

3          Would NHC have acted differently if it had known that

4   the hotel couldn't be built for $48 million?

5          They knew that too.  The beginning of this project,

6   the plan was to value engineer it.  You heard about value

7   engineering from Spiro, from Nick Martorano, and Mark Hunt

8   told you about it again this morning.  You heard that value

9   engineering is when you review materials or methods being used

10  on a construction project and you substitute them with less

11  expensive alternatives.

12         The plan was to use value engineering to knock down

13  the price of this hotel significantly, from Mark Hunt's

14  $72 million budget down to 48, but that didn't happen here.

15         One of the reasons is because there weren't final

16  materials or methods to review.  If you didn't know what

17  materials you were going to use or what they were going to

18  cost, how could you reduce the cost?

19         The other reason this project wasn't value engineered

20  is because it was a Nobu Hotel Chicago, which meant that in

21  addition to NHC, Nobu had the final say in many of the design

22  elements.  Meir Teper had the final say in many of the design

23  elements.  No one said no to Meir.  Meir was forceful, stern.

24  Meir made the interior designer cry when he changed a design

25  that he had approved six months prior.

1        In the design of this project, if Nobu didn't want a

2    less expensive alternative, the project couldn't have one.

3    Nobu wanted dynamic glass, Nobu wanted venetian plaster, so

4    the project had to have it.

5        How else did NHC know that the hotel couldn't be

6    built for $48 million?

7        Because the price was going to be reduced by tapping

8    into NHC's buying power, the tremendous buying power all

9    around the world they told Centaur they had.  They were going

10   to supply Centaur with vendors to bring down the cost.

11       Rodrigo Chapur got up on direct examination and he

12   told you that NHC had, quote, "quite a lot of vendors

13   available for Centaur to use on this project."  But as you

14   heard when I asked him at his deposition, before he got to

15   trial, he admitted that Centaur provided -- he admitted that

16   NHC provided Centaur with only three vendors, not quite a lot

17   of vendors, three.  And of those three, Centaur only used one

18   because only one provided a less expensive price.  One.

19       Now, remember, there were over a hundred

20   subcontractors on this project.

21       Ms. Wing told you a few minutes ago that Mr. Tsaparas

22   didn't use all of NHC's vendors because they wanted to take

23   the money, that that's why Mr. Tsaparas and Centaur didn't use

24   Mr. Chapur's vendors.

25       "What vendors?  They didn't provide any."

1    They provided three.  Centaur used one because it was
2  the only one that provided a lower price on this project.

3    NHC told Centaur that they would bring to the table
4  their relationships, their connections, that they knew vendors
5  that would cut Centaur a deal.  There was only one.

6    Would NHC have acted differently if it had known that
7  the hotel couldn't be built for $48 million?

8    They knew because they didn't do their part.  They
9  didn't do their part to get it there.  They didn't do their
10  part to bring that construction price within the target
11  budget.

12    Would NHC have acted differently if it had known that
13  the project documentation was a mess, that Centaur couldn't
14  account for payments made on this construction project?  They
15  knew that too.

16    On March 27th, 2019, Centaur's overwhelmed financial
17  controller, Veronica Velez, sent a spreadsheet reconciliation
18  to NHC in an email which you saw in court.  And that email
19  said that at that time, what Centaur knew on March 27th of
20  2019 was that Centaur was paid a certain amount of money on
21  the project, and Centaur had records for paying out a certain
22  amount of money on the project.  And the difference there at
23  that time was $8.27 million.

24    Now, this was a moving target.  You've heard
25  testimony that that number changed as time progressed, but at

1   that time, Centaur told NHC that there was a difference

2   between the amount of money that came in and the amount of

3   money that went out on the project of $8.2 million.

4   After that day, after Veronica Velez and Centaur told

5   them about the discrepancy, NHC sent Centaur an additional

6   $9.8 million.  Centaur said:

7   "We don't know what's going on.  We don't know where

8   the money is.  We're trying to figure it out.  We're compiling

9   documents.  We're putting everything together.  Well, we're

10  going to be honest with you, this is where we are right now.

11  We don't know where we are.  We don't know what's going on."

12  On March 27, 2019, they couldn't sort out

13  $8.2 million.  Would NHC have acted differently if it had

14  known that the project documentation was a mess, that Centaur

15  couldn't account for payments made on this project?  Centaur

16  told them, and after Centaur told them, they sent $9.8 million

17  anyway.  Even Deloitte couldn't figure out this financial

18  situation.

19  Now, the paperwork wouldn't have been a mess if the

20  parties had used a title company because Centaur's job sorting

21  out this paperwork, Veronica Velez's job sorting out all this

22  paperwork, would be handled by someone else.  Mr. Tsaparas

23  took the stand, and he told you that he wanted one.  He wanted

24  to use a title company on this project.  He didn't put his

25  foot down, but he wanted to.

1        Having a title company is up to the owner.  It's an

2  owner's expense, and the owner has the ultimate say.

3        Elements 2 and 3, NHC would have acted differently if

4  it had known the truth.  Defendant acted with the intent to

5  induce NHC.

6        NHC knew the truth, not only because they're

7  experienced, because their prowess, their stature in the hotel

8  industry, but because Centaur didn't hide it.  Centaur

9  admitted that the documents were a mess.  They told NHC, and

10  NHC told them, that the payment applications were not

11  accurate, that they were just a reflection of the February

12  2018 cash flow projection.

13        They told NHC that the scope of work was not yet

14  defined when they entered into the contract.  And that's

15  written into the contract, the contract that NHC's attorney

16  wrote.  It said, "The contract sum is coming later."

17        Now, in addition to the first proposition on this

18  jury instruction, the second proposition on this jury

19  instruction, and the third proposition on this jury

20  instruction, to succeed on its claim for fraud against Peter,

21  Spiro, or Centaur, the plaintiff must prove by clear and

22  convincing evidence that NHC reasonably believed the statement

23  or in the case of a concealed fact, reasonably relied on the

24  facts as it understood them and continued to employ Centaur on

25  the Nobu Hotel Chicago project or continued to make progress

1   payments to Centaur as a result.

2           What did the evidence show?  The evidence showed that

3   the Chapur family has 40 years of experience in the

4   construction industry.  They held themselves out as savvy,

5   sophisticated, well-connected, knowledgeable businessmen, who

6   have been through this before, who know how to build hotels,

7   who know how to operate hotels, who know what things cost.

8           They own a number of hotels around the globe, many of

9   which they built:  Hard Rock Cabo, Nobu Cabo, Hard Rock

10  Cancun, Hard Rock Riviera Maya, UNICO Riviera Maya, Hard Rock

11  Punta Cana, Residence Inn in Merida, Residence Inn in Cancun,

12  Residence Inn in Playa del Carmen, Hard Rock in Puerto

13  Vallarta, Nobu in Chicago, Eden Roc in Miami Beach, Nobu in

14  Miami Beach, Marriott Santo Domingo, Aloft Santo Domingo, a

15  piece of land in Jamaica where they were going to build

16  another hotel, a piece of land in Orlando where they were

17  going to build another hotel.

18          Now, despite all that experience and all those

19  hotels, Mr. Rodrigo Chapur tried to tell you that they had no

20  experience building hotels in the United States.  After

21  holding them out to the savvy, sophisticated businessmen to

22  Centaur, Rodrigo Chapur testified to you on that TV screen on

23  direct examination that the Chapurs had no experience building

24  hotels in the United States.  But then on cross-examination, I

25  asked him about the Nobu hotel in Miami, and he admitted that

1 they did construction there.

2      I asked him about the Eden Roc Hotel in Miami, and he

3 tried to explain away that that one wasn't his family; it was

4 his brother-in-law.

5      Other than the construction industry and how much

6 buildings cost and how much materials cost, let's talk about

7 what else the Chapur family knew.

8      On this project, they got reports:  weekly reports,

9 monthly reports, lots of pictures.  Those all showed the

10 status of construction.  They showed what was happening.  They

11 showed concrete being poured with a picture of concrete being

12 poured.  They showed what was going on, and there were about

13 600 pages of those reports, and the Chapur family all

14 confirmed that they got them.

15      There was also a webcam pointed directly at the

16 construction site where you could zoom in, enlarge the

17 project, see snow falling in the Chicago winter.  The Chapur

18 family had the login information for those webcams.

19      Now, if all this wasn't enough to keep the Chapurs

20 apprised of what was happening at this construction site,

21 Rodrigo came here about once a month.  He'd walk the site with

22 Spiro, the superintendent.  They'd take a look at what was

23 going on, how things were progressing.

24      Each time Rodrigo came, he said that he spent four or

25 five hours on the project.

1    Now, you have this family that has hotels all around
2  the world in many different countries:  Hard Rock, Nobu,
3  Marriott, sophisticated established brands.  These are people
4  that look around a construction project, they look at pictures
5  of a construction project, and they know what's going on.
6  They know how much things cost.  They know how much is left to
7  complete.  They know how far along in the project we are.  Are
8  we almost done?  Are we behind schedule?  They know.  They've
9  done it before.

10    Yesterday from the witness stand, Mr. Tsaparas told
11  you that when Mr. Chapur made the last payment on that cash
12  flow projection, the last payment on Defendants' Exhibit 2,
13  the exterior of the building was finished, but nothing had
14  started in the restaurant, very little had started on the
15  12th -- top floor of the hotel, there were no windows in the
16  upper rooftop.  There were windows in the body of the building
17  up until the 4th, 5th floor.  It was a 12-story hotel with no
18  windows from 6 up.

19    The element we're talking about here on this jury
20  instruction is whether NHC reasonably believed the statements
21  that Centaur was making.  We already talked about how Centaur
22  did not knowingly make false statements of fact.  But here,
23  the thing to consider is that even if they did, which they
24  didn't, but even if they did, was it reasonable for NHC to
25  rely on these statements?  Was it reasonable for NHC to think

1   that the project was on schedule, on budget, when the windows

2   weren't in?  When the restaurant wasn't started?

3          Was it reasonable for them to believe that the

4   payment applications represented work performed or money that

5   had been spent to more than a hundred subcontractors and many

6   other types of project-related expenses, when the numbers were

7   perfectly even, round numbers?  Or was it reasonable for the

8   defendants to think that when NHC emailed Centaur a snip of

9   the cash flow projection with a request for an invoice for the

10  month listed on that snip, that NHC wanted the payment

11  applications to line up with the February 22nd, 2018, cash

12  flow projection?

13         Let's look at that email again, Defendants' Exhibit

14  15.

15         Did NHC reasonably believe that the payment

16  applications represented work performed when Israel Navarro,

17  the treasurer, who said he had no involvement with

18  construction, was the one telling Centaur how much money to

19  send?  Did he know how much money had been spent by Centaur on

20  the project?  Did he know how much money Centaur had left to

21  spend on the project?

22         Of course not.  He told you it wasn't his job.

23         Instead, Centaur knew that this savvy, sophisticated,

24  well-connected, experienced family would know how much things

25  cost, would know how long buildings take to build, and would

1    act in accordance with practice in the industry, as

2    Mr. Tsaparas told you, and keep the funding coming.  They'd

3    sit down at the end, they'd square it all up at the end, which

4    is what they said they'd do.

5              Now, Centaur -- excuse me.

6              Now, plaintiff brought up Plaintiff's Exhibit 4.

7    Let's look at that.

8              Ms. Wing argued that this email says that Centaur was

9    requesting payments for work performed.  If we look at the top

10   of this email, it says $2.5 million for Centaur.  Is Centaur

11   work performed?

12             We can put that email to the side.

13             Now, in addition to the first proposition, the second

14   proposition, the third proposition, the fourth proposition, to

15   succeed on its claim for fraud against Peter, Spiro, or

16   Centaur, the plaintiff must prove by clear and convincing

17   evidence proposition five:  NHC was damaged due to its

18   reliance on the false statement or in the case of a concealed

19   fact due to its reliance on the facts as it understood them.

20             Damages.  You heard a lot about the plaintiff's

21   alleged damages for fraud and for breach of contract.  Here's

22   what it all boils down to.  They hired an expert to tell you

23   about their damages.  She told you that NHC was damaged

24   because it cost them about $21 million to complete this

25   project above the $48 million target price.  $48 million that

1    we already talked about were a design to, that we were going

2    to try to get the hotel to that target price of $48 million.

3              Now, the evidence showed that NHC paid their expert,

4    Ms. Dayna Anderson, who took that stand, over $370,000 to

5    calculate these damages.

6              MS. WING:  Objection, facts not in evidence.

7              THE COURT:  So if the -- as I've told you in the

8    instructions, if a lawyer makes an argument that's

9    inconsistent with what you recall of the evidence, you should

10   disregard the argument.  I'll leave that to you to decide

11   that.

12             Go ahead.

13             MS. HERRING:  This does not include Ms. Anderson's

14   time for her trial testimony.  Those were her bills only

15   through March of 2022.

16             Members of the jury, in these jury instructions,

17   Judge Kennelly has instructed you that you, and you alone,

18   must decide what weight, if any, you give the testimony of

19   each witness.

20             Now, the plaintiff made a big deal about money that

21   Centaur and Spiro sent to Corri McFadden, Spiro's long-term

22   romantic partner, and other entities that Peter and Spiro

23   owned, other entities that they said were unrelated to this

24   project.  You saw them.  We ran through the bank statements,

25   and they showed you a four-figure payment here, five-figure

1   payment there, a few six-figure payments.

2   Two things:  First, Centaur had one bank account for

3   the vast majority of this project.  Everything that came in

4   and everything that came out came from one bank account.

5   Of course, Centaur was making non-Nobu

6   project-related payments.  They're a business with other

7   projects, with other business expenses; they had other

8   clients, and they had other dealings.  They had to send money

9   to other people to run their business.

10   Second, when the money was coming out, money was

11   coming in.  NHC argues that Mr. Tsaparas sent nearly a million

12   dollars to Corri McFadden.  $4.5 million came into Centaur's

13   bank account during the time that it was working on the

14   project that was not paid by NHC.  Centaur received

15   $4.5 million from other entities in the course of its business

16   while it was working on this project.  So what if Centaur sent

17   money to 701-707 Orleans or Broadsmore Capital?  Centaur's a

18   business that conducted business outside of the Nobu Hotel.

19   Why has NHC been zooming in on all these bank

20   statements?  Why have they been only enlarging certain

21   portions?  Because they want you to see the financials out of

22   context.

23   Here's what happened on this project.  Here's what

24   the dollars and cents show.

25   Mark Hunt, the owner of the project before NHC, who

1   took the stand today, told you that his budgets for this
2   project were $72.6 million.

3   Michelle Murphy, who led the Chicago office for
4   Shawmut, the company that was hired to replace Centaur on this
5   project, who had over 30 years of experience in the
6   construction industry, told you that her company did an
7   analysis of this project. They looked at the work that had
8   been done, they looked at the quality of the work that had
9   been done, and they said that if her company built that
10  building, not Centaur, Shawmut, the hotel would have cost
11  $63.6 million. That number came before Shawmut finished the
12  project, and it turns out Shawmut ended up spending more to
13  fix -- to finish the project, which brings that $63.6 million
14  up even higher.

15  So how much did this hotel cost? How much did a
16  hotel of the quality of the Nobu Hotel Chicago cost? How much
17  should it have cost?

18  According to the person that sold the project to NHC,
19  Mark Hunt, the number was 72 million. And then you heard
20  Spiro tell you that it would have been possible to build this
21  hotel for 48 million, but not this hotel, not with these
22  finishes, not with what Meir Teper demanded, not with the
23  dynamic glass, not with the venetian plaster. They could have
24  built a hotel for $48 million, but not this one, not the
25  quality that Nobu required in this hotel.

1      So NHC is left with a hotel that cost more than

2   $65 million because of how nice it is, and they're arguing

3   that they're damaged by this asset.  No.  They got something

4   for this money.  They got a hotel better than what they

5   bargained for at the very beginning.

6      The overwhelming evidence shows that they wanted a

7   $65 million hotel for $48 million.  They got a $65,

8   $72 million hotel.  They have it today.  They own it.  They

9   operate it.  They run it.  They manage it.

10     Now, you saw appraisal reports today, members of the

11  jury, from Mr. Mark Hunt.  Mark Hunt had a project budget of

12  $72.6 million.  He had an appraisal done.  How much would this

13  Nobu Hotel Chicago be worth in three years after the appraisal

14  was done?  The appraisal firm opined that the hotel would have

15  a value of $101 million as of December 1st, 2021.

16     What are NHC's damages?  They had to spend more than

17  $48 million to build a hotel of more than $65, $72 million

18  that has been expected value of $101 million.  That's what

19  they're arguing to you.  That's what they want the defendants

20  to pay.

21     NHC wasn't damaged.  They knew what was happening,

22  they knew how this project was going, they knew what the

23  payment applications meant, and they knew how much this was

24  going to cost.  They said, "We'll figure it out later."

25     Now, they have a hotel worth $101 million according

1    to that valuation.  NHC has a hotel, and Centaur has nothing.

2              Mr. Alexopoulos told you that Centaur's situation is

3    dire.  While the Nobu Hotel is thriving.  NHC left this

4    business relationship with an incredible hotel that cost more

5    than $48 million because of the quality of the hotel that was

6    built, because the quality was just too good, and they didn't

7    want to sacrifice the quality to get down to the target

8    budget.  It cost more because of the designs and the choices

9    that NHC and Nobu and Meir Teper made.

10             Now they want Centaur to pay for it, to pay for the

11   difference between the $48 million target and the $101 million

12   value of the hotel.

13             Members of the jury, the defendants were told:

14             "Don't worry about it.  We'll figure it out later.

15   We'll sort out the price later.  We'll sort out the

16   construction plans later.  Just get building.  We're RCD.  We

17   know how this goes.  We have hotels all around the world.

18   We'll figure it out later.  Just build us a beautiful hotel."

19             "We want you to work on other projects.  There's a

20   Marriott we need help with in Chicago.  Let's see what we can

21   do together in Greece.  Let's work together for years to

22   come."  That's what NHC was telling Centaur.

23             Mr. Alexopoulos yesterday told you that Centaur spent

24   hundreds of hours working for NHC on other projects because

25   they said, "We'll figure everything out later.  We'll sit

1   down, we'll true it up, we'll work it all out." Why would
2   Centaur want to jeopardize that relationship to build projects
3   all around the world for years to come? It wouldn't.

4          They expected that everyone would sit down and figure
5   everything out later because that's what NHC told them. So
6   that's what Centaur did. That's how Centaur conducted itself:
7   in accordance with that plan.

8          But NHC didn't sit down with Centaur. They didn't
9   try to figure it out later. They're trying to make Centaur
10  pay for their asset, their hotel that they run, that was
11  valued at $101 million. They want $101 million hotel for
12  $58 million. They want Centaur to pay the difference.

13         And then, they told you that they want you to punish
14  Centaur, to punish Spiro, to punish Peter, to award punitive
15  damages. For what? For not allowing them a profit margin
16  that's big enough? On this $101 million hotel, NHC has not
17  been damaged.

18         Members of the jury, I came before you in opening
19  statements and I told you that after you hear all the evidence
20  in this case, I'm going to get a chance to come back before
21  you. And I told you then that I was going to ask you to find
22  Mr. Tsaparas, Mr. Alexopoulos, and Centaur Construction
23  Company not liable for fraud and not responsible for the
24  contractual damages alleged by NHC. That's what I'm doing
25  right now. Find all three defendants not liable for fraud and

1  not responsible -- and responsible for zero dollars of NHC's
2  alleged damages.

3          THE COURT:  Okay.  So next, you'll hear the rebuttal
4  argument on behalf of the plaintiff.

5                        - - -

6                MS. WING, REBUTTAL ARGUMENT

7          MS. WING:  "We'll sort it all out later."  What did
8  we learn when we sorted it all out later?  $8.2 million had
9  gone missing, $10 million worth of subcontractors hadn't been
10  paid, a million dollars had been sent to Corri McFadden,
11  $1.5 million had been sent to Spiro Tsaparas, and $400,000 had
12  been sent to Peter Alexopoulos.  That's what we found when we
13  finally sorted it out later and saw what had happened.

14          They claim that everybody on this project knew that
15  it was going to cost $48 million, more than $48 million, that
16  that was just the target budget and that the real price was
17  going to be in the design-build amendment.

18          There was no design-build amendment, and all we have
19  is a contract that says it's a guaranteed maximum price.
20  Spiro told you why we didn't have a design-build amendment:
21  They never created one.  And he also told you what was going
22  to go into that design-build amendment if it did exist,
23  $48 million.

24          The Chapurs testified, both of them, Rodrigo and
25  Roberto, testified they would not have bought this project.

1  That's materiality.  NHC acted differently based on what
2  Centaur, Peter, and Spiro were saying to them.

3       Everybody admitted that $48 million was the budget.
4  Spiro said it, Peter said it, Nick Martorano said it, Howard
5  Harris said it.  The notion that there was no budget here or
6  just some target placeholder number has been completely
7  disproven.  There was a budget, and Centaur blew it.

8       They also claim that Nobu and NHC's changes is what
9  caused this project to cost more, but you heard from Karen
10  Herold and Howard Harris about the true nature of these
11  changes.

12       Karen told you she was unaware of a single change
13  that made this project cost more.  Everything was to make the
14  price go down.

15       Howard testified that the only change that cost more
16  was $50,000 for some extra gym equipment.  That's $50,000, not
17  $12 million.

18       And if this claim of theirs was true, where are the
19  change orders?  Where is the documentation that NHC or Nobu
20  caused cost increases on this project?  They testified they
21  had change orders from the subcontractors that they never gave
22  to NHC, and they testified that they never had a single change
23  order between NHC and Centaur.

24       And why is that?  Because as Spiro admitted over and
25  over again, cost overruns were Centaur's responsibility.  The

1  contract value never changed.  It was always $48 million.

2  This was a guaranteed maximum price, and it's Centaur's

3  obligation to bear the costs over that price.

4       They argue that it's not fair that we got

5  $101 million hotel and it's not fair to ask Centaur to be held

6  to its contractual guaranteed maximum price.

7       First of all, that valuation is years old.  It was

8  from 2016.  We have a hotel in a pandemic.  It's a very

9  different valuation than what we see from that original HVS

10 valuation.  That valuation means absolutely nothing.

11      And with regard to damages, remember, Ms. Herring

12 didn't say a word about the $9.4 million that NHC shelled out

13 to subcontractors just to make them whole from when Centaur

14 had stiffed them.

15      They also said it wasn't reasonable to believe that

16 the hotel was on budget when all the money had been sent and

17 they could see that windows still weren't in.  They said,

18 "Even if we did lie, of course, we didn't, but even if we

19 did" -- it reminds me of the title of that O.J. Simpson book:

20 *If I did it*.

21      Even if they did lie, it wasn't reasonable for them

22 to believe that this thing was on budget when all the windows

23 weren't in.  Yes, it was.  There was $8.2 million that had

24 gone missing and that had shown up in the financial

25 reconciliation that Centaur had sent to Rodrigo a spreadsheet

1    saying "$10.8 million is our responsibility for the overruns."

2    So what was reasonable to believe after they had sent

3    the final payment was that Centaur was going to take on its

4    responsibility and spend $10.8 million on the overruns to make

5    up for that money that had gone missing.

6    This notion --

7    Can we look at Defendants' Exhibit 2?

8    This notion that the payment applications matching up

9    with the cash flow proves anything in this case is absolute

10   nonsense.  It doesn't.  It doesn't matter that the actual

11   payments were the same as the cash flow.  It doesn't change

12   the biggest lie:  "We have paid our subcontractors."  No, they

13   hadn't.  It doesn't matter if the payment was $1 million or

14   $1,000,747.86.  It makes no difference.  They lied, and that

15   cost NHC money.

16   Now, when we looked here at the bottom of Defendants'

17   Exhibit 2, we see something very interesting because they keep

18   talking about this $63 million from Shawmut and the

19   $72 million from Mark Hunt.  Look at the bottom of the actual

20   budget on this project:  $63 million.  Because what they want

21   you to ignore is the fact that NHC paid $15 million on this

22   project up front for the land and for the work that had

23   already been done, so it actually lines up perfectly that

24   Shawmut said this project will take $63 million.  $63 is what

25   NHC actually spent.

1    And if that would -- and with the $72 million from
2   Mark Hunt, all that shows is that they lied from the
3   beginning.  If they want to say no, they shouldn't get any
4   damages because it was $72 million, not 48, not 63, that would
5   only prove that they lied from the beginning, that they knew
6   it was going to be more expensive, but they told a nice tale
7   to the Chapurs to get them to sign on the dotted line.

8    All the other numbers, the $63 million from Shawmut,
9   the $72 million from Mark Hunt, the valuations in the HVS
10  report, all that does is show us how much the defendants owe
11  NHC.  It does nothing to help their case.

12    If we could go back to our PowerPoint.

13    They claim that their accounting records were a
14  disaster and everybody knew that.  You know what wasn't a
15  disaster?  The bank statements.

16    They accuse us of being selective in what we
17  highlighted out of these bank statements.  I disagree with
18  that.  We've been showing full statements, we've been showing
19  you what went out, what came in; we've been conceding when
20  there were project-related payments because we do agree that
21  there were project-related payments, just not enough.

22    I encourage you to take out Plaintiff's Exhibit 35
23  and look through it for yourself.  Look for those transfers to
24  account 7238 which is Spiro's personal account.  Look for the
25  transfers that are in those requests to admit as having

1   absolutely nothing to do with the project.  Take your time

2   with those bank statements.  You'll see where the money was

3   going.  And these records are not a mess, these records are

4   not a disaster, and these records tell the accurate story.

5        We see month after month, money coming in from NHC

6   and then going out immediately to those companies that they

7   admitted in the request for admit are not related to the

8   project.

9        Consider Dayna Anderson's testimony which no one

10   disputed was accurate.

11        Kim Herring attempted to paint Dayna in some sort of

12   bad light by saying she was paid money for her work.  First of

13   all, she didn't ask her a single question about the money she

14   was paid on her examination.  There's no evidence on that

15   topic whatsoever in this case.

16        And, of course, somebody who spent thousands of hours

17   analyzing these bank statements is going to have to bill

18   something for her time.  But what she did was analyze

19   everything line by line, and nobody disputed her testimony was

20   accurate.  Even Spiro said, "Yes, Dayna calculated that I sent

21   myself $1.5 million," so that's what Dayna said on the witness

22   stand.

23        So Dayna went line by line through every bank

24   statement and told you how much Centaur used for

25   non-project-related items, and there was no way they were able

1 to make all those payments without dipping in significantly to
2 NHC's money.

3 We saw this table from Dayna's analysis. They used
4 $28 million for project-related purposes. There was another
5 9 million. That's a gray area. Centaur claims it was for
6 project-related purposes, but we can't confirm that one way or
7 the other. We're actually giving Centaur the benefit of the
8 doubt on that one. We're not putting it in the final bucket
9 which is the $10 million we know was used for
10 non-project-related purposes.

11 37 of the 47 million that NHC paid went to
12 project-related items. The rest went somewhere else, places
13 it was not supposed to go. And you heard Spiro and Peter
14 agree "NHC money was supposed to be used for the project and
15 only the project."

16 Now they claim that, of course, they were paying out
17 on other things. They only had one bank account, and all
18 payments for the entire company for all operations went in and
19 out of that bank account.

20 We don't, in concept, have a problem with that
21 whatsoever, but NHC money was supposed to be used for the NHC
22 project and not for anything else. And the numbers don't add
23 up to support this explanation that defendants are offering
24 you.

25 The money that came in from NHC was exponentially

1 more than money that came in from other sources, yet, the

2 money on Nobu-related items was too little, and the money on

3 other items was too much. That's it. Plain and simple. You

4 can go through the bank statements and add it up yourself.

5 You can look at this table from Dayna Anderson to see what

6 everything adds up to.

7 Dayna went through every bank statement to look at

8 the deposits. There was $14 million in total on

9 non-project-related items. There was $4.8 million that came

10 in from other sources through this entire two-year time period

11 that she looked at. $4.8 million compared to the 47 million

12 that came in from NHC. You can't pay for $14.9 million with

13 4.9 million dollars, so 10 million of that money, things they

14 used for other things, had to come from NHC.

15 And you know what that $10 million tracks with? The

16 $10 million they didn't pay to subcontractors. They could

17 have paid the subcontractors if they used every dime of Nobu

18 money for Nobu-related purposes.

19 The subcontractors weren't paid, and that's the

20 bottom line of this case. That's where the fraud really lies.

21 I don't care if NHC owns one hotel or 14 hotels or 1400

22 hotels. It doesn't have to bear the cost of somebody else's

23 fraud. It doesn't deserve to be stolen from. Those

24 subcontractors deserved to be paid, and they were contracted

25 to be paid by Centaur.

1    Centaur and Peter and Spiro, they signed anything,

2  they said anything just to get paid.  And what happened in

3  between signing those payment applications, saying, "Yes, all

4  of our subcontractors are paid," "Yes, all of the work is

5  performed," and nearly $2 million showing up in their personal

6  bank accounts?  What happened in between there, that was

7  fraud.  That was deception.

8    Look at the money in, look at the money out, look at

9  the lies that were told, and find these defendants liable for

10  what they did.

11    Thank you for your time.

12    THE COURT:  Okay.  So there's one instruction that I

13  haven't read yet.  I'm going to read that right now.  Bear

14  with me just to get it up on my screen, which, of course, has

15  chosen this time to give me problems.

16    So you've got the last page.  So it's the last page

17  right before the verdict form.  You're going to see something

18  blocking it here.  I'll just do my best to read it.

19    The verdict must represent the considered judgment of

20  each juror.  Your verdict must be unanimous.

21    You should make every reasonable effort to reach a

22  verdict.  In doing so, you should consult with each other,

23  express your own views, and listen to your fellow juror's

24  opinions.  Discuss your differences with an open mind.  Do not

25  hesitate to re-examine your own view and change your opinion

1  if you come to believe it is wrong, but you should not

2  surrender your honest beliefs about the weight or effect of

3  evidence just because of the opinions of your fellow jurors or

4  just so that there can be a unanimous verdict.

5  The eight of you -- it should say the ten of you.

6  That's the one typo that I didn't correct.

7  The ten of you should give fair and equal

8  consideration to all of the evidence.  You should deliberate

9  with a goal of reaching an agreement that is consistent with

10  the individual judgment of each juror.  You are impartial

11  judges of the facts.

12  Okay.  So here's where we go from here.  I'm going to

13  swear in the officer in a second.  I'm going to give him an

14  official copy of the verdict form which is the one you should

15  use, although you've all got your own copies.

16  Leave your copy of the jury instructions that you

17  have there on your chair, and as you walk out the room, I'm

18  going to hand you a clean copy that has all of the typos out

19  of it except for that eight versus ten at the end there.

20  And then the exhibits -- I think you've been shown

21  how to pull those up on the screen, so -- and the lunches

22  should be there.

23  So I'm going to swear in the officer now.

24  (Court security officer sworn.)

25  THE COURT:  All right.  Here is the original of the

1  verdict form, and the jury is now excused to deliberate on
2  your verdict.

3        Leave those jury instructions just on the chair
4  there.  We'll toss those and give you a fresh one when you go
5  out.

6    (The jury leaves the courtroom.)

7        THE COURT:  Okay.  So the rule is you have -- if you
8  haven't given Melissa cell phone numbers, do that now.

9        The rule is you need to be here within 15 minutes of
10 when we make the call, which means 15 minutes of when it goes
11 into your voicemail, not when you happen to pull it out of
12 your voicemail.

13        So just make sure Melissa's got those.  She's across
14 the hall, before you leave.

15        All right.  Anything else anybody needs to bring up?
16        Okay.  Thanks.

17        MR. COCCIEMIGLIO:  Your Honor, the thumb drive that
18 was supposed to go back to --

19        THE COURT:  Melissa.  Give them to Melissa.

20        MR. COCCIEMIGLIO:  Melissa?  Okay.

21        THE COURT:  Yeah.

22        MR. COCCIEMIGLIO:  Also, there's two exhibits that
23 were entered this morning with the last witness.

24        THE COURT:  Are they on the thumb drives?

25        MR. COCCIEMIGLIO:  Yeah, they're on the thumb drive.

1 They just weren't read into the record.

2         THE COURT: What were the numbers?

3         MR. COCCIEMIGLIO: D-025 and D-095.

4         THE COURT: Defendants' 25 and 95 are admitted.

5         I think somebody should get the thumb drive to her

6 right away so that she can get that uploaded.

7         All right. Thanks.

8   (Above-mentioned exhibits were received in evidence.)

9   (The trial was adjourned at 1:00 p.m. until 3:25 p.m. of

10 this same day and date.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

```
 3
    NHC LLC,                              )    Docket No. 19 C 6332
 4                                        )
                    Plaintiff,            )
 5                                        )
            vs.                           )
 6                                        )
    CENTAUR CONSTRUCTION COMPANY INC.,    )    Chicago, Illinois
 7   et al.,                              )    August 17, 2022
                                          )    3:25 o'clock p.m.
 8                  Defendants.           )
```

```
 9                 TRIAL TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
10                          VOLUME 4-B
```

```
11
    APPEARANCES:
12
```

```
13   For the Plaintiff:      VEDDER PRICE P.C.
                             BY:  MS. NICOLE JOY WING
14                                MR. JOSHUA JASON OREWILER
                             222 North LaSalle Street, Suite 2600
15                           Chicago, IL 60601
                             (312) 609-7500
16
```

```
17
    For the Defendant:      SMITHAMUNDSEN LLC
18                           BY:  MS. KIMBERLY ANNE HERRING
                                  MR. MATTHEW WALKER HORN
19                                MR. MICHAEL FRANK COCCIEMIGLIO
                             150 North Michigan Ave, Suite 3300
20                           Chicago, IL 60601
                             (312) 894-3329
21
```

```
22
23   Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                             Official Court Reporter
24                           219 S. Dearborn Street, Suite 2102
                             Chicago, Illinois  60604
25                           (312) 435-5639
```

1  (The following proceedings were had in open court outside
2  the presence and hearing of the jury:)

3  THE COURT:  Okay.  We've got counsel present.  So
4  you're seeing on your screens the note from the jury.  It
5  says:

6  "Clarification on what NHC 'would have done
7  differently' in number two of fraud claim.  Define acted
8  differently."

9  And I also put up the instruction in question which
10  is page 12.

11  So I actually have a suggestion on this which if you
12  give me a second, I will pull it up.

13  So here's my suggestion:

14  "Members of the jury, thank you for your question.

15  "Your question concerns element 2 of NHC's fraud
16  claim which reads as follows," and quotes element 2.

17  "In this sentence," then it goes on to say this,
18  this, the proposed note:

19  "In this sentence, the phrase 'would have acted
20  differently,' means would have acted differently from the way
21  it actually acted."

22  So element 2 can be read as follows:

23  "Item 2:  The false statement or concealed fact was
24  material; in other words, if NHC had known the truth, it would
25  have acted differently from the way it actually acted.

1        "Of course, this is just one element of the fraud

2   claim.  You must consider all of the elements, including all

3   of the other instructions that I've given you."

4        So that's the proposal.

5        I'd like a reaction from -- first from defendant to

6   that proposal and from plaintiff.

7        MS. HERRING:  Judge, our response is that the jury

8   instructions have been given, the evidence is in, the

9   arguments have been made, and it's up to the jurors to

10  determine what this element means at this time.

11       THE COURT:  Okay.  So basically the response to the

12  jury, and you'll pardon me for being graphic, is "Go pound

13  sand," right?  That's the response.

14       So the Seventh Circuit has told us -- it's an opinion

15  by Judge Hamilton.  I can find the case if you ask for it.

16  When the jury expresses confusion, we shouldn't tell them to

17  "Go jump in the lake"; we should try to clear it up for them.

18  This is not a proposed change to the instruction.  It's a

19  proposed clarification.

20       Now, I'm going to ask my question again and ask if

21  you have an objection to this; and if so, is it something

22  other than what you just said because that objection is

23  overruled.

24       MS. HERRING:  All right.  Judge, we're okay with the

25  proposed instruction.

1     THE COURT:  What about on the plaintiff's side?

2     MS. WING:  Judge, my only suggestion would be is,

3   perhaps, not using the term "acted differently" again to

4   define "acted differently"; use something such as "behave in a

5   manner other than the way they actually behaved."

6     THE COURT:  Yeah, I'm going to go with it this way.

7     MS. WING:  That's fine.

8     THE COURT:  I mean, I get -- what you're basically

9   saying is "Don't use the term to define the term," but I don't

10  think that's what we're doing.  We're adding a couple of words

11  to make the term clearer; "differently" being the potentially

12  ambiguous word in there.  Different from what?

13     So okay.  I'm going to go with it this way.  Thanks.

14     I would suggest that since it's 3:40 -- I don't know

15  whether people have gone back to their offices.  I'd suggest

16  that you not, but you can do what you want.

17     I will get this to the jury.  We'll make copies of

18  the note that I send back and Melissa will give them to you.

19     All right.  Thanks.

20    (Short break.)

21     THE COURT:  Okay.  We got everybody back.  It's just

22  a scheduling note from the jury.  They're saying, "Can we

23  leave at 4 :45 and come back tomorrow at 9:00?"

24     I was going to say yes, but I figured I should just

25  let you know first.

1          Does anybody have a problem with that?

2          MS. WING:  No, Judge.

3          MS. HERRING:  No.

4          THE COURT:  Okay.  So please stay until 4:45 unless

5   something happens, but I'd say wait until 4:50, and then you

6   can go.  And then, just be, you know, available tomorrow if

7   and when you get a call from us.

8          And, Melissa, you can go down and tell the officer

9   that their schedule is okay.

10          Thanks, everybody.  I appreciate it.

11     (Trial adjourned at 4:15 p.m. on August 17, 2022, until 1:10

12   p.m. on August 18, 2022.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   NHC, LLC, a Florida limited        )
     liability company,                 )
 4                                       )   Case No. 19 C 6332
                          Plaintiff,     )
 5   -vs-                                )   Chicago, Illinois
                                         )   August 4, 2022
 6   CENTAUR CONSTRUCTION COMPANY,       )   3:00 p.m.
     INC., an Illinois corporation;      )
 7   SPIRO TSAPARAS and PETER            )
     ALEXOPOULOS,                        )
 8                                       )
                          Defendants.    )
 9
            TRANSCRIPT OF PROCEEDINGS - FINAL PRETRIAL CONFERENCE
10             BEFORE THE HONORABLE MATTHEW F. KENNELLY

11   APPEARANCES:

12   For the Plaintiff:    MS. NICOLE JOY WING
                           MR. CODY DANIEL LIBMAN
13                         MR. JOSHUA JASON OREWILER
                           Vedder Price P.C.
14                         222 N. LaSalle Street, Suite 2600
                           Chicago, IL  60601
15                         (312) 609-7500
                           Nhighland@vedderprice.com
16                         Clibman@vedderprice.com
                           Jorewiler@vedderprice.com
17

18   Court Reporter:

19             KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                       Official Court Reporter
20                  United States District Court
              219 South Dearborn Street, Suite 1426
21                    Chicago, Illinois  60604
                    Telephone:  (312) 435-5569
22             Kathleen_Fennell@ilnd.uscourts.gov

23         *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

24         PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
                 TRANSCRIPT PRODUCED WITH A COMPUTER
25
```

1  APPEARANCES:  (Continued)

2  For the Defendants:      MS. KIMBERLY ANNE HERRING
                            MR. MATTHEW WALKER HORN
3                           MR. MICHAEL FRANK COCCIEMIGLIO
                            SmithAmundsen LLC
4                           150 N. Michigan Ave., Suite 3300
                            Chicago, IL  60601
5                           (312) 894-3329
                            Kherring@salawus.com
6                           Mhorn@salawus.com
                            Mcocciemiglio@salawus
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings heard in open court:)

2          THE CLERK:  Case 19 C 6332, NHC versus Centaur

3      Construction.

4          THE COURT:  Okay.  So the protocol is going to be

5      you're wearing a facemask unless you're arguing something, and

6      as far as -- and I don't know, I've got to get these things

7      moved back, but you can argue from where you're sitting.  You

8      can argue from the podium.  Either is fine.  You have to have

9      a microphone right in front of you.

10         So in other words, that's not going to work.

11     Microphones move, so move them in front of you.

12         So let's start out getting everybody's appearances on

13     the record.

14         MS. WING:  Good afternoon, your Honor.  Nicole Wing,

15     Joshua Orewiler and Cody Libman on behalf of the plaintiff.

16         MS. HERRING:  Kimberly Herring, Matthew Horn and

17     Michael Cocciemiglio on behalf of the defendants.

18         THE COURT:  Okay.  So the kind of the sequence I want

19     to do this in is we've got a bunch of motions in limine.  Most

20     of those I am not going to need or want argument on.  I'm just

21     going to tell you what the rulings are.  Some of them I do.

22     I'll tell you what those are as we go, and then we'll come

23     back and pick those up.

24         There was a motion which I literally had in my hands

25     a second ago and I put it down, the one that the defense filed

02:59:48
03:00:02
03:00:13
03:00:31
03:00:45

1    yesterday.  We'll do that after we do the motions in limine,

2    and then we'll talk about everything else after that.

3          And then we'll do on the record everything we need to

4    do on the record, and then we'll let the court reporter go,

03:00:58    5    and then we'll talk about logistics.  That doesn't really need

6    to be on the record.  Okay?

7          So give me just a second here.

8          So starting off with the motion to bifurcate.  It's

9    denied.  I'm not persuaded that there is significant

03:01:23   10    evidence -- first of all, I'm not persuaded that there's

11    significant evidence that's admissible only on punitives, and

12    I will point out that the motion didn't identify anything, so

13    that point, quite honestly, is forfeited.

14          But that aside, it doesn't appear to me that there's

03:01:37   15    anything significant, and I think the jury can be trusted to

16    follow instructions.  And just as a logistical matter, the

17    way, as I've explained to folks before, the way trials work,

18    jury trials work around here during COVID is I got this

19    courtroom for a specific period of time.  I've got it for five

03:01:51   20    days, and I don't have it for longer than that.  And

21    bifurcation, I mean, I can take a verdict anywhere, but I

22    can't do a second part of a trial anywhere.

23          I don't think that there's a basis for bifurcation

24    even without that, but if there was, that would be kind of the

03:02:08   25    thing that would ice it.

1        So that motion is denied.  Melissa, that's document

2   No. 173, yes.

3        Okay.  So next are the motions in limine.  The first

4   one is entitled Motion to Bar the Use of the Terms

03:02:29    5   Embezzlement and Stealing.  That motion is denied.  It's not

6   unfairly prejudicial, given the allegations and the evidence.

7   There are fraud claims in this case, and I don't think it's

8   unfairly prejudicial, given what the claims are and given what

9   the evidence, at least as it's been presented on summary

03:02:47   10   judgment and in the motions in limine, is.

11        Let's see.  We're going to -- Ms. Anderson, No. 2 is

12   the admissibility of the testimony of Ms. Anderson.  We're

13   going to need to talk about that one.

14        Apologies.  My notes got moved here.  Just a second.

03:03:17   15        Okay.  So on the motion to bar -- No. 3 is entitled

16   Motion to Bar Reference to Other Litigation.  I have one or

17   two questions about that, so we'll come back to that.

18        No. 4 is entitled Motion to Bar Mention that Corri

19   McFadden Was Sent Money.  I have a question or two about that.

03:03:46   20        On No. 5, and this I think overlaps with a motion by

21   the plaintiff.  So I granted summary judgment on liability in

22   favor of the plaintiff on the breach-of-contract claim.  And

23   this motion is entitled to Bar Reference to Breach of Contract

24   Being Decided On A Motion For Summary Judgment and/or By the

03:04:03   25   Court.

1        So how would I -- how is the Court going to know --

2  how is the jury going to know that there's liability, there's

3  a finding of liability, unless I tell them?

4        MS. HERRING:  Judge, we have no objection to the jury

03:04:15    5  knowing that there's a finding of liability.  The objection is

6  to the jury knowing that Judge Kennelly made a finding.

7        THE COURT:  As opposed to whom?  I mean, where do

8  they think it's supposed to -- that it kind of descended from

9  on high somewhere, or what exactly?

03:04:29  10        MS. HERRING:  I don't think the jury has to be

11  instructed.

12        THE COURT:  There has been a finding that the

13  defendants are liable on the breach-of-contract claim?

14        MS. HERRING:  Correct.

03:04:39  15        THE COURT:  You have no problem with that.

16        MS. HERRING:  Correct.

17        THE COURT:  Okay.

18        Is there a problem with that?  I would assume you can

19  live with that.

03:04:46  20        MR. OREWILER:  Yes, your Honor.  And we would also

21  think that there should be, you know, instruction as to the

22  specific contractual provisions.

23        THE COURT:  Yeah, we'll worry about that part later.

24  Okay.  But that's -- so motion in limine 5 is granted to that

03:04:58  25  extent, and we'll come up with an instruction.

1       It will be -- you'll see it for the first time when I

2  send you the preliminary, a draft of the preliminary

3  instructions to be read to the jury before opening statements,

4  and we can -- any wordsmithing we need to do, we can worry

03:05:12    5  about it then.

6       Okay.  No. 6 is entitled Motion to Bar the Testimony

7  of Rudy Ramirez.  That one's denied.  Mr. Ramirez's testimony

8  about his dealings with the defendants is relevant.  It's not

9  character evidence.  However, he's barred from giving opinions

03:05:32   10  about anybody's character, whether it's the plaintiff's or the

11  defendants' or people affiliated with them, and counsel, which

12  I assume is plaintiff's counsel in this case, need to tell him

13  that.

14      So he can talk about his dealings, but he can't get

03:05:44   15  up and say this person's a person of good character, this

16  person is a cheat and a liar and so on.  That kind of

17  testimony isn't admissible.  So that's the ruling on that.

18      No. 7 is about settlement discussions.  I'm going to

19  need to hear argument on that.

03:05:57   20      Defense No. 8 is a motion to bar reference to

21  celebrity folks.  There's no objection to that, so No. 8 is

22  granted.

23      On No. 9, the motion to require the disclosure and

24  timing of the witnesses.  I mean, honestly, there shouldn't

03:06:10   25  have to be a motion on this.  You're going to need to disclose

1    the sequences of the witnesses and the next day's witnesses at

2    the end of each trial day, and the main message I'm going to

3    leave to everybody is we are going to go until quitting time,

4    and if somebody runs out of witnesses, there will be hell to

03:06:28    5    pay.

6        So 9 is granted to that extent.

7        10 we're going to need to talk about a little bit.

8    So there's probably about half of those we need to talk about.

9        So then on the plaintiff's motions.  One second.

03:06:45    10   Yeah, No. 1 I think we've kind of just talked about.  I mean,

11   it would seem to me that the instruction, and I don't know

12   that this needs to be done at the beginning of the case, but

13   the instruction that the jury is given at the end of the case

14   will have to identify which provisions of the contract the

03:07:10    15   defendants have been found to have violated.

16       And I guess my sense of defense motion in limine

17   No. 1 was that that is basically what you were looking for; is

18   that right?  Or is there more to it than that -- excuse me,

19   plaintiff's motion in limine No. 1.

03:07:31    20       MR. OREWILER:  Yes, your Honor.  That's correct.

21       THE COURT:  Okay.  That's all you're looking for is

22   some identification of what provisions of the contract there's

23   been a finding of liability on.

24       MR. OREWILER:  Yes, correct.

03:07:40    25       THE COURT:  Nothing more than that.

1          MR. OREWILER:  No, your Honor.

2          THE COURT:  Okay.  So that one's covered by the other

3 one, so it's granted to that extent.

4          And then No. 2 I need to hear argument on.  So that's

03:07:50  5 actually where we're going to start.  We're going to start

6 with plaintiff's motion in limine No. 2 about evidence of the

7 financial condition of non-party Chapur, probably the wrong

8 pronunciation, C-H-A-P-U-R, family members.

9          So the last thing I got on that was the defendants'

03:08:10  10 response, so let me hear from the plaintiff, I guess, a reply

11 to what they said in response.

12          MS. WING:  Certainly, Judge.

13          We believe the case law is overwhelmingly on our side

14 on this matter.  The Chapurs are six brothers and sisters and

03:08:26  15 a father that are the people behind the company NHC, the

16 plaintiff.  They also run --

17          THE COURT:  Let me focus this because --

18          MS. WING:  Yes.

19          THE COURT:  -- you can assume that I've read

03:08:37  20 everything more than once, okay?

21          So basically the argument as I understood it that's

22 made by the defendants in response is that we're not wanting

23 to put in anybody's balance sheet or that they're a

24 millionaire or a billionaire or whatever.  What they want to

03:08:50  25 put in is that they own a bunch of hotels because that's

1  relevant on the question of their level of sophistication and

2  what they would have understood and not understood as it

3  relates to the dealings at issue in this case.

4      Is that a basic summary?

03:09:03   5      MS. HERRING:  Yes.

6      THE COURT:  Yeah.  So why don't you deal directly

7  with that.

8      MS. WING:  Sure.  With regard to that argument that

9  they need to elicit testimony about their experience with

03:09:10   10  hotels, we believe they can do so without eliciting testimony

11  about their wealth, without calling them a billionaire family.

12  They've operated, I believe, 14 other hotels.  We don't have a

13  problem with that --

14      THE COURT:  Okay.  You don't have any problem -- so

03:09:23   15  what I take from that is you don't have any problem with there

16  being questioning and testimony elicited about you operate 14

17  hotels in three different countries or six different countries

18  or whatever it is.

19      MS. WING:  Correct, no problem with that, with their

03:09:36   20  experience, with calling them sophisticated, that's fine.

21  With going to the fact that they are all personally wealthy

22  and calling them things like billionaire family --

23      THE COURT:  Yeah.

24      MS. WING:  -- that's what we object to.

03:09:47   25      THE COURT:  Okay.  So what about that, Ms. Herring?

1       MS. HERRING:  Judge, I don't necessarily have an

2   objection, or I don't intend to elicit that they're

3   billionaires.  I don't know how much money they have.  We

4   haven't included any of that in this.

03:09:55    5       What we need to be able to introduce is the number of

6   hotels they have around the world.

7       THE COURT:  Yeah, okay.  So that's where the line

8   gets drawn.  You can't refer to their wealth because it's not

9   relevant.  You can bring in evidence that they operate 14

03:10:09   10   hotels or a dozen hotels or whatever it is in X number of

11   countries and that they've been doing that for Y number of

12   years.  And, you know, there may be some additional testimony

13   about that to show their level of background in the field.

14       So defendants' -- Plaintiff's No. 2 is I'm just going

03:10:21   15   to say granted in part and denied in part as stated in the

16   record.

17       So now we're going to go back to the defense motions

18   in limine.  And I want to start off, I don't want to start off

19   talking -- I don't want to do them in sequence.

03:10:33   20       So I want to start with No. 4.  So No. 4 has to do

21   with somebody named Corri McFadden.  I have no idea who it is,

22   although supposedly I guess it was somebody's girlfriend or

23   something like that.

24       So can you just flesh out for me a little bit on the

03:10:59   25   plaintiff's side exactly what you want to put in about that

1   and what its relevance is?

2           MS. WING:  Sure, Judge.

3           One of the main things that defendants misrepresented

4   in this case is where they were sending NHC's progress

03:11:15   5   payments as NHC would make them throughout the course of

6   construction.  We have emails from Spiro, which is the

7   principal of Centaur, to Rodrigo, the principal of NHC,

8   saying, I'm going to use this money to pay HVAC; I'm going to

9   use this money to pay the window guy.

03:11:30   10          And then the payment gets deposited in their bank

11  statements, and basically all of this information that they

12  want to exclude is in the bank statements.

13          THE COURT:  Okay.

14          MS. WING:  Then you go to the bank statements and you

03:11:39   15  say, no, HVAC was not paid, window was not paid, concrete was

16  not paid.  Instead we've got payments to Corri McFadden, your

17  girlfriend; we've got payments to yourself; we've got payments

18  to your creditors.  We don't have any desire to ask what that

19  stuff was used for, your prior point on that is well-taken,

03:11:55   20  whether it was golf clubs or cars or whatever, we don't care.

21  But we do want to be able to say this person, Burt Richmond,

22  is not HVAC or concrete.

23          THE COURT:  Okay.

24          MS. WING:  This 707 is not HVAC or concrete.

03:12:08   25          THE COURT:  Okay.  I've got a sense of it now.

1          MS. WING:  Thanks.

2          THE COURT:  So what's wrong with what's being

3     proposed here?

4          MS. HERRING:  Judge, the response is that none of the

03:12:15    5     recipients of this money is relevant in any way.  As Ms. Wing

6     mentioned, we have adjudicated this issue before.  I think

7     your Honor said it doesn't matter if they spent the money on

8     golf clubs or whiskey, all that matters is that it was not

9     project related.

03:12:29   10          THE COURT:  Right, but don't they have to put

11     something in to show that it wasn't project related?  In other

12     words, why would -- the jury isn't going to know who Corri

13     McFadden or, whatever, Burt Richmond, or whoever that is,

14     they're not going to know who those people are either.

03:12:41   15          And so just in terms of showing that it wasn't paid

16     for -- it wasn't used for something relating to payment of

17     subcontractors, don't they have to be able to put in that this

18     was a girlfriend or a, you know, business partner or, you

19     know, a lawyer or whatever?

03:12:56   20          MS. HERRING:  The fact that the payment went to

21     someone that was not project related does not need to come

22     into evidence.  The recipient of the payment does not have to

23     come in.

24          THE COURT:  There is unlimited time -- there's not

03:13:08   25     unlimited time in the world.  You just keep kind of repeating

1    a conclusion.  I need the reasoning.  That's what I'm asking

2    you for.  This is your third try, and so I'm just going to

3    give everybody a little practice point here.

4            When a judge asks a question and it doesn't get

03:13:23    5    responded to, the first time the judge assumes, well, that's

6    because lawyers don't answer questions.

7            The second time the judge starts thinking that's

8    because the lawyer doesn't have a good answer to the question.

9            The third time that it doesn't get answered, the

03:13:32    10   judge concludes that the lawyer doesn't have a good answer to

11   the question, or at least this judge does, and that's why

12   they're evading it.

13           So third and last.  Go ahead.

14           MS. HERRING:  Judge, I don't mean to evade your

03:13:43    15   question.  My point is only that the information can come into

16   evidence without an identification of the recipient of the

17   information because I believe the recipient is irrelevant.

18           THE COURT:  I don't agree.  I think it's relevant.  I

19   don't think it's unfairly prejudicial.  No. 4 is denied.

03:13:58    20           So now, let's see what do I want to do next.  We're

21   going to do the one on the expert or the forensic accountant

22   last.

23           On the -- hang on a second.  I now realize why this

24   thing is giving me a hard time.  Okay.

03:14:37    25       (Court reporter interruption.)

1        THE COURT:  Okay.  Let's see.  I ruled on 5.  I ruled

2   on 6.  We're on 7.

3        Okay.  So this thing about No. 7, defense No. 7 is

4   entitled Motion to Bar Settlement Discussions between Spiro

03:15:04   5   Tsaparas, T-S-A-P-A-R-A-S, and Rodrigo Chapur, and I gather

6   that this is all about these two emails, one of which is, I

7   think, Exhibit 9, and one of which is Exhibit 10, or maybe 8

8   and 9.  It's 8 and 9.

9        So I want to make sure I have a handle on the timing

03:15:23   10   of things.  So the lawsuit gets filed when?  What's the date?

11   Anybody know off the top of your head?  I mean, I can look it

12   up obviously.

13        MS. HERRING:  September 23rd, 2019, Judge.

14        THE COURT:  Okay.  And was there some sort of a

03:15:37   15   "we're going to sue you" letter that was sent before that or a

16   communication of some sort that says you're in default, we're

17   going to sue you, something along those lines?

18        MS. HERRING:  There was, Judge.  I don't recall the

19   exact date.

03:15:48   20        THE COURT:  Ballpark.

21        MS. HERRING:  August, I think.

22        THE COURT:  Okay.

23        MS. HERRING:  But there was a meeting at Ms. Wing's

24   office with my client and her client.

03:15:58   25        THE COURT:  Okay.  That was going to be my next

1   question.  At what point do the lawyers start getting

2   involved, so when did your firm start getting involved at

3   least in dealing with the defendants?

4           MS. WING:  After the meeting at my office on

03:16:10   5   August 23rd, they brought in the litigation attorneys because

6   based on what Spiro had said --

7           THE COURT:  Okay.  But the law firm presumably was

8   involved when they had the meeting at your office because my

9   guess is I couldn't walk in there and say, hey, I want to have

03:16:23   10   a meeting at Vedder Price.

11           MS. WING:  The transactional lawyers who had done the

12   contract had been involved up to that point.

13           THE COURT:  Okay.  And that meeting you think was in

14   August sometime?

03:16:30   15           MS. HERRING:  It was in August, yes.

16           THE COURT:  August.  Okay.

17           So Exhibit 8 is an exchange of emails that is dated

18   August 22nd and 23rd.  So, who is Luciana Tescari?

19           MS. HERRING:  She's an employee of Centaur.

03:16:51   20           THE COURT:  Got it.

21           So she sends an email to, I guess, somebody with the

22   plaintiff and says so we've hired this representative,

23   Shawmut, S-H-A-W-M-U-T.  They're going to represent us.  We'd

24   like to, you know, they're going to contact you to get info.

03:17:13   25   That's on the 22nd of August.

1       On the 23rd of August, an email goes from somebody

2  named Jason Swicionis, S-W-I-C-I-O-N-I-S.  Who's he?  Is he

3  with Shawmut Construction?

4       MS. HERRING:  Judge, I think we might be looking at

03:17:30  5  different emails.

6       THE COURT:  Am I looking at the wrong thing?

7       MS. HERRING:  I think so.

8       THE COURT:  "We need to meet to discuss payment.  Let

9  me know when you're available."

03:17:39  10      Okay.  I thought this was one of the emails that was

11  at issue on this motion in limine.

12      So let me look.  I'm told in the response that the

13  emails that are at issue are 8 and 9, and I've been talking

14  about 8.  Exhibits 8 and 9.  If 8 is not an issue and there's

03:17:56  15  no objection to it, then I can bypass that.  We can talk about

16  9.

17      MS. HERRING:  Judge, that is the incorrect email.

18  We're trying to grab the correct one.

19      MS. WING:  Exhibit 11 is one of the correct ones,

03:18:09  20  which is an email from July 24th.

21      THE COURT:  Whose Exhibit 11 to what thing?

22      MS. WING:  Plaintiff's.

23      THE COURT:  Plaintiff's Exhibit -- I've got to tell

24  you, I don't think there is an Exhibit 11.  The last one is

03:18:23  25  Exhibit 10.

1    MS. WING:  I'm sorry.  I was referring to the trial

2  exhibit number.

3    THE COURT:  I'm talking about the exhibits to the

4  motion in limine, which is the 2,227 pages of stuff that I

03:18:34    5  downloaded along with the final pretrial order.  And I'm

6  pretty sure it's not Exhibit 10.  It's not Plaintiff's

7  Exhibit 10.

8    So Plaintiff's Exhibit 9 is an exchange of texts.

9  Okay.  So maybe I'm looking at the wrong exhibit.

03:18:54   10    Plaintiff's Exhibit 8 is some emails, is a long email

11  from Mr. Tsaparas to Chapur dated July the 24th.  "Please find

12  a simple yet accurate update on the final costs to complete,"

13  and then it goes into a bunch of figures.

14    Is that one of the ones we're talking about?

03:19:13   15    MS. HERRING:  Yes.

16    THE COURT:  Okay.

17    MS. HERRING:  Yes.  It's Plaintiff's Exhibit 8.

18    THE COURT:  Okay.  So presumably -- not presumably,

19  when people have a contractual relationship where they're

03:19:27   20  disputing things, they're always talking about trying to work

21  it out.

22    How does that qualify as settlement discussions?

23  This is a month before the meeting at the lawyers' office.

24  How does that qualify as settlement discussions under the

03:19:38   25  rule?

1        MS. HERRING:  Because the proponent of this email,

2 Judge, Spiro Tsaparas, said that he sent the email because he

3 thought litigation was imminent.  He did this because he

4 thought litigation was imminent.

03:19:57  5        His declaration, your Honor, is in Defendants'

6 Exhibit 9.

7        THE COURT:  Okay.  I'm just looking at the email, not

8 how somebody tries to explain it as part of a motion in

9 limine, okay?

03:20:07  10        So the email, and I mean there may have been

11 testimony about it in the deposition, too, but he's basically

12 talking about what the cost overruns are, how they're going to

13 get reconciled, we're going to send you information, there's

14 delay costs, we understand we're going to be responsible for

03:20:26  15 that.  I'm having a hard time understanding how any of that

16 qualifies as an offer of compromise --

17        MS. HERRING:  He's accepting --

18        THE COURT:  -- which is what Rule 408 is about.

19        MS. HERRING:  He's accepting responsibility, your

03:20:37  20 Honor, for some of these costs in order to avoid a lawsuit.

21        THE COURT:  Yeah.  How is that an offer to

22 compromise?

23        MS. HERRING:  It's an offer to work things out on

24 this construction project so that there is no lawsuit filed.

03:20:56  25        THE COURT:  Okay.  Let me hear from the plaintiff on

1    this.

2         MS. WING:  Judge, we don't believe -- there was no

3    lawsuits being contemplated at this time.  They never

4    discussed a lawsuit.  They weren't involving lawyers.  I don't

03:21:07    5    see an offer of compromise here at all.

6         The only thing that was at issue at this time between

7    Spiro and Rodrigo was:  Was Centaur going to get fired from

8    this project or not, and they were trying desperately to stay

9    on as the design builder of the project, and this was their

03:21:22    10    proposal to do so.

11         THE COURT:  What is -- there's a reference in here to

12    something called RCD.  Remind me what that is.

13         MS. WING:  RCD is a brand operated by the Chapur

14    family of various hotels.  Oftentimes people have used the

03:21:38    15    terms --

16         THE COURT:  And so what's the significance of this

17    email?  I assume it lies largely in the sentence that says:

18    Centaur responsibility according to the contract of those

19    overruns are 4,000 -- $4,050,000.  Is that the main thing that

03:21:54    20    you're after in this email?

21         MS. WING:  That's one of the main points.  Another

22    one is the statement that the project is not going to suffer

23    any liens, but mostly the fact that Centaur is responsible for

24    the cost overruns on the project as an admission.

03:22:11    25         THE COURT:  Okay.  Exhibit 9 is the other one.  That

1   looks like an exchange of texts, and that's dated, the first

2   one is -- although it seems to kind of start in the middle, at

3   least from what I've got.

4            The first one is August the 15th of 2019, and it goes

03:22:25   5   for about a week.  The last one, and it talks about the

6   meeting at Vedder Price, which I assume is the one you guys

7   talked about.

8            So it looks like a meeting with the lawyers was

9   already contemplated at that point.  So what -- Ms. Herring,

03:22:40   10   can you tell me what it is, and this is, I guess, Plaintiff's

11   Exhibit 9 to the response to the motions in limine.

12            Can you tell me what it is in this exchange of texts

13   that you think falls within Rule 408?  It's not will you be in

14   Chicago tomorrow.  It's not --

03:22:58   15            MS. HERRING:  No.

16            THE COURT:  -- we can meet at 9:00.  What is it?

17            MS. HERRING:  Your Honor, the only aspects of the

18   exhibit and the other one that we have an issue with are

19   accepting of responsibility --

03:23:06   20            THE COURT:  Yeah.

21            MS. HERRING:  -- in a monetary amount.

22            THE COURT:  So, look.  I'm going to ask my question

23   again.  I'm talking about one exhibit, Exhibit 9.  I've got it

24   in front of me.  So quote me the words that you think are

03:23:15   25   within what's contemplated by Rule 408.

1       MS. HERRING:  Judge, to be honest with you, I don't

2   have the text in front of me.

3       THE COURT:  That's not good.

4       MS. HERRING:  No, it's not.

03:23:25    5       THE COURT:  Does anybody at your table have something

6   that they can call up?

7       MR. COCCIEMIGLIO:  Your Honor, the text message was

8   included.  We didn't include it in our motion.  They attached

9   it as an exhibit.  We used the text as context to show that

03:23:36   10   settlement discussions were happening and my client was aware

11   that litigation wasn't pending.

12       THE COURT:  Hang on a second.

13       In the motion, I'm looking at page 17 of docket entry

14   175, it refers to text messages, okay?  Now, you know, fine,

03:24:08   15   you chose not to -- you chose not to attach them as an

16   exhibit, but the text messages in question -- let me just make

17   sure of this, look at a number here, 4, 5, 6, 8.

18       Yeah.  The text message that you referred to in the

19   motion, which has a Bates stamp number of CEN 004568, is

03:24:35   20   Plaintiff's Exhibit 9.  You referred to it.

21       MS. HERRING:  Yes, Judge.  So --

22       THE COURT:  So what I want to know is in that text

23   message that you guys referred to in the email, what's the

24   part or parts of that text message that you consider to be --

03:24:49   25   to run afoul of Rule 408?

1          MS. HERRING:  There's nothing in the text messages,

2     your Honor.  The text message was included as context to the

3     fact that my client knew that a suit was coming because he

4     says, "Don't file a suit" in the text message.  It just gives

03:25:01  5     context to the other statement that we're trying to exclude.

6          THE COURT:  Do you guys at least have the motion with

7     you?

8          MS. HERRING:  I do.

9          THE COURT:  Look at the last sentence of the section

03:25:10  10    under No. 7, which is on page 18.  "As such, plaintiff must be

11    barred from introducing evidence or testimony or argument

12    relating to settlement discussions between Tsaparas and

13    Chapur, including, but not limited to," a different document,

14    NHC 46908.

03:25:28  15         So here's the problem.  We're dealing with motions in

16    limine.  If I just say, sure, Rule 408 applies and nothing

17    that runs afoul of Rule 408 can come in without identifying

18    what it is, it does nobody any good and we've wasted all of

19    the time you guys spent to write this and respond to it, all

03:25:46  20    the time I spent to read it, and the time we've been talking

21    about it.

22         So I can happily declare that the Federal Rules of

23    Evidence will apply in this trial, and that includes Rule 408.

24    I have been told about two documents.  I've been told about

03:26:03  25    these emails, which are the ones you referenced there, and

1  I've been told about these text messages that you referenced

2  on the previous page, and I'm trying to find out among the

3  text messages that you cite on the previous page what are the

4  gosh darn sentences or words or lines that you think run afoul

03:26:19  5  of 408.

6  It's not the whole thing.  It can't be the whole

7  thing.  It's not "when are you going to be available?"  I need

8  to know more.  And you're not going to be able to give it to

9  me.  In about 30 seconds, this motion is going to be deemed to

03:26:37  10  have been forfeited because you're not prepared to argue about

11  it at the final pretrial conference, the whole purpose of

12  which is to talk about motions in limine, for God's sake.

13  MS. HERRING:  Judge, the motion in limine No. 7 only

14  seeks to exclude the email that you had -- you brought up to

03:26:49  15  us.

16  THE COURT:  Okay.

17  MS. HERRING:  It does not seek to exclude, your

18  Honor, the text messages.

19  THE COURT:  Okay.  Now we're talking about the email.

03:26:54  20  I don't -- to me, the email does not look like an offer of

21  compromise within the contemplation of Rule 408, so that

22  motion is denied.

23  Okay.  So now we're talking about -- now we're down

24  to Ms. Anderson, who, as I understand it, is basically a

03:27:14  25  forensic accountant, right?

1          Right?

2               MR. OREWILER:  Yes, your Honor.

3               THE COURT:  Okay.  So -- and I know there's a big,

4     long report which I've looked at, and, you know, there's a

03:27:31    5     lengthy deposition and so on, so can you just kind of describe

6     for me in a nutshell what the gist of Ms. Anderson's expected

7     testimony is?

8               MR. OREWILER:  Yes, your Honor.

9               So primarily Ms. Anderson will testify that she

03:27:45   10     analyzed Centaur's bank statements, as well as a voluminous

11     number of project-related records, and she determined, based

12     on her analysis, that Centaur used more than 10 million of

13     NHC's funds for things that were not project related.

14               She also opines that NHC incurred $21,212,835 in

03:28:08   15     additional costs to complete the project based on Centaur's

16     actions.  And while we're not intending in our case-in-chief

17     to present this, she did opine that Centaur failed to comply

18     with industry standards relating to implementing project

19     controls.  Your Honor ruled on that on summary judgment.

03:28:28   20               THE COURT:  Right, I thought I did.  So when you say

21     not in your case-in-chief, does that mean there's a

22     possibility that it would come in if you thought that the

23     defendants had opened the door to it in some way or something

24     like that?

03:28:37   25               MR. OREWILER:  Yes.  If they were -- and I'm not

1  saying they will, but if they were to elicit evidence that,

2  you know, the way they ran this project, this is the way it's

3  done all the time in the industry or things like that, we want

4  her to be able to rebut that.

03:28:50  5  THE COURT:  Okay.  So my main takeaway from the

6  motion by the defendants was that this person doesn't have any

7  background in the hotel business, and, therefore, she's not

8  really qualified to talk about the financial matters that

9  she's talking about here.  That was my main takeaway from it.

03:29:10  10  So flesh it out for me.

11  MS. HERRING:  Your Honor, our argument was that she

12  doesn't have the experience to bring these opinions.  She

13  doesn't -- has never worked in construction.  She doesn't have

14  any experience in the construction industry.  She's just been

03:29:24  15  an expert her entire career.

16  THE COURT:  Why would you need experience in the

17  construction industry to be able to look at financial

18  statements and accounting records to determine where money

19  went and where it didn't go?

03:29:36  20  MS. HERRING:  Well, that experience with regards to

21  the construction industry, your Honor, is regarding her first

22  opinion, which Centaur did not follow project controls.

23  THE COURT:  Okay.  Back up.

24  Is that the one that you said, on the plaintiff's

03:29:52  25  side, that you said you're not going to present in your

1    case-in-chief?

2            MR. OREWILER:  Correct, your Honor.

3            THE COURT:  Okay.  So we don't need to talk about

4    that just yet.

03:29:59    5            So on that, you're going to have to -- you're not

6    going to be able to blurt it out in rebuttal or something like

7    that.  You're going to have to ask for a conference outside

8    the presence of the jury if you think that that particular

9    opinion needs to come in.

03:30:11    10           So we don't need to worry about that one now because

11   that's not coming in in their case-in-chief.

12           When I said "this drives me nuts," I was not talking

13   about you.  I was talking about something on my iPad.  Sorry.

14           Go ahead.  I'm ready.

03:31:13    15           MS. HERRING:  Me, your Honor?

16           THE COURT:  Yeah, I'm just waiting for you to tell

17   me.  So the thing that you -- the thing about not following

18   controls is the thing that they, the plaintiff, is saying that

19   they're not intending to introduce in their case-in-chief.

03:31:24    20           So what else is there from Ms. Anderson's testimony?

21           MS. HERRING:  Opinion 3, your Honor.

22           THE COURT:  Which is what exactly?

23           MS. HERRING:  It is she essentially -- let me pull it

24   up for you so I don't misquote it.

03:31:36    25           It's the amount of damages she claims were sustained

1  on the project.  Judge, she basically says there's a GMP in

2  the contract of $48 million.  NHC --

3          THE COURT:  Remind me what GMP is an abbreviation

4  for.

03:31:55  5          MS. HERRING:  It's the total number allotted in the

6  contract.

7          THE COURT:  Got it.  Okay.  I'm sorry.  I interrupted

8  you in the middle of a sentence.  Go ahead.

9          MS. HERRING:  Yeah, so, Ms. Anderson's opinion is

03:32:04  10  basically there was a contract that said you have to build

11  this hotel for $48 million, and NHC paid more money than that

12  for the hotel, and, therefore, the difference is their damage

13  award.

14          THE COURT:  Okay.  So, is Ms. Anderson going to say

03:32:17  15  something about what the damage award should be, or is she

16  just going to say we're supposed to pay this and we paid this

17  plus X?

18          MR. OREWILER:  Ms. Anderson is going to opine on the

19  additional costs that NHC incurred in her opinion as to the

03:32:33  20  costs that were incurred to finish the hotel based on

21  Centaur's actions.  NHC paid the full guaranteed maximum

22  price --

23          THE COURT:  That's what GMP stands for, guaranteed

24  maximum price?

03:32:46  25          MR. OREWILER:  Yes.

1          THE COURT:  Okay.

2          All right.  But you're not going to be eliciting from

3    her is this how much, Ms. Anderson, you think the ladies and

4    gentlemen of the jury should award to the plaintiff?

03:32:59    5          MR. OREWILER:  No, your Honor.

6          THE COURT:  Yeah, you're not going to ask that

7    because that question would be objected to, and the objection

8    would be sustained before you even finished the sentence.

9          Okay.  So, I mean, I guess I'm missing what the

03:33:10   10    problem is here.  This seems to me to be like standard,

11    plain-vanilla, run-of-the-mill forensic accounting work.  The

12    real argument would be why do you need an expert to do a

13    subtraction between 49 million and whatever the other number

14    is, but that argument I'm not really seeing as being your

03:33:26   15    argument.

16          And even if it was, somebody needs to do it, and

17    there's no reason why it can't be a forensic accountant since

18    she's going to be on the stand talking about these other

19    things, about, you know, this money, I analyzed the books,

03:33:37   20    this money didn't go to the project, it went to something

21    else; this money didn't go to the project, it went to somebody

22    else.

23          That's the kind of thing that forensic accountants

24    often do, and I don't see a problem with her doing the math

03:33:49   25    problem, too, so what am I missing?

1   　　　　MS. HERRING:  Judge, the other issue with that comes

2   back to her experience or lack thereof in the construction

3   industry.  There's no opinion in here about whether the costs

4   expended by NHC that she's opining they had to spend on this

03:34:03   5   project are reasonable and necessary for this construction

6   project.  She just does a simple math problem and holds

7   herself out as an expert, where, you know, there's no --

8   there's no evaluation of, you know, if this could have been a

9   significantly lower number.  She's just going to get up in

03:34:18   10   front of jury and say I'm --

11   　　　　THE COURT:  So let me just tell you how the argument

12   falls on the ears of the listener.  Here's how it falls:

13   She's not going to -- she's not basically going to stand up

14   and point a finger at us and point to a smoking gun.  She's

03:34:35   15   going to do something way less than that, and, therefore, she

16   shouldn't be able to testify.

17   　　　　That's kind of what you just said basically, so I'm

18   going to quote back to you what you said.  Give me a second

19   here.  No, that's the wrong thing.

03:34:54   20   　　　　There's no evaluation of this could have been a

21   significantly lower number.  There's no opinion about whether

22   the costs expended by NHC are reasonable and necessary for the

23   construction project.

24   　　　　So you're talking to me about things that she's not

03:35:10   25   testifying about.  She's not saying that the excess is

1    reasonable and necessary.  She's not evaluating, you know,

2    whether it could have been a significantly lower number.  I

3    mean, that's something a construction expert could have done.

4    That's not a reason why she can't testify about something that

03:35:29    5    is basically an exercise in math and analyzing books and

6    records.

7            MS. HERRING:  Judge, I believe it's going to confuse

8    the issues in front of the jury.

9            THE COURT:  I don't think --

03:35:39    10           MS. HERRING:  She's going to get up as an expert, and

11   she's going to offer this opinion that NHC had to spend all of

12   this additional and extra money when maybe they didn't.

13   That's going to confuse the issues coming from an expert.

14           THE COURT:  I would assume that the testimony of --

03:35:55    15   that they had to spend it is going to come from other people.

16   She's just going to say that they did spend it.

17           Am I right?  I mean, she can't -- Ms. Anderson can't

18   analyze whether it was a good idea or necessary or appropriate

19   for NHC to go out and incur this expense or that expense.

03:36:15    20   She's simply going to say that's the expense they incurred.

21   Am I correct?

22           MR. OREWILER:  Yes, and she does set forth in her

23   report additional detail about how she conducted that.

24           THE COURT:  Yeah, let's focus on my question because

03:36:26    25   it's kind of important.

1          So you want to try it again?

2          MS. HERRING:  Your Honor, can I read the opinion that

3   we're talking about to you?

4          THE COURT:  Sure.

03:36:34    5          MS. HERRING:  It says, "NHC incurred $21,212,835 in

6   additional costs to complete the project as a result of

7   Centaur's actions."

8          THE COURT:  So the only part of that that seems to me

9   even potentially problematic is "as a result of Centaur's

03:36:53   10   actions."  If the sentence stopped right before that, we

11   wouldn't be talking about this.  I would have denied the

12   motion already.

13          So you presumably are reading kind of the heading of

14   the opinion.  So what's the body of the opinion where the "as

03:37:08   15   a result" part is fleshed out?  Maybe on the plaintiff's side

16   you can just tell me.

17          MR. OREWILER:  So Ms. Anderson goes in through --

18          THE COURT:  Is she going to give an opinion about why

19   they had to incur the expense?  That's my question.  Is she

03:37:23   20   going to give an opinion or conclusion or any other testimony

21   about why NHC had to incur the excess expense that she's going

22   to be talking about or she's going to be quantifying?

23          MR. OREWILER:  Yes.

24          THE COURT:  Okay.  What's the opinion --

03:37:35   25          MR. OREWILER:  The opinion --

1    THE COURT:  -- she's going to say about that?  What's

2  she going to say?

3    MR. OREWILER:  The opinion is that NHC incurred the

4  additional cost of the dollar amount as a result of Centaur

03:37:45   5  not --

6    THE COURT:  Okay.  I'm going to read my question back

7  to you.  So listening is an important skill when one is in

8  court hearings:  Is she going to give an opinion or conclusion

9  or any other testimony about why NHC had to incur the excess

03:38:00  10  expense that she's going to be talking about or she's going to

11  be quantifying?

12    And I will note for the record, because it's a cold

13  record, that when I read it that time, I pretended that the

14  word "why" was in capital letters, bold print and underlined

03:38:14  15  three times.  So that's the important part of the sentence.

16    Is she going to give an opinion about why they had to

17  incur the expense that she's quantifying?

18    MR. OREWILER:  No.  That's going to come in through

19  fact witness testimony.

03:38:28  20    THE COURT:  That's kind of what I assumed.  So the

21  "as a result of" is not going to come from her, and it can't

22  come from her because she doesn't have a background in the

23  construction business.  To that extent, Ms. Herring is right.

24    So you'd best not be trying to elicit from her that

03:38:44  25  this was the fault of the defendants or this only happened

1  because of what they did or whatever because she's not -- that

2  testimony is going to come from other witnesses.

3  Now, you can have an expert assume other things,

4  assume this, assume that. That's kind of standard operating

03:38:55  5  procedure for experts, but she can't give that opinion.

6  So with that exception, motion number 3 is denied.

7  Okay. I think I have ruled on all the motions in

8  limine except for the new one. If I missed something, tell me

9  because I don't want to miss it.

03:39:16  10  MS. WING: Judge, I think there's two misses.

11  THE COURT: What are the two misses?

12  MS. WING: We never came back and discussed No. 3

13  about the other lawsuits.

14  THE COURT: I'm sorry. You're right.

03:39:22  15  MS. WING: Or the attorneys' fees, No. 10.

16  THE COURT: No. 3 and No. 10, you're absolutely

17  right. So, okay, other lawsuits. Let me just pull that one

18  up here.

19  So let me tell you what my takeaway is on the other

03:39:31  20  lawsuits thing. So the defense argument is, you know, if

21  plaintiff gets to put in front of the jury that the defendants

22  are getting sued all over the place, that's going to make them

23  look like bad people, you know, who ought to be drawn and

24  quartered or whatever.

03:39:46  25  The plaintiff says we have to be able to put on

1  evidence that there were lawsuits that resulted from the

2  defendants' nonpayment of contractors. That's kind of what I

3  took away from the two sides on the motion. Is that -- just

4  at a general level, is that pretty much right?

03:40:04  5  MR. LIBMAN: Correct, yes.

6  THE COURT: Okay. So the last thing I got on that

7  was from the plaintiff, and it's really that point. The

8  plaintiff is saying we need to be able to put on evidence of

9  that there were other lawsuits that were filed by contractors

03:40:18  10  or whatever because that's part of showing that the defendants

11  didn't do what they were supposed to do.

12  So what's wrong with that argument?

13  MS. HERRING: Judge, the first aspect is I'm only

14  aware of one lawsuit that's been filed. It seems to allude to

03:40:35  15  a number of lawsuits in there.

16  The other issues is --

17  THE COURT: Okay. Stop. Maybe we can solve this

18  problem right now.

19  Is there one or more than one?

03:40:41  20  MR. LIBMAN: There were two that were consolidated

21  into one lawsuit.

22  THE COURT: So it's two lawsuits that ended up as one

23  lawsuit.

24  MR. LIBMAN: Yes.

03:40:46  25  THE COURT: Does that sound right to you? Two

1    lawsuits by the same contractor, or are they different

2    contractors?  Who are they?  Just say who they are.

3           MS. HERRING:  Are we talking For Province here, guys?

4           MR. OREWILER:  Yes.

03:40:57    5    MS. HERRING:  Anything else?

6           MR. OREWILER:  There were other subs that filed

7    lawsuits, there were two different lawsuits filed by

8    subcontractors.  They were consolidated into one.

9           MS. HERRING:  Are you talking about Bricks and For

03:41:07   10   Province?

11          MS. WING:  Bricks and then I believe the scaffolding

12   people were in there as well.

13          MS. HERRING:  There was a --

14          MS. WING:  There's one other sub sub.

03:41:16   15   MS. HERRING:  That filed a mechanic's lien action

16   against --

17          THE COURT:  That's what happens in the mechanics

18   lien -- in front of the mechanics lien judges in the Daley

19   Center.  That's why they exist.  All of the mechanics liens

03:41:27   20   get filed, and they get put in front of one judge in one case.

21   That's the way it works.  That's always been the way it works

22   since before I was a lawyer, which is a long time ago.

23          So, we're talking about the same thing.  We're

24   talking about mechanics lien claims that ended up in

03:41:41   25   litigation.

1          Okay.  So now we're back to my question:  Explain to

2     me why it is that that's not relevant to have all these

3     lawsuits going on.

4          MS. HERRING:  Judge, the fact that there is one or

03:41:49    5     one consolidated lawsuit regarding a mechanic's lien is

6     relevant.  The mechanics lien issue is relevant.  There are

7     other lawsuits -- to the extent that there are other lawsuits

8     against --

9          THE COURT:  What are the ones you're afraid -- what

03:41:57   10     are the ones you want me to keep out?  Let me try it that way.

11          MS. HERRING:  There's one regarding a plumbing issue.

12     There's one against one of the defendants individually.  There

13     are some out there that have nothing to do with construction

14     at all.

03:42:13   15          THE COURT:  Is any of that stuff stuff that you're

16     going to put in?

17          MR. LIBMAN:  No.

18          THE COURT:  Okay.  Problem solved.

19          MS. HERRING:  Okay.

03:42:20   20          THE COURT:  So if that -- if anything changes, you've

21     got to tell me before you can do it.  So I think Motion No. 3

22     is basically moot based on the discussion here.

23          All right.  So then the other thing is attorneys'

24     fees.  So let me make sure I'm getting exactly what the

03:42:38   25     plaintiff is proposing to do.  You want to ask for what --

1  exactly what categories of attorneys' fees is part of the

2  damages?

3         MS. WING:  We want to ask for attorneys' fees under

4  the fraud claim for willful conduct.

03:42:51  5         THE COURT:  Is it your attorneys' fees incurred in

6  this case, or is it attorneys' fees incurred in defending this

7  other litigation or both or what?

8         MS. WING:  Attorneys' fees incurred in this case.

9         THE COURT:  In this case, okay.

03:43:02  10        And that's -- the whole attorneys' fees issue is

11  about the fees in this case.

12        MS. WING:  Correct.

13        THE COURT:  And I assume it's going to be the client

14  representative who's writing the check is going to be

03:43:12  15  testifying about that?

16        MS. WING:  Yes.

17        THE COURT:  Okay.  And do you know what the number

18  is?

19        MS. HERRING:  I do not, your Honor.

03:43:17  20        THE COURT:  What's the number?  What's he going to

21  say, he or she?

22        MS. WING:  I don't know it either.

23        THE COURT:  Oh, come on, somebody's got to know it.

24        How many digits to the left of the decimal point is

03:43:27  25  it?  Five, six or seven?  Is it tens of thousands, hundreds of

1  thousands or millions?

2      MS. WING:  Six.

3      THE COURT:  Okay.  So it's six digits to the left of

4  the decimal point.  Is the first of the six digits likely to

03:43:41  5  be greater than 5?

6      MS. WING:  Yes.

7      THE COURT:  Okay.  So we know it's between half a

8  million and a million bucks.  All right.  Whose this

9  testimony -- if I let it in, who's it coming from?

03:43:50  10      MS. WING:  It will come from Rodrigo Chapur, the

11  principal of NHC.

12      THE COURT:  Okay.

13      All right.  So, I'll be blunt with you.  I have to do

14  more reading of these cases in order to come up with a

03:43:59  15  decision on that, so I'm not going to decide it now.  But if

16  there's anything more you want to tell me now that you've kind

17  of heard what it is they're talking about, now is the time.

18      MS. HERRING:  Judge, if you will allow

19  Mr. Cocciemiglio to talk about this --

20      THE COURT:  I'll allow anybody who's got a microphone

21  in front of them to talk.

22      MR. COCCIEMIGLIO:  So, your Honor, if they're going

23  to introduce or if they're going to attempt to introduce

24  testimony as to their attorneys' fees, we're saying it's not

03:44:19  25  relevant because it's not recoverable.  The Illinois common

1   law fraud --

2        THE COURT:  That's the cases that I've got to read a

3   little bit more carefully than I've already done.

4        MR. COCCIEMIGLIO:  Right.  So to the extent they

03:44:28   5   would try to introduce testimony, we'd object to relevance.

6        THE COURT:  This is basically a straight relevance

7   issue, right?  It's can you recover your incurred attorneys'

8   fees as part of attorneys' fees under a fraud claim or not,

9   right?

10        MRL. COCCIEMIGLIO:  Correct.

11        THE COURT:  Does everybody agree that's the issue?

12        MS. WING:  Yes.

13        THE COURT:  Okay.  I'll decide that by the middle of

14   next week, and it will be some sort of a short written order.

03:44:50   15        Okay.  So I think the only other motion that we have

16   to talk about is the one that I left in my office that got

17   filed yesterday, so let me go grab that.

18        MS. HERRING:  Judge, I have one other point regarding

19   the Ms. Dayna Anderson motion in limine if you allow it?

03:45:04   20        THE COURT:  Yeah, go ahead.  Sure.

21        MS. HERRING:  There was another argument in our

22   motion that was not addressed today regarding prejudgment

23   interest.  She says in her last opinion, I'll read that to you

24   as well:  "NHC's damages including prejudgment interest

03:45:17   25   resulting from Centaur's actions and inactions total," you

1  know, 22 million and change.

2  THE COURT:  So is the issue whether prejudgment

3  interest is recoverable or not?

4  MS. HERRING:  Whether Ms. Anderson can testify to

03:45:29  5  prejudgment interest.

6  THE COURT:  Doesn't that involve just working with a

7  calculator?

8  MS. HERRING:  Well, Ms. Anderson is not a lawyer or a

9  judge.  She's not the one that's going to be deciding whether

03:45:43  10  or not prejudgment can be awarded here.

11  THE COURT:  Right, because it's going to be the jury,

12  right?

13  MS. HERRING:  Yes.

14  THE COURT:  They're not a lawyer or a judge either.

03:45:50  15  MS. HERRING:  Correct.

16  THE COURT:  Okay.  So what's the problem with her

17  testifying about it?

18  MR. COCCIEMIGLIO:  Your Honor, her opinion, as she

19  stated in her deposition, is based entirely on representations

03:45:59  20  from counsel.  So she's proffering NHC's --

21  THE COURT:  Give me a for instance.  What sorts of

22  things that she got from counsel.

23  MR. COCCIEMIGLIO:  Well, let me go to the motion, I

24  believe, cite exactly to that.

03:46:14  25  THE COURT:  Yeah, just rest assured that I did not

1    retain a mental picture of all 2,227 pages of the motions,

2    exhibits and pretrial order.  That's why I'm asking the

3    question.

4              MR. COCCIEMIGLIO:  Sure, one question.

03:46:26    5              THE COURT:  That's a real count, by the way.

6              MR. COCCIEMIGLIO:  Okay.  So in her deposition,

7    Ms. Anderson stated that her basis for this opinion was

8    relying entirely on the assumption that was provided to her by

9    NHC's counsel.

03:46:44    10              THE COURT:  What do you understand the assumption to

11    have been that she was relying on?

12              MR. COCCIEMIGLIO:  That she was entitled to

13    prejudgment interest, and this is how much it is.

14              THE COURT:  Oh, okay.  The assumption is entitlement

03:46:56    15    to it.

16              MR. COCCIEMIGLIO:  Well, I believe the calculation is

17    based off the same.

18              THE COURT:  Okay.  I guess you're missing my point.

19    Are you saying that counsel for the plaintiff told her, okay,

03:47:05    20    Ms. Anderson, the amount of prejudgment interest is X and just

21    told her the X and she just regurgitates that, or -- I think

22    that's extraordinarily unlikely, okay?

23              I think you're talking about something else, that she

24    relied on some underlying assumptions that were given to her,

03:47:21    25    and what I'm trying to find out is what those assumptions are.

1        MS. HERRING:  What prejudgment interest is and that

2  it's recoverable in a lawsuit.

3        THE COURT:  Guys, seriously, we're spending time in a

4  courtroom on this?

03:47:33  5        The motion is still overruled.  It's a proper subject

6  of testimony.  It's a calculation.  The entitle -- you know,

7  there's going to presumably be an instruction about the

8  circumstances under which prejudgment interest is recoverable.

9  If there isn't, you'd best be about the proposition of

03:47:50  10  drafting one, and the jury's going to have to make a decision

11  about it.

12        And, you know, you don't have to be -- you don't have

13  to be able to give a short course in contract law or

14  construction law to be able to testify about something like

03:48:02  15  this.  You just don't.

16        Okay.  So I've ruled on all the motions in limine.

17  I'm going to go grab the one that was filed yesterday.  I'll

18  be right back.  Don't go anywhere.

19      (Pause.)

03:49:13  20        THE COURT:  Okay.  So the last motion is Document

21  No. 188, which got filed yesterday.  Motion to compel NHC to

22  produce Manuel Nunez, N-U-N-E-Z, and Antonio Alonso, spelled

23  like Judge Alonso, to testify at trial or for a missing

24  witness instruction.

03:49:32  25        So here's my question.  I take it from this motion

1  that these people had their depositions taken.  Why isn't this

2  like any other witnesses who can't appear at trial that you

3  use their depositions?  What's inadequate about that?

4         MS. HERRING:  The allegations of fraud against all

03:49:45  5  three of the defendants, Judge, have changed significantly

6  since his deposition was taken.

7         THE COURT:  When were the depositions taken -- I

8  mean, there was a bunch of exhibits attached to this, but

9  given the timing of it, I didn't have a chance to read all of

03:49:55  10  it.

11         So when were the deps taken?

12         MS. HERRING:  Mr. Nunez's deposition was in October

13  of 2020.  Mr. Alonso's was in January of 2021, I believe.

14         THE COURT:  And when you say the allegations of fraud

03:50:06  15  have changed since then, in what way have they changed?

16         MS. HERRING:  So if you compare, your Honor, the

17  third amended complaint with, for example, the jury

18  instructions that were filed last week, the itemizations of

19  the fraudulent conduct, the alleged misrepresentations, have

03:50:23  20  changed significantly against all three of the defendants.

21         THE COURT:  So tell me -- I can pull up the jury

22  instruction.  So which proposed jury instruction is it?

23         MS. HERRING:  It's Document 172-11.

24         THE COURT:  Dash 11, okay.

03:50:38  25         MS. HERRING:  Page 30 to 32.

1    THE COURT:  All right.  Give me just a second to get
2  there.
3    Why isn't this working for me?  Page 30 of 32.  Oh,
4  it's, like, (i) through (x)?
5    MS. HERRING:  I'm sorry.
6    THE COURT:  It's (i) through (x) in proposed Jury
7  Instruction 21?
8    MS. HERRING:  Exactly, yes.
9    THE COURT:  So which ones of those were changed after
03:51:04  10  the depositions were taken?
11    MS. HERRING:  They're all changed.  If you compare
12  that with Document 26 and the allegations --
13    THE COURT:  That's the most recent version of the
14  complaint?
03:51:15  15    MS. HERRING:  It is, your Honor.
16    THE COURT:  Give me a second to pull that up.
17    Okay.  Where do I look in the third amended complaint
18  for the comparison?
19    MS. HERRING:  Page 18 of 25 is an example.
03:51:42  20    THE COURT:  Let me get there.  18 of 25.
21    Okay.  So I'm on page 18, and there's -- on pages 18
22  and 19 there's three kind of long bullet points about false
23  representations by Mr. Tsaparas?
24    MS. HERRING:  Yes, and that continues on page 19 with
03:52:08  25  some allegations against Mr. Alexopoulos.

1    THE COURT:  That's Peter?

2    MS. HERRING:  Yes.

3    THE COURT:  Got it.  So it's paragraph basically 61

4  through 63.  So you're telling me that if I read those and

03:52:28   5  whatever other paragraphs of the complaint might describe what

6  the false representations were, it's not going to map onto

7  what you have here in the jury instruction.

8    MS. HERRING:  So -- yes.  Can I give you an example?

9    THE COURT:  Please.

03:52:41  10    MS. HERRING:  The allegations against Peter

11  Alexopoulos are itemized on page 19, and they deal with

12  signing of a contractor's application.

13    THE COURT:  Okay.

14    MS. HERRING:  Now in the jury instructions filed last

03:52:54  15  week, they are alleging that Mr. Alexopoulos has made false

16  statements of material fact regarding the project being on

17  budget or the project being on schedule.  None of those things

18  were in this complaint.

19    THE COURT:  Were representations about those two

03:53:10  20  things attributed to Mr. Tsaparas?

21    MS. HERRING:  Yes.

22    THE COURT:  So is the real problem with

23  Instruction 21 that it doesn't break down which defendant is

24  claimed to have made which representation?

03:53:21  25    MS. HERRING:  Well, Judge --

1                THE COURT:  Because that's what I'm getting out of

2    what you just said, that being on budget and being on scale

3    wasn't what they alleged Alexopoulos did.  It's what they

4    alleged Tsaparas did.

03:53:33    5                MS. HERRING:  They alleged Tsaparas did that at the

6    time of the complaint, and at the time Mr. Nunez's deposition

7    was taken, there were none of those allegations against

8    Mr. Alexopoulos, so those questions were not asked.

9                THE COURT:  Okay.  So let me ask a question.  Let's

03:53:46    10   just focus with that little narrow example.

11               Is it right now currently the plaintiff's contention

12   that Mr. Tsaparas, in other words, Spiro as opposed to Peter,

13   made misrepresentations about the hotel project being on

14   budget and about it being on schedule?

03:54:02    15               MS. WING:  Yes.

16               THE COURT:  Okay.  And is it your contention that I

17   can find those in the third amended complaint somewhere?  And

18   if so, point me where.

19               I'm not saying that's necessary.  I'm just trying to

03:54:15    20   deal with the argument on its own terms first.

21               MS. WING:  We believe in that page 18 of the third

22   amended complaint, there are the allegations about

23   Mr. Tsaparas making representations about the schedule and

24   budget.

03:54:29    25               THE COURT:  Which one is Mr. Tsaparas, that's Spiro?

1       MS. WING:  Spiro.

2       THE COURT:  No, no.  I think the question was whether

3  you had attributed that to Mr. Alexopoulos.

4       MS. WING:  No, we never did, nor do we now.

5       THE COURT:  Okay.  So that gets me back to my

6  question.

7       So is the real problem with Instruction No. 21 that

8  it -- that really the contention is it ought to be broken

9  down, that we contend that Tsaparas did this, we contend that

10  Alexopoulos did that?

11       Of course, the contention is going to be they were

12  all acting on behalf of Centaur at the time, I assume, but --

13  so let me ask -- let me put the question this way,

14  Ms. Herring.

15       Is there any misrepresentation that's identified in

16  items (i) through (x), Roman numerals (i) through (x), of

17  Instruction No. 21 that wasn't attributed to somebody in the

18  complaint?  That's my question.

19       In other words, is there any brand new

20  misrepresentation in there that wasn't referenced in the third

21  amended complaint at all?

22       MS. HERRING:  Generally, no.  Specifically, some of

23  the wording is significantly different, but the general

24  concepts, no.

25       THE COURT:  Okay.  So if this -- if the wording of

1    this instruction is your basis for the contention that the

2    depositions of the two witnesses, Nunez and Alonso, isn't good

3    enough, the remedy isn't to exclude their depositions.  The

4    remedy is to tailor this instruction a little bit better.

03:56:11    5    MS. HERRING:  Your Honor, I had meet-and-confer

6    correspondence on the phone with my opponents, and they told

7    me that they intend to move forward with all of these

8    itemizations of fraud against all three of the defendants.

9    THE COURT:  Yeah, okay.  So hang on one second here.

03:56:36    10    I get what you're telling me, but I guess I'd really

11    prefer to have an answer to my question.

12    So, look, basically what you're telling me is that

13    now the defendants are attributing a misrepresentation to

14    Tsaparas that in the complaint was attributed to Alexopoulos

03:57:04    15    and vice-versa, and that there's more than one in each of

16    those categories and that at the time of the depositions, each

17    misrepresentation kind of had an identified misrepresenter

18    with it.  And, therefore, the deposition isn't good enough

19    because we didn't get to ask questions about, well, did Peter

03:57:23    20    Alexopoulos say that the project was on schedule and under

21    budget?

22    MS. HERRING:  Yes, your Honor.

23    THE COURT:  Okay.  But -- so my question was isn't

24    the remedy about -- isn't the remedy for that to just maybe to

03:57:39    25    tailor the instruction a little bit better?

1    MS. HERRING:  So, your Honor, in addition to that, I

2  would ask for all of these issues against Mr. Alexopoulos that

3  did not appear in the complaint to be barred.  They cannot

4  argue that he made false statements of material fact.

03:57:53    5    THE COURT:  Is there no such thing of vicarious

6  liability?  Centaur is a defendant, correct?

7    MS. HERRING:  Yes, but we're talking about fraud

8  against an individual, Peter Alexopoulos.

9    THE COURT:  Well, is the entity also a defendant on

03:58:05    10  the fraud claim?

11    MS. HERRING:  It is.

12    THE COURT:  So how could I bar it?  If anybody made

13  the misrepresentation acting within the scope of his

14  employment with the entity, the scope of his authority with

03:58:16    15  the entity, it's got to come in against the entity.  I mean,

16  maybe there's -- maybe you get an instruction at some

17  appropriate point that says when you're considering the

18  individual liability of A or B, then you can only consider

19  what they did, although my guess is there's probably going to

03:58:33    20  be some form of evidence that they were acting in concert and,

21  therefore, each -- what each did is attributable to the other,

22  but I don't see why it's anything better than that, and I

23  don't see why it's excluding a deposition.  I'm still not

24  getting anywhere close to that.

03:58:47    25    MS. HERRING:  The issue is not the liability imputed

1  to Centaur, it's the liability that's imputed to Peter that I

2  did not have an opportunity to ask these two men that have now

3  disappeared about.

4      THE COURT:  Okay.  Let me hear from the plaintiff on

03:59:01  5  this.

6      MR. LIBMAN:  Judge, we believe at the time the

7  depositions were taken, you know, defendants' counsel had a

8  chance to ask them whatever questions they wanted to.  They're

9  more than a hundred miles away now.  You know, we represented

03:59:14  10  them at their depositions as individuals associated with an

11  affiliated entity.

12      We have no way to compel these people to come and

13  testify any more than the defendants do at this point.

14      THE COURT:  Okay.  So let me ask this specific

03:59:26  15  question then:  So is -- is part of the claim going to be, the

16  fraud claim against individual defendant A going to be that

17  individual defendant A is not just responsible in fraud for

18  the representations that he made, he's also responsible for

19  the representations that individual defendant B made?

03:59:50  20      Is that contention going to be made?  Just a yes or

21  no.

22      MR. OREWILER:  Yes, with respect to payment

23  applications.  Otherwise, no.

24      THE COURT:  Hang on a second.  Let me make sure I'm

04:00:02  25  getting that.

1        MR. OREWILER:  Can I explain that?

2        THE COURT:  Yeah, yeah, I need you to actually.

3        MR. OREWILER:  So generally no, but the payment

4   applications were signed by one individual defendant, and they

04:00:11   5   were sent at the instruction of the other individual defendant

6   on behalf of the company.  So the payment applications are all

7   three.  Otherwise, no.

8        THE COURT:  Okay.  And what do you -- so -- and

9   that's in the complaint.  I'm looking at paragraph 62.

04:00:36   10  Paragraph 62 talks about Mr. Alexopoulos making false

11  representations in a payment application.

12       And then down at the end, the second-to-last sentence

13  of that paragraph says that -- and I'm using last names, not

14  first -- with Alexopoulos's knowledge and at his instruction,

04:00:54   15  Tsaparas emailed the contractor's application for payment, et

16  cetera.  That's what you're talking about?

17       MR. OREWILER:  Yes, your Honor.

18       THE COURT:  Okay.

19       MS. HERRING:  Judge, can I provide a little bit of

04:01:06   20  factual background on this?

21       THE COURT:  This is kind of your last shot on this

22  motion, so go ahead and give me what you want to give me.

23       MS. HERRING:  Judge, Mr. Alexopoulos was not hands-on

24  involved in the day to day of this construction project.  He

04:01:18   25  did sign these payment applications, but his testimony is that

1  he was not the one communicating with NHC.  He was not the one

2  that rolled up his sleeves and was coordinating the

3  construction on this project.

4  Now all of these new allegations have popped up

04:01:32  5  against him regarding things that are very detailed, like the

6  budget and the schedule for the project that he was not

7  involved in in any way.  That's why I need to talk to these

8  two witnesses because I did not have an opportunity to talk to

9  NHC's financial accountant and project accountant about false

04:01:47  10  statements potentially made by Mr. Alexopoulos because these

11  claims were not in this case at that time.

12  THE COURT:  Is that who these two guys are, they're

13  accountants?

14  MS. HERRING:  The project accountant and the CFO,

04:01:57  15  your Honor.

16  THE COURT:  Was there any testimony by them that they

17  had any direct communications with Mr. Tsaparas or

18  Mr. Alexopoulos?

19  MS. HERRING:  Yes, your Honor.  Manuel Nunez --

04:02:08  20  THE COURT:  Oral communications as opposed to stuff

21  that was sent?

22  MS. HERRING:  Yes, your Honor.  Mr. Nunez flew here

23  to meet with my clients at their office.

24  THE COURT:  Okay.  And I'm just going to quote back

04:02:18  25  to you what you just said.

1          Mr. Nunez flew here to meet with my clients at their

2     office.  So when you took his deposition, did you ask him

3     about those meetings?

4          MS. HERRING:  I asked him about his communications

04:02:27    5     with Mr. Tsaparas regarding all of these --

6          THE COURT:  Okay.

7          MS. HERRING:  -- budget issues.

8          THE COURT:  So when I look at the deposition, which

9     I'm going to have somebody email me before 5:00 today and I'm

04:02:38   10     going to look at sitting in my living room tonight, you're

11     going to -- when I look at your questioning of him about these

12     deposition -- about these meetings, the questioning is just

13     going to be about what one guy said to you, not about what

14     anybody else said to you?  Not what happened at the meeting,

04:02:54   15     what else happened at the meeting, there's not going to be any

16     question like that.

17          MS. HERRING:  It is -- Judge, I can't tell you

18     exactly what I asked in the deposition.

19          THE COURT:  If you're a reasonably careful lawyer,

04:03:05   20     you probably attempted to exhaust his recollection about

21     everything that happened at the meeting because that's what

22     people do in depositions.  So -- so before, you know, you're

23     telling me right now that I only asked about what one guy said

24     to him, not about anything else, not -- didn't exhaust his

04:03:20   25     recollection of what happened at these meetings.

1          So before I sit down in my living room tonight and

2     read these depositions and take time to do that, you don't

3     want me to find out that you're giving me a wrong story on my

4     own.  That's what I'm trying to get across to you.  You don't

04:03:39   5     want that to happen.

6          MS. HERRING:  Understood.

7          THE COURT:  So when I read the depositions, is there

8     going to be something where it's obvious that what's happening

9     is somebody's completely exhausting the recollections of what

04:03:55  10     happened at the meeting?

11          MS. HERRING:  All I can tell you, and I don't want to

12     tell you the wrong thing, is that I did not focus --

13          THE COURT:  Gosh darned right, you don't.

14          MS. HERRING:  I did not focus on alleged false

04:04:05  15     statements made by Mr. Alexopoulos with regards to all of

16     these issues because there were no claims against him

17     itemizing these things.

18          THE COURT:  Okay.  So was there testimony about who

19     was in the meetings -- we're talking about Mr. Nunez, right?

04:04:17  20          MS. HERRING:  Yes.

21          THE COURT:  Is there testimony about who was in the

22     meetings with him that you're talking about here?

23          MS. HERRING:  There is, yes.

24          THE COURT:  Who?

04:04:25  25          MS. HERRING:  That's --

1       THE COURT:  Who?

2       MS. HERRING:  Mr. Tsaparas.  There was discussion

3  with Abby Gutierrez who's a representative of Deloitte.

4       THE COURT:  Okay.

04:04:33     5       MS. HERRING:  But it's not -- not just the meetings,

6  Judge.

7       THE COURT:  See, I'm now going to exhaust your

8  recollection here.  Was there testimony about who all was

9  present at the meetings that we're talking about?

04:04:45    10       MS. HERRING:  I believe so, yes.

11       THE COURT:  Okay.  And you had opportunities to ask

12  those questions.

13       MS. HERRING:  I did.

14       THE COURT:  Okay.  And did you ask about

04:04:52    15  Mr. Alexopoulos being there?

16       MS. HERRING:  I would guess yes.

17       THE COURT:  I would -- I would bet money on it.

18       MS. HERRING:  Yes.

19       THE COURT:  Okay?

04:04:59    20       So I'm not seeing there as being anything material

21  that has been -- that has changed since the deposition that

22  would make the depositions inadequate, that would make these

23  witnesses different from any other witness.  There's no

24  obligation to bring even witnesses who are under corporate

04:05:16    25  control in from out of state.  It's commonly done, but there's

1    no obligation to do that.

2         The hundred mile -- the subpoena power has been what

3    it is in the Federal Rules of Civil Procedure since before I

4    was born, okay, and since before I was practicing law.  It

04:05:31    5    hasn't changed.  That's why there are depositions.

6         The assumption when you depose anybody, even if

7    they're like the key person in the case, has got to be this

8    person could die, get sick, or not be able to come to trial

9    for one reason or another, and you take it accordingly.  And

04:05:45    10   to say it again, I'm not seeing anything material that's

11   changed here that would make the depositions inadequate, so

12   the motion to compel is denied.  And I'm not seeing a basis

13   for a missing witness instruction either.

14        So now we're done with all of this.  So let me just

04:05:59    15   talk about a couple of other things here.

16        I am absolutely dead serious about the amount of time

17   you folks have for this case.  Now, I can bump a little bit, I

18   can bump the end of those days a little bit.  So a 26-hour

19   trial, not including jury selection, really amounts to about a

04:06:18    20   30-hour trial because jury selection is included.

21        Historically in this building, that would have been a

22   seven-day trial.  We're going to have longer days, so it's a

23   five-day trial.  I don't have a single date beyond that.  I'm

24   getting on a plane at 1:00 in the afternoon on Friday, the

04:06:33    25   19th of August, and I have no choice on that.  So that's going

1    to be the day after we finish the trial.

2         I might be able to be around that morning for jury

3    deliberations.  It's my intention if the jury hasn't reached a

4    verdict to have another judge available to take a verdict, and

04:06:47    5    I'll be available for any questions that come back.  But the

6    times are solid.

7         I can bump the end of the day a little bit, but at

8    some point, you're imposing too much on jurors.  One of the

9    things that I am concerned about here is that I think there

04:06:59    10    have been references at one or more of the status hearings

11    about witnesses who require an interpreter.

12         How many witnesses are there like that, and who are

13    they?

14         MS. WING:  Two, and they're both very short

04:07:10    15    witnesses.

16         THE COURT:  You mean they're below five foot six?

17         MS. WING:  Very little patience?

18         THE COURT:  They're not going to testify for a very

19    long time.

04:07:18    20         MS. WING:  They are both witnesses called by us.

21         THE COURT:  Okay.  So, and I know there was some

22    correspondence by somebody with my courtroom deputy clerk that

23    official court interpreters aren't allowed to work on civil

24    cases, so you guys are on your own.  Do you have somebody?

04:07:31    25         MS. WING:  We do.

1          THE COURT:  Are they going to do -- here's the key.
2   Are they doing simultaneous?
3          MS. WING:  Yes.
4          THE COURT:  Yay.
04:07:37    5          Okay.  And are these live witnesses or video
6   witnesses?
7          MS. WING:  They are live witnesses.
8          THE COURT:  Double yay.  Okay.  So you've got that
9   covered.
04:07:44   10          All right.  Are they people who are sometimes on
11  contract with the court?  Because I know there was a list of
12  those that was out there or do you know?
13          MS. WING:  The woman that we've retained comes from
14  the list from the court.
04:07:54   15          THE COURT:  Who is it?
16          MR. LIBMAN:  Moira Pujols.
17          THE COURT:  Oh, yeah, I know her.  She's good.
18          All right.  So let me just -- just so you know that
19  some of the sort of personal quirky things.  I -- under normal
04:08:12   20  circumstances, I would have -- I would permit jurors to ask
21  questions.  I'm going to dispense with that because that takes
22  away from time.  It's historically not a feature of jury
23  trials.  It's something I've done for some number of years,
24  but it's not necessary and so we're not going to have that.
04:08:26   25          You won't -- I know Ms. Wing has tried a couple cases

1  in front of me before.  That instruction is not going to be in

2  the preliminary instructions, so we're not going to have that.

3  I give -- I will send you probably over the weekend a

4  draft of the written questionnaire that the prospective jurors

04:08:46  5  will fill out.  They will come in on Wednesday of next week to

6  get their COVID test and fill out the questionnaires.  We'll

7  have the questionnaires available on Thursday.  You can look

8  at them, but you can't contact anybody, you can't disseminate

9  names, addresses, or anything else to anybody, but the

04:09:00  10  questionnaires will be available, a copy of them will be

11  available from Melissa.

12  Those will all be filled out then.  I will send you a

13  draft of that over the weekend by email.  If I can get

14  maybe -- if I can get somebody to get out a sheet of paper and

04:09:14  15  put all six email addresses on it, I'll send it to all of you,

16  and I'll basically ask for comments back by a particular point

17  in time on Monday with a copy to everybody else.

18  I have to get that questionnaire to the jury

19  department on Tuesday.  So I'll deal with any additions,

04:09:29  20  subtractions, objections you have, I'll give you the final

21  version.  That's the one that will go to the jury.  That's the

22  first thing.

23  The second thing you'll get from me, and this will

24  come after the -- and probably not until Monday, quite

04:09:40  25  honestly, after the questionnaire, is going to be a draft of

1  the preliminary jury instructions.  So it's my usual practice

2  to instruct the jury at the beginning of the case not just on

3  the general stuff on what their duties as a jury is, but at

4  least on the elements and outlines of the claims and defenses

04:09:57  5  they're going to be deciding so that they know what the case

6  is about to some extent and what they're going to have to

7  decide at the beginning.

8  I will read those and display them on the screens for

9  the jury before the opening statements.  It's probably about

04:10:13  10  15 minutes worth of time.  That doesn't count against

11  anybody's time, by the way.

12  I will get you a draft of those probably Monday.

13  Again, I'll ask for comments back with a copy to the other

14  side.  We'll come up with a final version, and I'll let people

04:10:26  15  put any objections on the record at some point before you give

16  opening statements.

17  That's the second thing.

18  The third thing is I am -- unless we get derailed by

19  somebody getting COVID, okay, I am as sure as I can possibly

04:10:42  20  be that we will have a jury before the lunch break on Friday.

21  Not by lunch, before the lunch break.  The last civil jury I

22  picked I think we had a jury by 11:00 starting at 9:15, and

23  part of that is because having filled out the questionnaires,

24  it just speeds up the process.  I'll talk about the logistics

04:11:00  25  of the jury selection once we get offline here.

1       The reason I'm telling you this now is that you need

2  to be prepared to give openings potentially before lunch and

3  absolutely to put on witnesses at least after lunch through

4  the end of the day, and you really don't want to run out of

04:11:15    5  witnesses before the end of the day.  So if that means some

6  witness has to be on hold or waiting, you know, life is tough

7  on witnesses.  That's kind of what that means.

8       At the end of the case, I will instruct the jury

9  before closing arguments.  They'll all have instructions in

04:11:30   10  their hand at that point.  It's perfectly proper for people to

11  read from, quote from, or put up on the screen anything in the

12  jury instructions because the jury will have them all by then.

13       All the questioning on voir dire will be done by me.

14  At the end, I'll ask if people have any questions for any

04:11:50   15  particular jurors on any particular points.  Presumably I'll

16  ask those unless I think they're unreasonable, but there won't

17  be attorney voir dire.

18       Just doing a mental inventory here.

19       I think that's everything.

04:12:03   20       Oh, on exhibits.  I said this in the order about

21  trial time limits.  It is in your mutual interest not to be

22  fighting about foundations for exhibits.  I've got to think

23  that everything in this case is somebody's business record

24  admissible under 803(6).  My very strong advice to you is

04:12:22   25  overcome your visceral -- your visceral views that everything

1    the other side wants to put in must be excludable and

2    stipulate to the foundations or agree to the foundation so we

3    don't have to worry about that because that's going to count

4    against your time, and the time is precious.

04:12:38    5    So, that's pretty much everything I have to say other

6    than the logistical stuff we'll talk about offline.

7    So what issues, questions, comments, things that

8    people want to bring up, starting with the plaintiff?

9    MS. WING:  Judge, with regard to the witnesses who

04:12:51    10    are going to testify via deposition designation --

11    THE COURT:  Yeah.

12    MS. WING:  -- do you have a preference for how that

13    is presented?  I like to bring a support staff person and

14    read.

04:12:58    15    THE COURT:  Thank you for bringing that up.

16    So, first of all, it's fine if you want to have

17    somebody sit up there and read the witness's stuff.  I will

18    tell the jury that this isn't the real witness and that

19    they're not to read anything in the person's intonation and

04:13:11    20    how they read it.  It's just the words on the page.

21    I will -- this is one thing I did not look at.  I

22    know I've got designations and objections.  What I don't know

23    that I have is do I have the depositions?  Do I have the

24    transcripts so I can rule on the designations?

04:13:32    25    MR. OREWILER:  Yes, your Honor.  We filed them.

1          THE COURT:  Is it -- is it part of the pretrial

2     order?  Is it somewhere else?

3          MR. OREWILER:  It's --

4          THE COURT:  Oh, it's part of the pretrial order.  I'm

04:13:41    5     seeing it.

6          Okay.  So what I'm not seeing, and this may be a

7     function of having downloaded them onto a device, do -- did

8     people kind of highlight the objected-to part in the

9     transcripts?

04:14:00   10          MR. OREWILER:  We did not, your Honor.  We'd be happy

11     to do that.

12          THE COURT:  Okay.  How many depositions are we

13     talking about altogether that I'm going to have to rule on?

14          MR. OREWILER:  There's only one to which objections

04:14:09   15     were raised.

16          THE COURT:  Here's what I'd like you to do, if you

17     wouldn't mind, if you can collectively do this.  I would

18     prefer to have it over the weekend, but that can mean 7:00

19     tomorrow night, though I would not advise staying until 7:00

20     tomorrow night to do this.

21          If somebody -- if you can go through and mark up in

22     one color what the designations are for each side and in

23     different colors what the objected-to parts are for each side.

24     It's just easier for me to go through them, and then send me

04:14:33   25     to my proposed order email address a PDF that has that on it.

1  You don't have to file it or anything like that.  It's just
2  for ease of reference.

3         And I will get you the rulings on those -- that
4  probably won't be over the weekend.  It will probably be like
04:14:48  5  Tuesday or something like that.

6         Other questions that you've got?

7         MS. WING:  The other thing about deposition
8  designations are when are we going to see defendants'
9  deposition designations for these witnesses that they wanted
04:15:01  10  to compel live?

11         THE COURT:  Okay.  So here's my suggestion:  Figure
12  that out, talk about it.

13         MS. HERRING:  We have provided them, your Honor, for
14  one of them, and that's what the objections are.

04:15:12  15         THE COURT:  You'll talk about it.

16         MS. HERRING:  Yeah.

17         THE COURT:  I just need if at some point that I can
18  rule on them before people actually have to use them.  I mean,
19  are these video depositions?

04:15:21  20         MS. HERRING:  No.

21         THE COURT:  So it's not a big cutting job or anything
22  like that, but I just need time, and I don't mind doing those
23  overnight the night before, that's not a problem, but just
24  make sure I get them at some point in time for the extra, the
04:15:33  25  two extra people or the one extra person.

                        MS. WING:  Yes.  So there's going to be two more that

they may possibly have designations to, and we obviously won't

have those to you tomorrow, but the ones that do exist right

now, we'll have to you by tomorrow.

04:15:43          THE COURT:  Again, I'm hoping that you can kind of

get this all worked out.

                        MS. WING:  Sure.

                        THE COURT:  Anything else you got that you can think

of you've got on your list?

04:15:50          MS. WING:  I don't -- the plaintiff doesn't have

anything else.

                        MS. HERRING:  I have a couple, Judge.

                        THE COURT:  The plaintiff.  Don't make that mistake

again.  You said defendant.  You're plaintiff.  I called you

04:16:00   defendant a couple times, too.

                        MS. WING:  Oh, goodness.

                        THE COURT:  Yeah.

                        MS. WING:  Plaintiff doesn't have anything further.

                        THE COURT:  There you go.

04:16:08          MS. HERRING:  Defendants do.

                        THE COURT:  Yeah, go ahead.

                        MS. HERRING:  Your standing order, your Honor, says I

should ask you if you want hard copies of the exhibits.

                        THE COURT:  No.

                        MS. HERRING:  Okay.

1           THE COURT:  I've got to change that thing.  I haven't

2 wanted a hard copy of anything for about ten years.

3           MS. HERRING:  My next question, Judge, is regarding

4 peremptory strikes for the jurors.

04:16:25  5           THE COURT:  Actually, the thing that I would like,

6 what I would like is, and you're going to need to do this

7 anyway.  So the exhibits, I assume you're going to project

8 them all, and when the jurors look at them, they look at them

9 on a system.

04:16:36  10           You're going to have to give Melissa, my courtroom

11 deputy clerk, a USB drive that's got all of your exhibits on

12 them.  Make an extra one for me, and that way if I need to

13 look at something, I can just put it on my laptop, and you can

14 talk to Melissa about the timing of that.

04:16:56  15           Whenever you give them to her is when you need to

16 give them to me.

17           Anyway, you were about to say.

18           MS. HERRING:  My next question is regarding

19 peremptory challenges, Judge.

04:17:05  20           THE COURT:  Three per side.

21           MS. HERRING:  Sorry?

22           THE COURT:  Three per side as the statute says.

23           MS. HERRING:  The statute says three per party,

24 Judge.

04:17:14  25           THE COURT:  Yeah, except the law is that if the

1  parties are aligned with each other, which they are, the judge

2  has the discretion --

3      MS. HERRING:  Correct.

4      THE COURT: -- to give or not give extras, and I'm

04:17:20  5  not.

6      MS. HERRING:  Okay.  Understood.

7      THE COURT:  Three per side.

8      MS. HERRING:  My last question, your honor, is you

9  gave me permission for defendant Tsaparas to take a PCR test

04:17:30  10  in Colorado.

11     THE COURT:  Yeah, yeah, yeah.  Because he's got to

12  travel in.

13     MS. HERRING:  He needs to take the test and I need to

14  send you the results on the 9th, which is the same day we're

04:17:35  15  going?

16     THE COURT:  Yeah, I think that makes sense.  Send it

17  to Melissa.

18     MS. HERRING:  Okay.  That was my next question.

19  Perfect.  That's all we have.

04:17:44  20     THE COURT:  Yeah, and then what will happen, just so

21  you know during the trial is that you'll have to retest

22  periodically.  It will probably end up being two times.  It

23  will probably be like either Friday and Wednesday or Monday

24  and Thursday.

04:17:55  25     We'll worry about that when the time comes.  You're

1  just going to pop down to the second floor on that.

2          MS. WING:  Judge, we'll be sending our client

3  representative's PCR test in through --

4          THE COURT:  Oh, yeah, same deal.  Take them on

5  Wednesday.  That's the key.

6          Okay.  Anything else anybody can think of?

7          MS. HERRING:  Not from us.

8          THE COURT:  Okay.  So I'm going to -- we're going to

9  go off the record.  I'm going to let the court reporter go,

10  and we're going to talk about logistics.  So, thanks, Kathy.

11      (Which were all the proceedings heard.)

12                      CERTIFICATE

13      I certify that the foregoing is a correct transcript from

14  the record of proceedings in the above-entitled matter.

15  */s/Kathleen M. Fennell*          *August 9, 2022*

16  Kathleen M. Fennell                    Date
    Official Court Reporter

17

18

19

20

21

22

23

24

25